No. 18-2759

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

DEON PATRICK,

Plaintiff-Appellee,

v.

CITY OF CHICAGO, ANTHONY VILLARDITA, THOMAS JOHNSON, RICK ABREU, TERRY O'CONNOR, SEAN GLINSKI, and MICHAEL BERTI,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 14 cv 3658
The Honorable Ronald A. Guzman, Judge Presiding

# BRIEF OF PLAINTIFF-APPELLEE

Stuart J. Chanen (Counsel of Record)
Nicole N. Auerbach
Ariel Olstein
VALOREM LAW GROUP
218 N. Jefferson St, Suite 300
Chicago, Illinois 60661
312-676-5460

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 18-2759

Short Caption: Patrick v. City of Chicago, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

[ ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Deon Patrick

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Valorem Law Group

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

---

Attorney's Signature: [signature] Date: August 29, 2018

Attorney's Printed Name: Stuart J. Chanen

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d). Yes X No ____

Address: 218 N. Jefferson Street, Suite 300, Chicago, IL 60661

Phone Number: (312) 676-5460 Fax Number: (312) 676-5499

E-Mail Address: stuart.chanen@valoremlaw.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 18-2759

Short Caption: Patrick v. City of Chicago, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Deon Patrick

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Valorem Law Group

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

---

Attorney's Signature: /s/ Nicole Nehama Auerbach Date: April 30, 2019

Attorney's Printed Name: Nicole Nehama Auerbach

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ____ **No** X

Address: 218 N. Jefferson Street, Suite 300, Chicago, IL 60661

Phone Number: (312) 676-5460 Fax Number: (312) 676-5499

E-Mail Address: nicole.auerbach@valoremlaw.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-2759

Short Caption: Patrick v. City of Chicago, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Deon Patrick

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Valorem Law Group

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

---

Attorney's Signature: /s/ Ariel Olstein Date: April 30, 2019

Attorney's Printed Name: Ariel Olstein

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ____ **No** X

Address: 218 N. Jefferson Street, Suite 300, Chicago, IL 60661

Phone Number: (312) 676-5460 Fax Number: (312) 676-5499

E-Mail Address: ariel.olstein@valoremlaw.com

## TABLE OF CONTENTS


**JURISDICTIONAL STATEMENT ... 1**

**STATEMENT OF THE CASE ... 1**

**Introduction ... 1**

**SUMMARY OF THE ARGUMENT ... 19**

**ARGUMENT ... 19**

**I. THE DISTRICT COURT NEITHER COMMITTED CLEAR ERROR NOR ABUSED ITS DISCRETION IN DENYING DEFENDANTS' POST-TRIAL SANCTIONS MOTION BASED ON PERJURY. ... 19**

**A. Defendants Have Waived or Forfeited Any Challenge to the District Court's Factual Findings. ... 19**

**1. Defendants have waived or forfeited their argument that the district court clearly erred in holding they were not prejudiced by Patrick's 1999 Affidavit. ... 20**

**2. Defendants have waived or forfeited their argument that the district court clearly erred in holding they were not prejudiced by Patrick's 2014 Interrogatory Response. ... 21**

**3. Defendants have waived or forfeited any argument about the Mixon Affidavit included in Patrick's verified 2004 petition because they failed to publish the exhibit to the jury or have that exhibit admitted. ... 22**

**4. Defendants have also waived or forfeited any challenge to the court's conclusion that even if prejudice existed, it was cured. ... 23**

**B. The District Court Did Not Abuse Its Discretion When It Declined To Sanction Patrick. ... 24**

**C. The Standard of Review ... 24**

**1. This Court should reject Defendants' argument that prejudice is an unnecessary factor in a sanctions motion. ... 25**

**2. The two false statements were not material. ... 28**

**3. The issue of perjury should not be taken away from the jury. ... 30**

**4. Defendants come with unclean hands. ... 32**

**II. THE DISTRICT COURT DID NOT ERR OR ABUSE ITS DISCRETION IN ADMITTING PATRICK'S CERTIFICATE OF INNOCENCE. ... 36**

A. Defendants Have Waived Their COI Argument in Their Post-Trial Motions and In This Court. ..... 36

B. The District Court Did Not Err or Abuse Its Discretion In Admitting the COI, Nor Did It Err or Abuse Its Discretion In Denying Defendants' Motion For New Trial Based On The COI. ..... 38

1. The COI had probative value. ..... 40

2. The COI did not unfairly prejudice Defendants. ..... 42

III. THE DISTRICT COURT DID NOT ERR OR ABUSE ITS DISCRETION IN DENYING DEFENDANTS' MOTION FOR POST-TRIAL RELIEF BASED ON CUMULATIVE ERROR ..... 47

A. Defendants Have Waived Their Cumulative Error Argument. ..... 48

1. Defendants waived their current cumulative error argument by not presenting it to the district court. ..... 48

2. Only preserved or plain errors may be considered as cumulative errors. ..... 49

B. The District Court Did Not Abuse Its Discretion In Rejecting Defendants' Cumulative Error Arguments. ..... 50

IV. THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ON FABRICATION OF EVIDENCE, AND THE JURY HAD SUFFICIENT EVIDENCE TO FIND LIABILITY. ..... 52

A. The District Court Properly Instructed The Jury on Fabrication of Evidence. ..... 52

1. Standard of Review ..... 52

2. The Instruction Was Complete and Correct. ..... 53

3. Neither *Manuel* nor *Lewis* are applicable here. ..... 57

4. The Evidence and Argument Guided the Jury to a Proper Consideration of Patrick's Fabrication Claim. ..... 58

5. Defendants Were Not Prejudiced by the Fabrication Instruction. ..... 59

6. The Court's Instruction Sufficiently Covered "Materiality." ..... 59

B. Even If Fabrication Instruction Given Was Error, It Was Harmless Error. ..... 60

C. The Jury Had Sufficient Evidence For Fabrication Liability. ..... 61

1. Standard of Review ..... 61

V. THIS COURT SHOULD UPHOLD THE JURY'S LIABILITY FINDINGS FOR FAILURE TO INTERVENE AND CONSPIRACY.................................................. 65

A. Defendants Were Properly Found Liable For Underlying Constitutional Violations.................................................................................................. 65

B. Defendants' Failure-To-Intervene and Conspiracy Arguments Should Be Rejected As Moot. ................................................................................................ 66

C. This Court Should Reject Berti's and Glinski's Assertion that they Cannot Be Liable for Conspiracy or Failure To Intervene........................................................ 68

CONCLUSION ............................................................................................................ 69

## TABLE OF AUTHORITIES

**Cases**


*Alvarez v. Boyd*, 225 F.3d 820 (7th Cir. 2000) ........................................ 48, 50, 51

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015)........................................ 55, 56

*Avery v. City of Milwaukee*, 40 F. Supp. 3d 1089 (E.D. Wis. 2014) ............ 40, 54, 55, 56

*Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838 (7th Cir. 2017).............................. 50

*Bruton v. United States*, 391 U.S. 123 (1968) ................................................ 16

*Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005) .......................................... 53

*Collins v. Illinois*, 554 F.3d 693, (7th Cir. 2009).............................................. 25

*Domka v. Portage County, Wis.*, 523 F.3d 776 (7th Cir. 2008)............................ 48

*Doornbos v. City of Chicago*, 868 F.3d 572 (7th Cir. 2017) ................................ 37

*Dotson v. Bravo*, 321 F.3d 663 (7th Cir. 2003) ................................................ 26

*Escamilla* v. *v. Jungwirth*, 426 F.3d 868 (7th Cir. 2005) .................................. 27

*Faigin v. Kelly*, 184 F.3d 67 (1st Cir. 1999)................................................ 42, 46

*Fednav Intern. Ltd. v. Contl. Ins. Co.*, 624 F.3d 834 (7th Cir. 2010) .................... 48

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ............................................ 56

*Figgs v. Dawson*, 829 F.3d 895, (7th Cir. 2016) ............................................. 22

*Fuery v. City of Chicago*, 900 F.3d 450 (7th Cir. 2018).................................. 25, 26

*Glickenhaus & Co. v. Household International Inc.*, 787 F.3d 408 (7th Cir. 2015) ............ 68

*Gonzalez v. Crosby*, 545 U.S. 524, (2005)...................................................... 24

*Grepke v. General Elec. Co.*, 280 F.2d 508 (7th Cir.1960) ................................. 64

*Harris v. City of Chicago*, 14 C 4391, 2018 WL 2183992 (N.D. Ill. May 11, 2018)............. 40, 42

*Hernandez v. HCH Miller Park Joint Venture*, 418 F.3d 732 (7th Cir. 2005) ................ 53

*Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018) ................................................ 55, 58

*Khorrami v. Rolince*, 713 Fed. Appx. 494 (7th Cir. 2017) .................................. 55

*Kitchen v. Burge*, 781 F. Supp. 2d 721 (N.D. Ill. 2011) ..................................... 68

*Kluppelberg v. Burge*, 84 F. Supp. 3d 741 (N.D. Ill. 2015)............................... 40, 42

*LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933 (7th Cir. 2019) ............................. 24

*Lavender v. Kurn*, 327 U.S. 645 (1946)......................................................... 64

*Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019) ............................ 55, 57, 58

*Logan v. Burge*, 09 C 5471, Dkt.423 (Court Order) (N.D. Ill. Oct. 19, 2012) ................ 40

*Manuel v. City of Joliet,* — U.S. —, 137 S.Ct. 911 (2017) .................................................... 57, 58

*Montano v. City of Chicago*, 535 F.3d 558 (7th Cir. 2008)....................................... 29, 30, 31, 32

*Monzidelis v. World's Finest Chocolate, Inc.*, 92 Fed. Appx. 349 (7th Cir. 2004) ...................... 24

*Newsome v. McCabe*, 2002 WL 548725 (N.D. Ill. Apr. 4, 2002) ......................................... 40, 44

*Ott v. City of Milwaukee*, No. 09-C-870, 2015 WL 1219587 (E.D. Wis. Mar. 17, 2015)...... 40, 44

*Puffer v. Allstate Ins. Co.*, 675 F.3d 709 (7th Cir. 2012)................................................ 36, 47, 48

*Ramirez v. T&H Lemont, Inc.*, No. 12-1268, Dkt.80 (N.D. Ill. Jan. 19, 2016), *aff'd*, 845 F.3d 772 (7th Cir. 2016) ........................................................................................ 27, 28

*Ray v. Clements*, 700 F.3d 993 (7th Cir. 2012).................................................................... 64

*Richman v. Sheahan*, 358 F. App'x 682 (7th Cir. 2009) ................................................ 36, 37, 38

*Saathoff v. Davis*, 826 F.3d 925 (7th Cir. 2016)............................................................... 53, 60

*Sanchez v. City of Chicago*, 880 F.3d 349 (7th Cir. 2018) ........................................................ 49

*Saunders-El v. Rohde*, 778 F.3d 556 (7th Cir. 2015)............................................................... 55

*Secrease v. W. & S. Life Ins. Co.*, 1:14-CV-00955-JMS, 2015 WL 275606 (S.D. Ind., Jan. 21, 2015)................................................................................................................... 26, 27

*Sheehan v. Donlen Corp.*, 173 F.3d 1039 (7th Cir. 1999) .......................................................... 62

*Susan Wakeen Doll Co. v. Ashton Drake Galleries*, 272 F.3d 441 (7th Cir. 2001).......... 52, 53, 58

*Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305 (7th Cir. 2002) .................................. 27

*Tolliver v. Northrop Corp.*, 786 F.2d 316 (7th Cir. 1986)........................................................... 25

*United States v. Allen*, 269 F.3d 842 (7th Cir. 2001)................................................................... 49

*United States v. Bradford*, 905 F.3d 497 (7th Cir. 2018)............................................................. 41

*United States v. Brown*, 822 F.3d 966 (7th Cir. 2016)................................................................. 50

*United States v. Cardena*, 842 F.3d 959 (7th Cir. 2016) ............................................................. 61

*United States v. Carson*, 870 F.3d 584 (7th Cir. 2017) .............................................................. 61

*United States v. Delgado*, 672 F.3d 320 (5th Cir. 2012) ............................................................ 49

*United States v. Dobek*, 789 F.3d 698 (7th Cir. 2015)................................................................. 61

*United States v. Jones*, 455 F.3d 800 (7th Cir. 2006) ................................................................. 45

*United States v. Nance*, 236 F.3d 820 (7th Cir. 2000)................................................................. 20

*United States v. Olano*, 507 U.S. 725, (1993)............................................................................ 19

*United States v. Thomas*, 321 F.3d 627 (7th Cir. 2003)................................................................ 42

*Viramontes v. City of Chicago*, 840 F.3d 423 (7th Cir. 2016)..................................................... 53

*White v. Fitzpatrick*, No. 18-1741, 2018 WL 6168633 (7th Cir. Nov. 26, 2018)......................... 55
*White v. Hefel*, 875 F.3d 350 (7th Cir. 2017)................................................................................ 58
*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012)............................................................ 54
*Williams v. Drake*, 146 F.3d 44 (1st Cir. 1998)............................................................................ 48
*Wipf v. Kowalski*, 519 F.3d 380 (7th Cir. 2008) ........................................................... 36, 37, 38

**Rules**

Fed. R. Civ. P. 28(a)(8)(B) ........................................................................................................ 50
Fed. R. Civ. P. 403.............................................................................................................. 36, 41
Fed. R. Civ. P. 56........................................................................................................................ 50
Fed. R. Civ. P. 60(b) ................................................................................................................... 24
Fed. R. Evid. 103 ............................................................................................................... 36, 38
Fed. R. Evid. 103(a)..................................................................................................................... 38
Fed. R. Evid 103(b).............................................................................................................. 37, 38

## JURISDICTIONAL STATEMENT

Appellants' jurisdictional statement is both complete and correct.

## STATEMENT OF THE CASE

### Introduction

Deon Patrick spent 21 years, one month and eight days in prison for murders he did not commit. After a six week trial, the jury found that Appellants are to blame.

Between December 2 and 5, 1992, four Chicago Police Department ("CPD") Detectives, Villardita, Johnson, O'Connor, and Abreu ("the Detectives"), rounded up, interrogated, and physically and psychologically abused Patrick and six other innocent young men at the Area 6 police station, and obtain seven coerced, fabricated, and interlocking confessions to two murders. The six others were Lewis Gardner (age 15), Daniel Taylor (17), brothers Paul and Akia Phillips (17, 19) ("Paul" and "Akia"), Joe Brown (20) and Rodney Matthews (22).

Approximately 24 hours after coercing the confessions, the Detectives learned there was proof that Taylor was actually in a CPD lockup when the murders occurred. Because the confessions were interlocking, proof that Taylor was in lockup at that time unraveled all seven confessions. Rather than releasing the seven, the Detectives, along with two District 23 (which is within Area 6) police officers, Sean Glinski and Michael Berti (collectively, "Defendants"), orchestrated a cover-up by *fabricating* more evidence and *suppressing* other evidence to create a false narrative that Taylor was *not* in the lockup at that time.

The Defendants' actions led to Patrick's (and Taylor's) wrongful convictions and sentences of life in prison without parole, as well as the convictions of two alleged "lookouts," Gardner and Paul, each sentenced to 30 years and who served 15. R389–3664:1-15. (Akia's and Brown's confessions were suppressed and charges dismissed. Matthews was acquitted by a jury. R373–34:12-25.)

In 2013 and 2014, on motion by the Cook County State's Attorneys' Office ("CCSAO"), Patrick's, Taylor's, Gardner's and Paul's convictions were all vacated. R373–35:12-24. Each obtained a "Certificate of Innocence" ("COI") under Illinois law without opposition from the CCSAO. R373–9:13-10:17; R326-4–207:25-214:14.

In May 2014, Patrick brought this lawsuit, and in April 2017, the jury found all or some Defendants liable for coercion, fabrication, malicious prosecution, conspiracy and failure to intervene. [1] A.1-3. The jury found that Defendants acted so maliciously or with such reckless disregard of Patrick's rights that punitive damages were awarded against all. *Id*. The court entered judgment, R365, and later amended it to include the City of Chicago, R413, as the City had stipulated to its own liability in the event of any individual Defendant liability. R136, 289.

The court denied Defendants' post-trial motions. R403, 405; A.4-35.

This Court should affirm.

---

[1] Taylor has a pending civil rights case against Defendants, *Taylor v. City of Chicago*, 14-cv-737 (N.D. Ill.). Gardner and Paul's joint civil rights case, *Phillips v. City of Chicago*, No. 14-cv-9372 (N.D. Ill.) was settled in 2018. Patrick's jury did not learn about these cases or the others' COIs (*see infra)*.

**What the Jury Heard and Evaluated**

The jury had ample opportunity to evaluate Patrick's claims and Defendants' defenses. Over six weeks, the jury heard from 32 witnesses and viewed 164 admitted exhibits. The jury learned the following:

**The Murder and Initial Investigation**

On November 16, 1992, at approximately 8:43 p.m., Jeffrey Lassiter and Sharon Haugabook were murdered in Lassiter's apartment at 910 W. Agatite on Chicago's North Side ("the murders"). PTX14–1-2, PTX17. Villardita and Johnson were assigned as lead detectives. R374–273:14-17.[2]

That night, they spoke with Faye McCoy, who lived in Lassiter's building and described four men she saw leaving the building shortly after the murders occurred. PTX12, 14. She identified all four as black males, ages 24-25, who were not from that neighborhood but had been frequenting Lassiter's apartment. *Id.* She also told the officers that Lassiter had been beaten up one week before. *Id.* She identified one of the four as "Goldie," or Dennis Mixon, a 31-year-old gang leader from the West Side. R373–149:2-19; PTX16-1.

The next day, a police report compiling information gleaned from police informants corroborated that "Goldie" and three associates were involved in the murders and that they were suspected of trying to "take over" Lassiter's apartment

[2] Trial transcripts are, *e.g.*, R374 (record)–419 (page):19-24 (lines). Plaintiff's trial exhibits are, *e.g.*, PTX16 (exhibit number in R513)-7 (page). Defendants' trial exhibits are, *e.g.*, DTX4 (in R514)-3 (page).

as a "spot" to sell drugs. PTX15. Villardita testified that Mixon immediately emerged as the primary suspect. R374–354-55.

The jury learned that Detectives made little attempt to locate Mixon or determine the identity of the others, and they repeatedly ignored obvious leads. For example, the Detectives ignored other officers' suggestion to listen to the 911 tape regarding the beating even though a neighbor heard Lassiter tell the dispatcher that "4 men broke into his apartment . . . and then beat him . . . ." PTX23, R374–369:6-70:2.

The Detectives also failed to investigate a lead related to Mixon's brother Larry, who, *one week before* the murders, *one block from* the murders, had been arrested for trespass of an apartment that Larry, two other males and one female were charged with trying to "take over." *Cf*. R374–398:4-399:4 with PTX15. The Detectives ignored this crucial lead even though one of the males arrested with Larry had a pending charge of murder. R374–404-05. Detectives also never showed Dennis Mixon's photograph to the woman arrested – even though the report of her arrest showed she was driven to the apartment in a red car (just like the informants said Dennis Mixon drove) by a fourth unidentified male who did not go up to the apartment. PTX18-2; R374–419:19-421:13.

The Detectives also failed to contact Mixon's father, a Sherriff's Deputy who had previously worked at Area 6, to try to help bring Mixon in. R374–349:6-14, 350:2-8, 387:3-13.

Two weeks after the murders, there was little progress and no suspects arrested. Nevertheless, on November 30, Villardita and Johnson wrote a note to their fellow officers: "Clear this case by the time we come back from our days off." PTX27-5; R374–437:1-11.

**The Round Up and Confessions**

The round-up began with the youngest and most vulnerable of the seven, 15-year-old Gardner. In the morning of December 2 – the same day Villardita and Johnson returned from their days off – District 23 police officers arrested teenagers Gardner, Paul, and Akia. Paul thought they had been set up, as they received a call that morning saying people outside wanted to buy drugs, something rare for that time of day. As soon as they got outside, officers swarmed and arrested them. R383–2351:3-2352:4. Police took them to the 23rd District station and charged Gardner and Akia with drug possession and Paul, who was released, with disorderly conduct. R383–2352:9-13; R516-3–147:16-17.

Between approximately 1 and 2 p.m., Gardner was transported with his mother from District 23 to Area 6 for additional questioning. R389–3658:21-24. Neither were told why Gardner was being brought to Area 6. *Id.* Before even entering Area 6, police told Gardner's mother she should go back to work. R389–3658:25-3659:3. Gardner, a juvenile, had not yet completed 8th grade at the time. R389–3658:12-20.

A sergeant assigned O'Connor and Abreu to interview Gardner, but they did not do so. R375–458:2-459:11. Instead, O'Connor placed Gardner in a conference

room and waited for Villardita and Johnson to arrive. R387–3297:23-3298:11. Villardita testified that when he arrived at around 4:30 p.m., he learned that Gardner had "volunteered" that he had information about the murders to a District 23 officer, although Villardita admitted that he never saw any record documenting any such District 23 conversation, and Gardner denies it occurred. R375–453:9-12, 454:22-457:13, 470:22-471:1.

At 2:25 p.m., Akia was *also* transported to Area 6 because, according to Villardita, he *too* allegedly "volunteered" to District 23 officers that he had information about the murders. (PTX 30; R375–451:2-5). Again, there is no documentary evidence of any such conversation, and Akia denies it occurred. R375–457:6-11.

No one seemed in a hurry to ask questions about the Agatite murders. Villardita and Johnson waited from their arrival to about 7:00 p.m. to begin Gardner's interview. R387:3299:7-9. O'Connor and Abreu also waited until then to interview Akia. R387:3300:19-25. Interestingly, even before the Detectives began either interview, O'Connor and Abreu had *already* requested overtime approval to help with the murder investigation that night. R387-3299:24-3300:1; R392-4044: 12-16.

Villardita claimed that in the first 5-10 minutes of interviewing Gardner, he confessed to acting as a lookout and participating in a pre-murder meeting at Clarendon Park (the "Planning Meeting"). This purported "confession" occurred *without* a youth officer, a parent, or a lawyer present. R375:478:1-479:9. Neither

Villardita nor Johnson took any notes of this purported Gardner interview, and neither memorialized it in a General Progress Report ("GPR"). R375—480:21-482:3.

In contrast, Gardner testified that when detectives came in, he denied knowing anything about the murders. R389:3659:8-24. He was left alone again for another significant amount of time. *Id*. When Villardita and Johnson finally returned, they brought in several photos of those who were ultimately charged, including Patrick. R389:3660:1-10, 3661:1-5. The Detectives also read Gardner information from a spiral notebook and told him to memorize it and put it in his "own words." R389:3361:16-25. More than 14 hours after Gardner arrived at Area 6, Detectives brought a court reporter to take Gardner's confession. PTX35; R375:500:19-24.

Over the next four days, Detectives obtained six more interlocking confessions to the murders. Patrick Supplemental Appendix ("PSA") 1-106. "Interlocking," because each confession described not only the purported involvement of that "confessor," but also the involvement of the other six. *E.g.*, PSA4-16. At the Detectives' direction, all the confessions also implicated Mixon. *E.g.*, PSA17, 32, 59, 61-62; 97. All seven confessions reflected the false story Detectives had concocted, which they then coerced the seven to rehearse and repeat. *Id*. The confessions of the first four, the four youngest, occurred before a court reporter, PSA1-94, but for the three oldest – Patrick, Matthews and Brown – handwritten confessions were presented for them to sign. PSA95-106.

Defendants ensured that the confessions included premeditated conduct including motive (a $200-400 drug debt) and intent (a declaration at the fictitious meeting that if the debt was not paid the victim "would pay"). *E.g.*, PSA13, 31. Each confession also stated that a gun was displayed at the meeting and that roles — four "lookouts" and four "inside the apartment" — were assigned. *Cf.* PSA13, 14-16, 17 with PSA32-34.

Moreover, to make the confessions appear authentic, the Detectives had the confessions match certain evidence gleaned from the crime scene. For example, several confessions noted that Lassiter's apartment door was kicked in, which was consistent with the scene evidence. *E.g.*, PTX36-9, PTX51-3. The Detectives also gratuitously threw in information to make the crime appear particularly heinous. For example, several stated that Haugabook was shot while begging for her life. *E.g.*, PTX36-15; PTX51-3. To include a robbery charge, several confessions said money was taken from Lassiter's pockets after he was killed. *E.g.*, PTX48-3; PTX36-18.

Several statements in the confessions could not have occurred. For example, Lassiter's apartment was on the second floor and there were no windows making his apartment visible from the street. Nevertheless, in Gardner's confession, when asked what he *saw* from his lookout position on the street, he said the perpetrators "kicked the door in, and they started arguing with the people about the money," neither of which Gardner could have seen/heard from outside the building. PTX35-18.

Also, diagrams of the area were given to the alleged lookouts to mark where they were supposedly posted. PSA107-110. The diagrams were then attached to their confessions. *E.g.*, PSA94. Much of what the lookouts claimed to have seen was physically impossible to see. For example, Gardner and Paul each said he saw Patrick, Mixon, and others walk in and out of Lassiter's building even though, from their purported vantage points, there was another building that would have totally obstructed any such view. PSA107; R375-508:16-510:24 (Gardner); PSA110; R384-2404:5-9 (Paul).

The Detectives purposely ignored other critical information from the confessions. Gardner's confession identified a person named "T-Mack" as both attending the Planning Meeting and entering Lassiter's apartment. PSA17. Paul meanwhile identified Mark-C as a lookout. PSA82; PTX53-12, 14; R384-2465:24-25. Detectives made no attempt to locate or inquire about either T-Mack or Mark-C *at all*. R375-516:17-517:10.

**The Tactics Used To Obtain The Confessions**

Although Brown died before any exonerations, the other six innocent men all testified that the confessions were fabricated and coerced. R380-1621:12-14 (Patrick); R383-2299:8-2300:10 (Matthews); R384-2414:12-15 (Paul); R389-3659:15-3661:13 (Gardner), R390-3758:2-4 (Akia dep. pages 156:9-1, 160:24-161:4, 161:15-165:23); R386-2985:23-2989:22 (Taylor).

They also chillingly described the tactics Detectives employed. All but Gardner were held in a locked interrogation room, some for 28-30 hours, with no

windows or clocks, often while handcuffed to a ring on the wall, some with no bathroom breaks, no lawyers, parents, or youth officers, no phone calls and no food or drink. R380–1557:10-1558:14 (Patrick); R383–2193:14-2196:6 (Matthews); R383–2360:22-2364:2 (Paul); R386–2974:24-2975:5 (Taylor). Others were physically abused. R386-2977:14-2978:6 (Taylor); R516-3-151:5-152:3, 156:9-24 (Akia); R380-1617:23-1618:5 (Just after he confessed, Brown told Patrick that a detective had put a gun to his head and told him the "could make it look like an accident" if Brown did not confess).

The Detectives also used psychological tactics, including bringing in those who had confessed to the rooms of those who had not, to point and say things like, "Yes, he did it," before being yanked from the room. R387-3132:9-15 & 3134:11-14; R3830-2364:24-2365:7; R380-1568:7-18; R383-2192:13-17; R380-1607:24-1608:7; R383-2194:9-17; PTX33-2. To further pressure the boys who had not yet confessed, Detectives showed the typed confessions of those who had and pointed out where the hold-outs' were mentioned as having been involved. R386-2978:13-2979:5. They also used some confessions to educate the others about the story to tell in their own confessions. *E.g.*, R383-2197:10-19; R383-2366:4-2367:20.

Detectives also held a lineup for McCoy to view. PTX45. McCoy told Detectives that she knew the four in the lineup (Patrick, Matthews, Paul and Brown), and they were *not* among the four she saw leaving the apartment. R373-154:7-12. The Detectives fabricated the lineup report, purposely omitting this exculpatory statement and instead falsely stating that McCoy "knew the four

suspects," "has seen them in the area" and "is afraid and will not go to court." PTX45-2.

Akia testified that Detectives beat him and fed him a "pre-made" story from a notebook. R516-3–161:15–162:6. Taylor was also beaten and shown where in Gardner's and Akia's confessions they said he was involved. R386-2986:3-2987:4. He testified he agreed to confess because he was scared, wanted the beating to stop, and was promised if he confessed he could go home. R386:2986:1-17. *See also* R383-2353:12-25, 2360:22-2361:1-2363:11, 2364:1-2365:17, 2393:12-21. Taylor believed he "had no choice but to tell them what they wanted to hear . . . . " R386-2986:18-2987:4. Paul was left in a dark room for hours, aggressively shaken awake when he dozed, and Taylor was brought to his room to point him out. Paul asked several times to speak with his mother and Detectives told him he would "never see [his] mom again" and "you're going to jail for life." *Id.*, 2364:1-23. He was also falsely told he was identified in the lineup. Matthews held out for more than 28 hours, while handcuffed to the ring on the wall with no chair provided. He urinated on himself because no one answered his screams to be taken to the bathroom. He broke when Detectives brought his friend Patrick in to say he should confess. The Detectives then gave him papers to read, memorize, and repeat back to them. R383-2200:14-2201:5.

**Deon Patrick**

O'Connor, Abreu, and Villardita participated in the almost 30-hour interrogation of Patrick and:

(1) painfully handcuffed him to the ring on the wall and kicked away the chair, R380–1546:22-1547:20; 1552:21-23;

(2) gave him no food or drink, R380–1558:10-14;

(3) woke him up whenever he fell asleep, R380–1557:10-1558:14;

(4) ignored his repeated requests to speak to his lawyer, who Patrick identified by name, R380–1562:11-12; 1571:1-8; 1619:5-7;

(5) told Patrick he would go to death row and never see his children again, R380–1561:12-21;

(6) threatened that they would use force and made Patrick believe they were doing so on Matthews, who was screaming in his room. R380–1569:4-17;

(7) told Patrick that others were implicating him in the crimes, R380–1546:11-16, 1552:9-15; 1557:1-7;

(8) showed him parts of others' confessions implicating him, R380–1557:1-7, 1558:19-1559:2, 1567:1-5, 22-25;

(9) brought Taylor into his room to declare that Patrick was involved, R380–1568:9-25; and

(10) falsely told Patrick he was identified in the lineup. R380–1569:22-1570:9.

Patrick explained how the 30-hour interrogation overbore his will. R380–1570:13-21 ("I just felt like I gave up at some point"); *see also* R380–1572:22-1573:2.

**Taylor's Alibi Proves the Confessions Were False**

*Every* confession, including Taylor's, placed Taylor at the Planning Meeting at 7 p.m. and inside the apartment at 8:43 p.m. when the murders occurred. But the

jury learned it was *physically impossible* for Taylor to have participated in either because he was in CPD lockup from 6:45 pm until 10:00 pm on a disorderly conduct charge. R164-41. This showed every one of the intertwined confessions was false – begging the question: how were Detectives able to obtain seven confessions, all of which describe the material and active participation of one who could not have been there?

**Detectives Double Down Through Additional Fabrication, Coercion and Suppression**

During his interrogation, Taylor told Detectives he was in lock up at the time of the murders. R386–2979:6-19; R379–1278:11-1281:2. They ignored this and continued coercing confessions through December 5. Early December 6, a 23rd District officer Steve Caluris phoned Villardita and informed Villardita that he had found a report showing a person named Daniel Taylor was arrested at 6:45 p.m. and bonded out at 10 p.m. R379–1281:3-1282:23, *quoting* DTX53; *see also* PTX1.

Instead of releasing the seven, however, Villardita and Johnson doubled down on their misconduct by fabricating, and causing others to fabricate, additional false evidence to support the fiction that Taylor was *not* in lockup.

***Adrian Grimes:*** On December 7-8, Villardita and Johnson created a fabricated report saying that on the night of the murders, rival gang member Grimes saw Taylor, Patrick and others having a meeting at Clarendon Park. PTX56. It further said that Grimes saw Matthews "leaving the scene" of the crime. PTX56.

Perhaps the most riveting testimony of the trial was a tearful Grimes

explaining how detectives arrested him on December 7 and held him in a conference room overnight until they presented him to the grand jury the next morning. R516-1—29:10-33:16, 36:14-18. He further recounted how years later, he was again arrested and jailed overnight on a reinstated drug charge, and Detectives roughed him up in the ante-room of the courtroom so he would testify at Taylor's trial. R516-1–47:11-49:10.

***Officer Gillespie.*** The same false December 7-8 report says Villardita and Johnson interviewed District 23 Officer Gillespie who had prepared Taylor's bond slip on November 16. PTX56. The report claims Gillespie said that he (Gillespie) "could have been gone" by the time Taylor bonded out. PTX56. Gillespie testified that he would never have said that, as his shift continued until the morning of November 17. R386–2934:24-2935:3. Gillespie also testified that he *never* wrote out bond slips in advance, and he pointed out that the two bond slips that sequentially followed Taylor's were issued within five minutes of the time listed on Taylor's bond slip, "10:00 p.m." R386–2927:6-2928:13; PTX4, PTX6.

Villardita and Johnson also falsely wrote that Gillespie said that disorderly conduct arrestees are "generally released" in 45 minutes, PTX57, but on re-direct, Gillespie confirmed that that was the very "low end" for a disorderly conduct stay, and that in fact it was not unusual for a disorderly arrestee to spend three hours in lockup. R386–2957:25-2958:3.

***Berti and Glinski.*** To bolster the concocted story that Taylor was *not* in lock up, Detectives enlisted Berti and Glinski to fabricate a police report one month

*after* the murders, to say they saw Taylor on the street near Lassiter's apartment at approximately 9:30 p.m. on November 16. PTX60 ("Berti/Glinski Report"). They wrote this time despite admitting neither had worn a watch or made any contemporaneous note of the time one month earlier. R388–3499:24-3501:12 (Glinski); R389–3710:12-3711:21 (Berti).

Though the Berti/Glinski Report was never signed by any supervisor, PTX60, it made its way into the police file to promote the false narrative about Taylor. The jury also had evidence that Glinski testified inconsistently at Patrick's criminal trial and Taylor's criminal trial about other aspects of the night of the murders. *Cf*. R382—2106:23-2113:22, *quoting* DTX300—Q-38:24 to Q-39:7, Q-40:1-12, Q-40:21 to Q-41:13 (Patrick's trial) *with* DTX323—N-116:16 to N-117:6 (Taylor's Trial).

***Omission.*** In addition to fabricating false evidence that Taylor was not in lockup, Villardita and Johnson hid evidence that supported that he was. The jury saw many pieces of evidence that Villardita and Johnson purposely withheld from the police file (thus, never given to prosecutors and therefore, never given to defense counsel). This omitted evidence all supported that Taylor was in lockup until 10 p.m., including:

(a) a lockup list that showed Taylor was in the lockup when the shifts changed at 9:30 p.m. PTX3;

(b) a list of all CPD personnel working lockup that evening PTX4;

(c) a Villardita timeline of Taylor's arrest and lockup processing, which also reflected that Detectives had spoken with a Sergeant Pierson, a conversation never disclosed anywhere else DTX52;

(d) the arrest reports and sequential bond slips for James Anderson and Eugene Fisher showing they were bonded out just after Taylor PTX5, 6, 7 8;

(e) that log books were kept showing a visual check done every 15 minutes in the lockup to ensure each detainee was there; and

(f) a 12/30/92 Villardita and Johnson GPR, still "missing" to this day, about Taylor's lockup cellmate James Anderson. PTX66.

**Fabricated Evidence to Deprive Patrick of His Liberty**

Many pieces of fabricated evidence were used against Patrick in the grand jury, including Grimes' and O'Connor's grand jury testimony, the seven fabricated confessions, the false diagrams, and the fabricated story about Taylor not being in lockup. R387–3329:16-20; PSOF 87. The grand jury indicted Patrick and the other six just after hearing O'Connor's testimony. *Id*.

The Patrick jury learned that that his fabricated confession was the only substantive evidence admitted against him at his criminal trial, and that the fabricated lineup report was used to impeach McCoy. R380–1631:23-1633:2; DTX298-P111:3-15; Dkt.357-7.

The Taylor-was-***not***-in-lockup evidence (as well as the suppression of the evidence supporting that he was) significantly influenced Patrick's criminal defense strategy. Patrick testified that he and his criminal lawyer, John Theis, did not raise the Taylor alibi, as they had little ammunition to counter the false Taylor evidence. R380–1629:4-16:30:16. Patrick explained that raising the Taylor alibi came at great risk because Patrick's criminal judge ruled that if Patrick opened the door to evidence about his co-defendants, the protection afforded by *Bruton v. United*

*States*, 391 U.S. 123 (1968), would disappear and all other confessions would be admitted. R380–1629:4-14. Patrick's defense was further chilled because Grimes and Glinski were on the State's list of trial witness, PTX1402; R380–1628:3-12, and Patrick had no evidence to counter the Grimes police report and grand jury testimony or the Berti/Glinski Report. R380–1630:6-16.

**Defendants Chose Not To Defend Their Conduct**

Defendants did not defend their conduct; rather, their defense was that Patrick and the others *did* commit the murders. R373–39:21-24; R392–4080:18-25, 4121:3-8. Defendants relentlessly assailed Patrick and the other innocent men's credibility, stating from opening statements on that Patrick was a "murderer" who duped the CCSAO into vacating his conviction. R373–39:19-23, 64:21-66:1. Defendants were allowed to admit extensive evidence of prior bad and criminal acts, gang activities, and prior inconsistent statements from the criminal and post-conviction proceedings, including efforts to attack the affidavits and pleadings that Patrick and the others had filed. *E.g.*, R381–1703:12-1706:6, 1716:14-1718:22. R386–3001:2-3002:13; R383–2234:5-2235:12.

Regarding Taylor in lockup, Defendants claimed that either he had *escaped* in time to participate in the Planning Meeting and murders; or, someone else, perhaps his brother, was in the lockup claiming to be Taylor while Taylor committed the crimes. A long-time FBI handwriting expert, Peter Smerick, testified that it was "highly probable" (the second highest level an examiner can give) that the bond slip signature *was* Taylor's, R382–2059:3-7, and that the sole

reason he was prevented from giving the highest level of certainty was because the top copy of the 4-page carbon bond slip no longer existed and thus was not examined. R382–2059:3-8-2060:15. Smerick testified that under examiners' standard parlance, a "highly probable" designation means "virtual certainty." R382–2058:13, 2060:3-10.

**The Verdict**

After the nearly six-week trial, the jury returned a verdict, finding: (1) Villardita, O'Connor and Abreu liable for coercion; (2) Villardita, Johnson, Berti and Glinski liable for fabrication; (3&4) all Defendants liable for federal conspiracy and failure to intervene; and (5&6) Villardita, Johnson, O'Connor and Abreu liable for malicious prosecution and state conspiracy. A.1-3. The jury awarded Patrick $13.3M in compensatory damages and $90,000 collectively in punitive damages. *Id.*

**Post-Trial Motions**

Defendants filed two post-trial motions: a combined Rule 50(a)/59(b) motion seeking judgment in their favor or a new trial, R403 (the "New Trial Motion"), and a Rule 60 motion seeking judgment or relief from judgment and a new trial, as a sanction against Patrick (the "Sanctions Motion"), R405.

Appellants based their Sanctions Motion on: (1) a false statement regarding Taylor that Patrick made in a 1999 *pro se* affidavit ("1999 Affidavit"); and (2) a false statement regarding Lemuel Hardy that Patrick made in a 2014 interrogatory response and at his deposition (collectively, the "2014 Interrogatory Response"). The district court denied both motions.

## SUMMARY OF THE ARGUMENT

The district court judge provided the parties a fair trial.

This Court should reject each of Appellants' arguments on one or more of the following grounds: (a) waiver; (b) forfeiture; (c) no error at all; (d) no clear error; (e) no abuse of discretion; or (f) harmless error.

The jury's verdict and court's judgment should be affirmed.

## ARGUMENT

### I. THE DISTRICT COURT NEITHER COMMITTED CLEAR ERROR NOR ABUSED ITS DISCRETION IN DENYING DEFENDANTS' POST-TRIAL SANCTIONS MOTION BASED ON PERJURY.

The district court did not err when it denied Defendants' Sanctions Motion. Defendants have waived or forfeited this argument by not challenging any of the district court's factual findings, and they have both failed to set forth the correct standard of review and to meet it.

#### A. Defendants Have Waived or Forfeited Any Challenge to the District Court's Factual Findings.

Waiver is the knowing and intentional relinquishment of the right to challenge a court action, while forfeiture is the failure to challenge a court action, but not knowingly or intentionally. *United States v. Olano,* 507 U.S. 725, 730-34 (1993). When a party waives an argument in the district court, it may not bring that argument in the appellate court *at all*. *Id*. When a party forfeits an argument, this Court goes beyond clear error review – a "firm and definite conviction that error occurred – that is normally applicable to factual finding, but also "plain error," that the error was "plain," affected appellant's "substantial

rights," and also "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Nance*, 236 F.3d 820, 824 (7th Cir. 2000) (citation omitted).

Here, Defendants *did* knowingly fail to challenge the district court's prejudice findings regarding perjury, both in the district court and on this appeal. Even if they now assert that they did not do so knowingly, they have not attempted to establish plain error, nor could they. Defendants have therefore waived their perjury arguments, or, if not waived, forfeited.

1. **Defendants have waived or forfeited their argument that the district court clearly erred in holding they were not prejudiced by Patrick's 1999 Affidavit.**

Defendants asserted in the district court that Patrick's *pro se* 1999 Affidavit, in which he falsely stated that he saw Daniel Taylor get arrested the evening of the murders, required the sanction of judgment in their favor or, at a minimum, a new trial. R405.

The court held that Defendants were not prejudiced at trial by the 1999 Affidavit because Patrick had already corrected the false statement in his 2014 deposition. A.19 ("Defendants were clearly on notice prior to trial that the statement about Plaintiff having witnessed Taylor's arrest was false").

Defendants are silent in this appeal with respect to this "no prejudice" finding. While Defendants argue that a district court is not *required to* find prejudice to issue sanctions (an argument Patrick disputes below), Defendants never once address the court's finding in this Court, nor do they assert that this

prejudice finding was error (let alone clear error). They have therefore waived or forfeited the argument.

**2. Defendants have waived or forfeited their argument that the district court clearly erred in holding they were not prejudiced by Patrick's 2014 Interrogatory Response.**

Because Patrick testified at trial that he did say something to Lemuel Hardy about his criminal case one time, Defendants also complain about Patrick's 2014 Interrogatory Response which stated he had never spoken with Hardy about Patrick's criminal case.

Judge Guzman held that Defendants were not prejudiced by Patrick denying a prior prison conversation with Hardy in the 2014 Interrogatory. The court emphasized that not only were Defendants aware 2-1/2 years before the trial that Hardy alleged and Patrick denied any such conversation, A.17, but Defendants specifically "questioned Patrick about [Hardy's assertion] at [Patrick's] deposition." *Id*. Defendants had every pretrial opportunity to pursue any conflict in testimony. A.17, A19.

Further, Defendants told the district court that "had plaintiff not lied in the pretrial proceedings about his contact with Hardy, they 'would have strongly considered writ[t]ing Mr. Hardy out to give live testimony at trial to give his version of events.'" A.17 n.4, *quoting* R405-22. The court rejected this argument, correctly holding that Defendants never indicated "how Hardy's potential testimony on the issue [of the purported Patrick-Hardy prison conversation] would have affected the verdict." A.17-18 n.4

This same argument *could have* been rejected for another reason, and this Court may affirm on any basis in the record. *Figgs v. Dawson*, 829 F.3d 895, 902 (7th Cir. 2016). Defendants cross-examined Patrick on March 23 about his conversation with Hardy, but did not rest their case until April 6. It is disingenuous for Defendants to assert prejudice based on being unable to writ in Hardy after allegedly being "surprised" by Patrick's trial testimony about the conversation, when in fact, they had plenty of time to do so, but chose not to.

**3. Defendants have waived or forfeited any argument about the Mixon Affidavit included in Patrick's verified 2004 petition because they failed to publish the exhibit to the jury or have that exhibit admitted.**

Defendants also tried to smear Patrick with a lie about Hardy's involvement in the murders that came from Mixon, *not* Patrick. In April 2004, a post-conviction petition was filed on behalf of Patrick and the four others convicted of the murders (without having cleared any of the conflicts). DTX215. The petition included an affidavit by Mixon implicating Hardy as having been at the murders and exculpating Patrick, Taylor, Gardner, and Paul as having *not been there*. DTX215:7-8¶¶13, 16. Because Patrick signed a verification that the statements in the petition were true ("on information and belief"), Defendants' trial theory was that Patrick "adopted" Mixon's 2004 statement about Hardy, which Mixon in 2013 admitted was false. R390—3761:1-11, *quoting* DTX11251.

Defendants never published the 2004 Mixon Affidavit nor had it admitted as evidence notwithstanding listing it twice on their Trial Exhibit List, *Cf*. R227:32 (DTX209), 36 (DTX 226) *with* R514. Other Mixon affidavits *were* published by

Patrick, PTX81, 86. Defendants closed their case by reading the CCSAO report that reflected Mixon's 2013 recantation of the 2004 statement regarding Hardy. Notably, in the 2013 CCSAO summary read to the jury, Mixon affirmed – contrary to his penal interest – that he had entered the apartment with two others (while a fourth person waited in the car), but that *none of the three* he was with that night were Hardy, Patrick, or any "of the persons arrested for the murder." R390—3758:5-3762:25, 3762—18-25. As Defendants read into the record, "Mixon said he didn't see Deon Patrick do nothing because Deon Patrick was not there." R390—3761:19-21.

The entire Hardy theory was irrelevant to the issues before the jury. Most significantly, Defendants do not challenge Judge Guzman's no prejudice holding or even attempt to rectify their failure to explain to the district court "how Hardy's potential testimony would have affected the verdict." By failing to challenge those factual findings in this appeal, Defendants have waived or forfeited them.

**4. Defendants have also waived or forfeited any challenge to the court's conclusion that even if prejudice existed, it was cured.**

Judge Guzman also found that "the jury was made aware of the lies, and Defendants had an opportunity to cure any prejudice they suffered." A.17. *See also* A.16 ("Plaintiff's lies were revealed at trial, and defense counsel rightly took the opportunity during closing arguments to highlight Plaintiff's lack of credibility on this issue."); A.33 ("Defense counsel's detailed cross-examination and, at times, blistering closing argument was almost entirely focused on Plaintiff's lack of credibility . . . .").

Defendants do not address the court's "any-prejudice-was-cured" finding at all. Indeed, Defendants do not even inform this Court of the finding, nor have they asserted that it was "clearly erroneous." Defendants have therefore waived or forfeited their argument that this "any-prejudice-was-cured" finding was error.

Defendants have neither asserted, nor established, error, nor clear error, with respect to any of these findings. The argument is waived.

### B. The District Court Did Not Abuse Its Discretion When It Declined To Sanction Patrick.

The district court also appropriately exercised its discretion to conclude that the sanctions Defendants sought were not appropriate under the circumstances.

### C. The Standard of Review

Defendants misstate the standard of review. Br.39. While this Court does review sanctions rulings for abuse of discretion, Defendants are silent about the fact that *this Sanctions Motion* was brought under Rule 60(b), which requires a significantly more deferential standard of review. "Relief under Rule 60(b) is 'an extraordinary remedy . . . granted only in exceptional circumstances.'" *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 949 (7th Cir. 2019) (internal citations omitted). "District courts are given wide latitude in deciding motions under Rule 60(b)." *Monzidelis v. World's Finest Chocolate, Inc.*, 92 Fed. Appx. 349, 352 (7th Cir. 2004) (internal citation omitted). *See also Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005) (once a district court has denied relief under Rule 60(b), such "proceedings are subject to only limited and deferential appellate review."); *Tolliver v. Northrop*

*Corp.*, 786 F.2d 316, 319 (7th Cir. 1986) (this Court will reverse only if the judge "omitted relevant factors" or "considered improper ones").

Defendants also significantly misstate what "abuse of discretion" review actually means, asserting that this Court "will uphold a district court's decision *so long as it could be considered reasonable*." Br.38-39 (emphasis added), *quoting Collins v. Illinois*, 554 F.3d 693, 696 (7th Cir. 2009). First, *Collins* did not involve relief from a post-trial judgment so Defendants' proposed "so-long-as-it-could-be-considered-reasonable" standard is not applicable on that basis alone. Second, in reality, this Circuit's actual abuse-of-discretion standard is far more exacting: this Court will reverse "only if no reasonable person could agree with the district court's decision." *Tolliver*, 786 F.2d at 319; *Fuery v. City of Chicago*, 900 F.3d 450, 454–55 (7th Cir. 2018) ("we can reverse only where no reasonable judge would have done the same").

**1. This Court should reject Defendants' argument that prejudice is an unnecessary factor in a sanctions motion.**

Instead of contesting Judge Guzman's prejudice findings, Defendants make a different prejudice argument. They assert (1) that "prejudice is not a prerequisite to sanctions," and (2) that the Seventh Circuit has "upheld sanctions . . . involving dishonesty in litigation . . . without a finding of prejudice," although they do concede that prejudice "may be a consideration." *Id.* at 41-42, *citing* six Seventh Circuit cases.

There are three reasons why this argument should be rejected.

First, as long as Defendants concede that prejudice "may be a consideration," then it is of no moment to Judge Guzman's conclusion of "no prejudice" that other judges may have granted sanctions without an express finding of prejudice. Indeed, the argument is a non-sequitur; it does not follow from "some judges have sanctioned without a finding of prejudice" that "it was wrong to not sanction when no prejudice was found."

Second, Defendants significantly mischaracterize the cases upon which they rely. With respect to three of the cases, Defendants are simply wrong that this Court upheld sanctions without a finding of prejudice. In *Fuery v. City of Chicago*, 900 F.3d 450, 464 (7th Cir. 2018), this Court complimented the district court for its "detailed analysis of each instance of conduct" and "its dedication to ensuring that the sanction had . . . been imposed . . . only after *fair consideration and weighing of the harm to the defendants*." *Id.* at 454-55 (emphasis added), *citing Fuery v. City of Chicago*, 07 C 5428, 2016 WL 5719442, at *10 (N.D. Ill. Sept. 29, 2016) ("The record establishes numerous instances of misconduct *that prejudiced Defendants* . . . . The destruction of [Plaintiff] Fuery's notes additionally *prejudiced Defendants*.") (emphasis added).

The same is true for *Dotson v. Bravo*, 321 F.3d 663, 669 (7th Cir. 2003), where this Court stated that both the "City [of Chicago] and Bravo *were prejudiced* in their defense of this case," *Id*. at 669, and to a slightly lesser extent in *Secrease v. W. & S. Life Ins. Co.*, 1:14-CV-00955-JMS, 2015 WL 275606 (S.D. Ind., Jan. 21, 2015), where the Court acknowledged that prejudice to a party is one of the central

purposes of sanctions, but did not rely on it expressly. *Id.* at *1, *aff'd*, 800 F.3d , 397, 401 (7th Cir. 2015).

Defendants are correct that the other three case do not mention prejudice, but it is necessary to consider each case to understand why. *Escamilla* v. *v. Jungwirth*, 426 F.3d 868 (7th Cir. 2005), was not a sanctions case. The district court dismissed a *habeas* petition solely on timeliness grounds. *Id.* at 870. This Court did include some *dicta* about perjury, but then immediately made clear that "the district court did not deny the petition on this [perjury] ground, however. Instead it held the petition untimely." *Id.* This Court did not discuss prejudice from the perjury because perjury was not the basis for the Court's holding.

Second, in *Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305 (7th Cir. 2002), plaintiff misrepresented his financial condition on his *in forma pauperis* application. *Id.* at 306. The district court dismissed the lawsuit, and this Court affirmed, holding the court had no choice but to dismiss because the statute governing false *in forma pauperis* applications requires dismissal. *Id.* While Defendants are correct that this Court did not discuss how the false fee waiver application had harmed the *Thomas* defendants, the sanction in that case was *required*, and it therefore hardly stands for the proposition that prejudice is never a valid consideration on sanctions motions.

Finally, in *Ramirez v. T&H Lemont, Inc.*, No. 12-1268, Dkt.80 (N.D. Ill. Jan. 19, 2016), *aff'd*, 845 F.3d 772 (7th Cir. 2016), the district court dismissed Ramirez's lawsuit after learning that Ramirez had bribed a witness to falsely testify

that he had observed defendant discriminating against Ramirez when in fact the witness had seen no such thing. *Id*. at 781. While neither the district nor the appellate court *discussed* the "prejudice" to the employer from plaintiff's bribe and subornation of perjury, it is self-evident that such conduct *did* harm the defendant, and, given what both courts said about bribery and subornation, it is ludicrous to suggest the courts found no prejudice.

Finally, in each case, this Court affirmed the district court. In five of the six, it affirmed the district court's *exercise of its judgment*. (Recall that in the sixth the district judge "had no choice;" he was statutorily required to sanction.) This Court's focus was not on the presence or absence of a "prejudice" discussion. It was whether the district judge – the one with the front row seat to the misconduct alleged, the one in the best position to decide what sanction, if any, was appropriate – properly used his or her discretion in deciding the motion. Therefore, even if this Court were to conclude that prejudice is not an *absolute* requirement to a sanction award, such a holding would not affect a district court's discretionary determination to deny sanctions on the ground that Defendants were not prejudiced or on the ground that any prejudice present was cured.

This Court should reject Defendants' "no-prejudice-required" argument.

**2. The two false statements were not material.**

Patrick's false statements were also not material to the issues tried to the jury. Throughout their Brief ("Br."), Defendants operate under the unsupported premise that the 1999 and 2014 statements were relevant to the material issues

tried. From that unsupported premise, Defendants leap to the unsupported conclusion that Patrick's misconduct rose to the level of willful abuse of the district court's processes or that he conducted the entire litigation in bad faith. Br.38-39. These arguments are without merit.

Whether Patrick saw Taylor get arrested on the night of the murders or whether he did in fact speak to Hardy about his criminal case were issues so far removed from the disputed issues that they simply do not rise to the level of willfully abusing the judicial process or conducting litigation in bad faith. *See Montano v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008) (inconsistencies between plaintiffs' testimony at their depositions and at trial did not warrant dismissal sanction).

Not only did Defendants fail to establish *how* they were harmed by Patrick's 1999 Affidavit or 2014 interrogatory response and deposition testimony, they also never explain how these facts – true or false – are relevant to the material disputed issues – whether Defendants coerced Patrick's confession, fabricated material evidence against him, conspired to do so, and violated other rights.

Patrick's admitted false statement in his *pro se* affidavit does not rise to the level of willfully abusing the judicial process *in this case* or conducting *this case* in bad faith. After all, Patrick told the truth about the 1999 affidavit *in this case*. First, he admitted in his 2014 deposition that the affidavit was wrong; he had not seen Taylor get arrested. R152-1–161:7-8. Second, he fronted this fact at trial. R380–1533:18-22. Nor did the 20-year old false statement in any way affect the

overwhelming evidence that Taylor (1) was arrested on November 16, at 6:45 p.m., (2) was taken to the District 23rd station, and (3) remained there until he bonded out at 10:00 p.m. *See* R164-40 (police report) and R373–87:16-24 (arresting officer's testimony); *Id*. at 41 (lock-up record); R213–138-39 (the uncontested expert testimony that the person signing out of lockup at 10:00 p.m. was Taylor).

Similarly, the jury heard that Patrick adopted Mixon's affidavit implicating Hardy only on "information and belief" (which the court concluded merited its own limiting instruction). DTX215-19; R382–1983:2-14, R383–2423:19-2425:3. Appellants' also acknowledge that the pleading containing the Mixon affidavit was withdrawn. Br.27, *citing* R380–189-90. And, at trial, Defendants read aloud a 2013 CCSAO report where *Mixon* admitted to falsely implicating Hardy, R390–3761:1-11, *quoting* DTX11251. The jury rejected Defendants' attempt to smear Patrick with a lie that Mixon – not Patrick – had told about Hardy.

Finally, separate from the jury's consideration of credibility, whether Hardy and Patrick spoke was simply immaterial to any issue the jury was asked to decide. This is yet another basis to reject Defendants' sanctions argument.

**3. The issue of perjury should not be taken away from the jury.**

This Court should also affirm the district court for the reasons stated in *Montano v. City of Chicago*, 535 F.3d 558 (7th Cir. 2008), a case Defendants do not cite at all. In *Montano*, the district court dismissed Plaintiffs' lawsuit with prejudice on the ground that several of the plaintiffs had engaged in "perjury." *Id*. at 558. This Court reversed, holding that the district court had abused its discretion in holding that certain "testimonial discrepancies" constituted perjury.

*Id*. at 564. The Court parsed the testimony in detail and concluded that the district court had erred in concluding that the inconsistencies rose to the level of and supported a finding of "perjury." *Id.* This Court further held that "[a]s a fraud on the court, perjury may warrant the sanction of dismissal. We say 'may' because 'one can imagine [perjury] cases in which a sanction of dismissal would be excessive.'" *Id*. (internal quotation omitted).

Most significantly for purposes of this case, this Court rejected the contention Defendants make here, Br.42, that a party's false statements with respect to one subject naturally rendered that party's testimony unreliable in all respects:

> It simply is not a reasonable inference from a falsehood in one part of a witness's testimony to the falseness of the entire testimony, and where a witness's testimony is 'a compound of truth and falsity,' the prudent course is to permit the jury to sort through it; "[p]erjury is a circumstance to be weighed by the jury in determining a witness's credibility rather than a ground for removing the issue of credibility from the jury by treating the witness's entire testimony as unworthy of belief."

*Montano,* 535 F.3d at 567 (internal quotation omitted). Treating Patrick's entire testimony as incredible is precisely what Defendants unsuccessfully requested of the trial court and now, ask this Court to do as well. Suggesting that the entire six-week trial, in 2017, was tainted by a 1999 post-conviction false statement and a 2014 discovery false statement, Defendants ask this Court to do precisely what it held in *Montano* to be error: taking "the credibility question from the jury." *Id*. at 567.

When Judge Guzman concluded that Defendants had ample opportunity to use Patrick's alleged perjury to their own advantage by repeatedly telling the jury

that he was a liar, he was tracking the same principles this Court articulated in *Montano*. It was for the jury to decide whether Patrick's lie in one aspect of his testimony led to the inexorable conclusion that he was lying in all his testimony. By ruling in favor of Patrick – notwithstanding the full display of these lies by both Patrick's admission of them and Defendants' relentless mention of them – the jury demonstrated that these examples did not taint the rest of Patrick's testimony or the trial as a whole.

In reaching its decision, the jury is presumed to have (1) fully considered Defendants' "detailed" cross-examination and "blistering" closing arguments; (2) judged for itself Patrick's credibility and that of the other witnesses; and (3) followed the instructions given to them, including the one directing them how to evaluate the credibility of the witnesses. R369–13. Indeed, it is a fair inference that the jury concluded that both issues were tangents Defendants repeatedly raised to deflect the fact that they had grotesquely violated Patrick's civil rights.

Defendants' argument should be rejected under *Montano*.

#### 4. Defendants come with unclean hands.

The correctness of the district court's decision is further supported by contrasting Patrick's 1999 and 2014 transgressions with Defendants' own false statements throughout trial (and indeed, all the way back to Patrick's criminal trial). Patrick does not raise this point to "excuse" his own misconduct; misconduct Judge Guzman strongly criticized. Rather, he raises it to emphasize the context in

which the trial court determined that Patrick's 1999 and 2014 false statements did not rise to the level of sanctionable conduct in the context of this trial.

Because all reasonable inferences must be drawn in Patrick's favor, it is more than a fair inference that in denying Defendants' Sanctions Motion, the district court took into account *Defendants*' repeated false statements. Patrick sets forth here just one example of that perjury, because it was so pervasive throughout the criminal case, discovery, and during the trial.

The night of the murder, McCoy told Villardita and Johnson that she saw four men – all ages 24-25 – leaving Lassiter's apartment building. Johnson took contemporaneous notes, PTX12, and testified he accurately recorded the description that she provided in a Supplemental Report, PTX14-2. *See* R150-3–106, 99 (Johnson Dep.). These four 24-25 year olds immediately became their primary suspects. R374–354:25-356:1.

But after the Detectives coerced confessions from innocent victims Taylor (age 17), Patrick (20), Matthews (age 22), McCoy's statement that all four people she saw were ages 24-25 became problematic. Specifically, Villardita faced the problem of convincing Patrick's criminal jury, and later the jury in this case, that the real perpetrators were ages 17 to 22, when their own police reports said McCoy said they were "24-25." Villardita could have argued that McCoy was simply "off" in her age descriptions, but instead he chose to repeatedly lie about what McCoy had said, and he did so under oath at least three different times. *See* R151-7–178:23-24 (Villardita's Testimony at Patrick's Criminal Trial: "[McCoy] said all four people

were four male blacks around the age **20 to 25**."); R151-7–179:4-6 ("As far as the other two, she could only give that they were male blacks, **20 to 25** and that's it"); R151-7–179:14-15 ("[o]ther than **20, 25**, male blacks, I believe that's all she said"); R379–1432:8-10, 18 (Villardita's Videotaped Deposition (194:22-195:6): "the information we had . . . from Fay McCoy. They were in the **20- to 24**-year-old category"); R374–286:16-20 (Villardita's Trial Testimony: "From what I remember, the only person that she said noticed him was the last person, which she described as the male black, I think **20 to 24**, dark-complected and had a knee-length, either dark or black, coat. And I believe she said he had a skullcap."). (emphasis added).

Defendants may assert that Villardita simply "misremembered" what was written in his report. Yet, each time he intentionally falsified the *ages*, he *correctly* described *in detail* what McCoy had said about the suspects' clothing, for example. See *Id*.

And, if there were any doubt at all about this intentional falsehood (*i.e.,* "perjury,"), there certainly should not be after Defendants' lawyer in this case stood in the well of the courtroom and propitiated the *false* 20-24 theme by incorrectly reading the McCoy description and reiterating the false information to which Villardita had testified:

| | |
|---|---|
| BORKAN: | And there is further descriptions here. "Number two, male black, 20 to 25, 5'8" to 5'10"". |
| CHANEN: | I'm sorry, your Honor. Mr. Borkan must have mistakenly misread it. It's 24 to 25. |
| BORKAN: | Isn't that what I said? 24 to 25? |

. . .

CHANEN: No. Mr. Borkan stated 20 to 25, Judge.

THE COURT: Well, we're agreed on what it says now; right?

R376–719:22-720:7. *See also* R376–720:13-22, 778:20-779:15.

But there is more. In light of the jury's findings of coercion and fabrication, numerous other statements Defendants made under oath – such as the "spontaneous confessions" of Gardner, Akia, and Taylor – simply could not have been true. R375–478:8-479:9; R377–984:1-985:12; R387–3301:10-3302:9. *See also* R378–1238:254-1240:8. In light of the jury's findings, the only conclusion that can be reached is that the jury believed that Defendants lied under oath when they denied the coercion, fabrication and other misconduct, making their hands woefully unclean in seeking sanctions against Patrick. This Court may affirm on any basis supported by the record, *see supra*, and in light of this evidence, unclean hands certainly was and is a fair basis to deny the motion.

Ultimately, Judge Guzman decided that sanctions were not appropriate for the two false Patrick statements. He excercised his discretion appropriately. He heard all of the testimony, not just the alleged perjury Defendants cite, but Defendants' own perjury as well. The judge is presumed to have assessed all of it in concluding that sanctions were not appropriate, and that decision was neither clear

error nor an abuse of discretion. Defendants' demand for a "sanction" should be denied in its entirety.[3]

## II. THE DISTRICT COURT DID NOT ERR OR ABUSE ITS DISCRETION IN ADMITTING PATRICK'S CERTIFICATE OF INNOCENCE.

Defendants assert that the district court erred in admitting Patrick's Certificate of Innocence ("COI"), arguing that the prejudicial impact of the evidence substantially outweighed its probative value. Br.43-48, *citing* Fed. R. Civ. P. 403. Rule 403 is the sole ground on which Defendants assert COI error in this Court. *Id.*

### A. Defendants Have Waived Their COI Argument in Their Post-Trial Motions and In This Court.

Defendants first raised their COI Rule 403 argument in a motion in limine, Br.48 n.8, *citing* R216-3 [*sic*: R216], at 19-26 and SA2-14, which the district court rejected. SA8-13. Defendants assert that "no more" than the motion in limine is needed "to preserve an evidentiary issue." *Id.*, *citing* Fed. R. Evid. 103, *Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008), and *Richman v. Sheahan*, 358 F. App'x 682, 683 (7th Cir. 2009). Defendants, however, are wrong.

Defendants' appellate burden after a jury has ruled against them is far greater than their burden at the motion in limine stage. The issue in this Court is no longer just 403 balancing; it is now whether "the record contains [any] evidence

---

[3] Defendants assert that even if this Court affirms the denial of a judgment and a new trial on this ground, it should still "remand for determination of a different sanction." Br.43. Defendants did not request a "different sanction" in the district court, R405, at 2, 14, 24, so the request is waived. Nor does the boilerplate language, "whatever other relief this Court deems fit and just," *Id.* at 2, 24, which appears in virtually every *ad damnum* clause ever written, preserve the request. *Puffer*, 675 F.3d at 718 (undeveloped arguments are waived).

on which the district court rationally could have based its decision," whether the alleged error had "a substantial and injurious effect or influence on the determination of a jury," and whether "the result reached was inconsistent with substantial justice." *Doornbos v. City of Chicago*, 868 F.3d 572, 579 (7th Cir. 2017).

Indeed, in Defendants' Motion for New Trial, they acknowledged their higher post-trial burden by conceding that they were required to establish that Patrick's use of the COI rendered the entire trial fundamentally unfair to Defendants. *See* R403–25. To support that burden, however, Defendants did nothing more than assert that Patrick repeatedly misrepresented that Defendants had an opportunity "to be heard [by the Circuit Court on] vacating Plaintiff's conviction" and "to object to the entry of the COI." *Id*. They did not, however, cite to evidence or develop their argument beyond these mere conclusions. The district court correctly concluded, "With respect to these arguments, Defendants' assertion of prejudice is conclusory and fails to include any specifics or citations to the record; thus, the argument is waived." A.34.

Nor can Defendants' waiver be saved by simply referencing or incorporating their motion in limine arguments, Br.48, because that motion did not assert *the actual effect* that the alleged faulty evidentiary ruling had on the jury. *See* R216-3, at 19-26. Therefore, while Federal Rule of Evidence 103(b) preserved the evidentiary argument *ex ante*, it did not preserve Defendants' argument that admission of the evidence had "a substantial and injurious effect or influence on the determination of a jury." *Doornbos*, 868 F.3d at 579. (Nor are *Wipf* or *Richman,*

*supra,* to the contrary. *Wipf* simply repeats the Rule 103 standard, and *Richman* addresses argument preservation under Rule 103(a), not Rule 103(b).)

Defendants have also repeated in this Court the exact same error they made in the district court. They do not *develop* the argument that the erroneous evidentiary ruling in fact detrimentally affected the jury. *See* Br.43-48. Rather, they simply re-argue the motion in limine denied pretrial. *Id.* This also constitutes a waiver or forfeiture before this Court.[4]

### B. The District Court Did Not Err or Abuse Its Discretion In Admitting the COI, Nor Did It Err or Abuse Its Discretion In Denying Defendants' Motion For New Trial Based On The COI.

The Court should also reject Defendants' argument on the merits. Judge Guzman properly rejected Defendants' 403 argument, explaining at the motion in limine argument that the COI is relevant to establish the essential "terminated-in-a-manner-indicative-of-innocence" element of Patrick's malicious prosecution claim:

> What the plaintiff has to show is, as you indicated, not only that his case was terminated favorably, but that it was terminated in a manner indicating innocence. So the question is, what pieces of evidence out there are there that, when the state's attorney's office *nolle prossed* this case, it's because they thought the defendant was innocent, not because witnesses had died, they couldn't prove the case up. Not because evidence had been lost. Not because for political reasons. But because they believed the defendant was innocent. This seems to me, regardless of what the statute says, or its purpose, an opportunity for the state's attorney's office to have stepped up and said: No, we don't think he is innocent. He shouldn't get a certificate of

---

[4] The closest Defendants come to even mentioning the *potential effect* of the COI is their assertion on pages 45-46 that: (1) a jury "is likely" to give significant deference to a COI because a COI is a judicial determination of innocence, and (2) that "Plaintiff took advantage of this [by] using the COI to improperly appeal to the jury's emotions," Br.46. This lone reference to Patrick's rebuttal argument is insufficient to overcome waiver. Just as in the district court, Defendants have not sufficiently *developed* the arguments required *to overturn a jury verdict* on this ground.

> innocence. And instead of doing that, they sat on their hands. That's evidence. Circumstantial evidence, but it's evidence. And it goes to an essential element of his malicious prosecution claim. It comes in.

SA.7. The Court also emphasized in denying the motion in limine that both sides would have a fair opportunity to put forth their respective versions of Patrick's guilt or innocence. SA.12-13. In its post-trial opinion, the court reiterated that each side in fact had had such an opportunity. A.34.

Even though many other defenses were available, Defendants consciously chose to try this case on the ground that Patrick and the other innocent six criminal defendants were in fact murderers. This theme was seared into the jury from Defendants' first words in opening statement to the end of closing arguments and all points in between. R373–39:21-24 ("the evidence in this case will absolutely lead to the conclusion that the man who is sitting at this table [Patrick] is a double murderer"); R392–4121:3-8 ("you all get to decide whether murderers get paid for their crimes"); *Id*. at 4080:18-25 ("That's not what innocent people do. Liars do that. Murderers do that. Guilty people do that. That's what he did."). The entire six-week trial was a re-trial of Patrick 25 years after the crimes occurred.

Once Defendants made it clear they would proceed in this manner, the district court correctly concluded that it would be fundamentally unfair to allow Defendants to paint Patrick as guilty but then prohibit him from raising his COI. The district court properly rejected Defendants' argument and concluded that the COI was probative of issues that Defendants themselves chose to make central to

the case. SA.7, 12-13. Such a ruling was wholly consistent with the dictates of Rule 403.

**1. The COI had probative value.**

Although this Court has never addressed Rule 403 balancing with respect to a COI, five district court judges in this Circuit have held a COI is probative of the favorable termination element of a malicious prosecution claim. *Logan v. Burge*, 09 C 5471, Dkt.423 (Court Order), at 1-3 (N.D. Ill. Oct. 19, 2012) (Bucklo, J.) (PSA111-136); *Kluppelberg v. Burge*, 84 F. Supp. 3d 741, 748 (N.D. Ill. 2015) (Lefkow, J.); *Harris v. City of Chicago*, 14 C 4391, 2018 WL 2183992, at *4 (N.D. Ill. May 11, 2018) (St Eve, J.) ("the Court rejects Defendants' argument that the risk of unfair prejudice would substantially outweigh the highly probative Certificate of Innocence"); SA.34 (Guzman, J.).

In addition, two other judges in this Circuit have reached the same result for evidence of innocence comparable to a COI. *Ott v. City of Milwaukee*, No. 09-C-870, 2015 WL 1219587, at *8 (E.D. Wis. Mar. 17, 2015) (Randa, J.) (Wisconsin Claims Board's finding of "clear and convincing evidence that [Ott] was innocent" had probative value); *Avery v. City of Milwaukee*, 40 F. Supp. 3d 1089, 1094 (E.D. Wis. 2014) (Randa, J.) (same), *rev'd in part on other grounds,* 847 F.3d 433 (7th Cir. 2017); *Newsome v. McCabe*, 2002 WL 548725, at *5 (N.D. Ill. Apr. 4, 2002) (Plunkett, J.) (gubernatorial pardon had probative value).

Many of these same judges have held that a COI is probative for additional reasons as well. As one example only, the *Kluppelberg*, *Harris,* and *Logan* courts

found it probative of damages (84 F. Supp. 3d at 746; 2018 WL 2183992, at *3; PSA111).

Finally, though they attempt to downplay it, Defendants concede that the COI had probative value. Br.44 ("The probative value of a COI is limited"); Br.45 ('The probative value was practically non-existent."); Br.47 ("[The COI] therefore has minimal probative value . . . .").

Therefore, that a COI has probative value is beyond dispute; the only question is how much weight it should be given. This Court need not look beyond *United States v. Bradford*, 905 F.3d 497 (7th Cir. 2018) for its answer:

> [A]n important consideration in Rule 403 balancing is the extent to which the defendant actually contests the fact that the evidence tends to prove. "[I]f a defendant offers to concede or stipulate to the fact for which the evidence is offered, additional evidence may have little probative value." *Id.* But Bradford never offered to stipulate [to the fact on which the government sought to admit evidence.]

*Id*. at 507. In other words, had Defendants conceded the factual point, that Patrick was innocent, certain evidence in support of it, such as the COI, would have had relatively limited probative value. Where, however, as here, they vigorously contested Patrick's innocence, the COI had substantial probative value. Defendants' argument to the contrary is frivolous and should be rejected.[5]

---

[5] Defendants regurgitate various unsupported and unavailing "let's-see-what-sticks" attacks on the probative value of the COI:

(1) the Illinois COI statute bars COIs from being used as evidence in civil rights trials (Br.44-45);
(2) Patrick's COI Petition before Cook County Chief Criminal Judge Biebel was "thin and misleading" (Br.45);

### 2. The COI did not unfairly prejudice Defendants.

Defendants' fail to establish prejudice, let alone "unfair prejudice." Defendants correctly concede that that the evidence must not only be wrongfully admitted, but also must "induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented," Br.43-44, *quoting United States v. Thomas*, 321 F.3d 627, 630 (7th Cir. 2003). Again, Defendants do not actually develop an "unfair prejudice" argument that meets this standard.

The sole basis on which Defendants assert "unfair prejudice" is that "[a] jury *is likely* to give significant deference to a COI precisely because it is a judicial determination of innocence." Br.45-46. To support this argument, Defendants rely only on *Faigin v. Kelly*, 184 F.3d 67, 80 (1st Cir. 1999), and cite to one moment in Patrick's rebuttal closing argument, when counsel stated the jury should be

---

(3) the proceeding before Judge Biebel was "not adversarial" and Judge Biebel issued it "without a test of its merits" (Br.45);
(4) the COI proceeding was a "civil proceeding," distinct from the criminal proceedings that had already terminated and therefore had no bearing on Patrick's malicious prosecution claim (Br.46-47);
(5) Defendants could not "intervene" in the COI proceeding and therefore had no opportunity to try to influence its outcome (Br.45-48); and
(6) Judge Guzman engaged in "pure speculation" when he concluded that the "no position" taken by the CCSAO provided a fair inference that the CCSAO believed Patrick innocent (Br.47).

Defendants' arguments about the COI statue were amply addressed in *Kluppelberg* and *Harris*. Defendants' argument that the Petition was "thin" or the merits untested are also wrong. Judge Biebel issued Taylor's COI on the same day, moments before issuing Patricks' (*see* PTX 90) and Patrick's COI Petition cited Patrick's voluminous Second Successive Post-Conviction Petition which had multiple exhibits, to which Judge Biebel had access from the court file. DTX235-¶6.

"outraged and incensed" that Defendants had repeatedly asserted that the COI was "not worth the paper it was written on." Br.46, *quoting* R392–4156.

First, this argument must be rejected because Defendants did not object to the "outraged and incensed" statement at the time it was made and therefore waived this argument. Though Defendants claim they preserved the objection at sidebar and that "[c]ourts routinely hear objections at sidebar," Br.46 n.7, such sidebars require timeliness so that the court can rule and still give the non-objecting party an opportunity to cure or rephrase. No such thing happened here. After closing arguments were complete, Defendants called a sidebar to inform the court that there was a typo in one of the jury instructions. R392–4156:10-4157:19. After that exchange occurred, another of Defendants' lawyers stated, "Judge . . . for the record the last comment was about -- something about sending a message with the compensatory damage verdict. I just want to preserve my objection to that," to which the Judge said, "Ok." *Id*. Defendants now incorrectly claim that the judge's "Ok" "amount[ed] to overruling the objection," Br.46 n.7, which is legally incorrect because there was no way at that point to sustain or overrule such a belated objection, and Defendants did not ask for a curing instruction or admonition to the jury.

Second, even if this Court deems the objection not waived, the district court properly found that the "emotional" statement was not error or was harmless. Viewing the statement in context establishes that the court was correct. The

outraged and incensed comment was a direct response to Defendant's opening statement and closing argument:

> Now, Mr. Scahill told you on the first day that Deon Patrick's certificate of innocence is not worth the paper it was written on, and he told you that again today. If you believe Deon Patrick, if you believe that Daniel Taylor was in lockup, if you believe that these defendants violated his civil rights, I hope you are offended ***by that concept.*** I hope you are outraged and incensed, and I hope that you show that you are by your compensatory verdict for Deon Patrick. And that you show them what the value is of a piece of paper that says you're actually innocent and what the value of somebody's life can be and what the value is, ladies and gentlemen, of 21 years, 1 month, 8 days. Thank you.

R392–4155:23-4156:9 (emphasis added).

Third, Defendants' assumption that jurors will improperly give too much weight to a COI also fails, both generally and specifically, in a situation, such as here, where the judge provides a specific instruction:

> The question of whether the Plaintiff is actually guilty or innocent of committing the acts described in the criminal charges against him may only be considered by you as one of the many factors you may consider in determining whether his rights were violated as he alleges.

R369–28. *See also* R390–94-104, 123-26 (jury instruction conference).

Courts have repeatedly held that any concern that the jury might overweigh a single piece of evidence is easily cured by such an instruction, an instruction the jury is presumed to have heeded. *See*, *e.g.*, *Ott*, 2015 WL 1219587, at *8 ("the dangers asserted by the Defendants—unfair prejudice and confusion—will be avoided because the jury will be properly instructed on the law, making it clear that the Claims Board's decision [that plaintiff is innocent of the criminal charges against him] is only one piece of evidence to weigh when applying that law."); *Newsome*, 2002 WL 548725, at *5-6 (admission of governor's innocence pardon did

not prejudice defendants, and even if there was prejudice, any such prejudice was rendered harmless by the court's curative instruction).

Defendants assert that "some evidence is simply too overpowering for a limiting instruction to be curative," Br.48, *citing United States v. Jones*, 455 F.3d 800, 811 (7th Cir. 2006), but interestingly, they never overtly say whether Patrick's COI falls within their reference to "some evidence." Defendants instead rely on Judge Easterbrook's concurring statement in *Jones* that "telling juries not to infer from the defendant's criminal record that someone who violated the law once is likely to do so again is like telling jurors to ignore the pink rhinoceros that just sauntered into the courtroom," 455 F.3d at 811 (Easterbrook, J., concurring). They then implicitly request this Court to conclude that Judge Guzman's cautionary instruction on guilt and innocence failed to cure the "overpowering" nature of a COI. But Defendants' false analogy to a defendant's criminal record and a sauntering pink rhinoceros fails in its entirety, as there is no evidence (nor even a reasonable inference) that this jury failed to follow this instruction.

Because Defendants have not established any prejudice from the COI (let alone unfair prejudice), its prejudicial value could not possibly have outweighed its extensive probative value (let alone substantially outweighed).[6]

---

[6] Defendants also ignore that the district court was appropriately vigilant in considering the prejudice that might arise from admitting COIs. The court *granted* Defendants' motion in limine to bar reference to Taylor's, Gardner's and Paul Phillips' COIs, holding that the COIs of non-parties had no probative value in Patrick's case and could be prejudicial. R326-4–207:25–214:14 (denying admission of PTX 90, 91, 92 at pretrial conference).

3. **Even if admission of the COI was error under 403 balancing, the district court did not err in concluding that such error was harmless.**

Judge Guzman also held that "any error in admitting the [COI] was harmless." A.35. Twice in their brief, Defendants allude to harmless error in relation to the COI Br.46, 49, but in each instance, state their opposition to the district court's finding as a conclusion and do little, if anything, to develop the argument that the court's evidentiary ruling was *not* harmless. Defendants assert that "[c]ourts have recognized that prior judicial determinations create a tremendous risk of unfair prejudice because a jury is naturally inclined to accord more respect to a court's judgment, *and an error in admission is not harmless*." Br.46 (emphasis added), *citing only Faigin*, 184 F.3d at 80. But the First Circuit's opinion in *Faigin* is silent about harmless error in relation to this issue, and Defendants have not pointed to any other decisions that have held that "error in admission of [a prior judicial determination] is not harmless," nor has Patrick found any such case.

The district court decided that if admitting Patrick's COI was erroneous, it was harmless error. A.35. Defendants repeatedly argued that Patrick was guilty and had duped the CCSAO into moving to dismiss and duped Judge Biebel into issuing the COI. *E.g.*, R373–39:19-23, 64:21-66:1; R392–4115:20-25, 4116:6-14, 4120:18-4121:8. They further argued that Defendants did not have the opportunity to object at the COI hearing. *E.g.*, R392–490:1-7. Throughout the trial, they assailed Patrick and the other innocent six as murderous villains, and unworthy

gangbangers, and were even allowed to bring in past criminal history that was more than 20 years old. *See* R381–1716-1719; R392–4099:22-25.

Given the time Defendants spent on Patrick's alleged guilt, admitting ten COIs of Patrick's would not have come close to countering Defendants' attention to his alleged but unfounded guilt. Defendants' COI arguments should be rejected.

## III. THE DISTRICT COURT DID NOT ERR OR ABUSE ITS DISCRETION IN DENYING DEFENDANTS' MOTION FOR POST-TRIAL RELIEF BASED ON CUMULATIVE ERROR

Defendants argued in their post-trial motion that even if certain errors did not individually require post-trial relief, they did "cumulatively." R403–24. The district court carefully parsed this argument and rejected it, holding:

(1) none of the purportedly "cumulative errors" were, in fact, errors;

(2) even if erroneous, each such error was harmless; and

(3) none of the purported errors were so prejudicial that, individually or collectively, they altered the jury's verdict or rendered the trial "fundamentally unfair."

A.32-35.

In this appeal, instead of addressing *the district court's* cumulative error opinion, Defendants have asserted a brand new cumulative error theory. By doing so, Defendants have waived the argument, as arguments may not be raised for the first time on appeal. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("arguments not raised to the district court are waived on appeal"). In addition, Defendants never actually explain how these non- or harmless errors were in fact errors, and, more specifically, how they have caused greater harm "cumulatively" or

"synergistically" than they do standing alone. *See Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000); *Williams v. Drake*, 146 F.3d 44, 49 (1st Cir. 1998) (party must establish that "multiple errors synergistically achieve 'the critical mass necessary to cast a shadow upon the integrity of the verdict.'") (internal citation omitted).

## A. Defendants Have Waived Their Cumulative Error Argument.

### 1. Defendants waived their current cumulative error argument by not presenting it to the district court.

Defendants' cumulative error argument in their post-trial motion focused on (1) exclusion of Audrey Mathews' testimony, (2) admission of the COI, and (3) that the district court permitted too much evidence related to Patrick's criminal co-defendants. R403–24-25. The district court found no such cumulative error, rejecting the argument in detail. A.32-35.

Now, instead of challenging the district court's rejection of the purported "cumulative error" Defendants presented there, Defendants instead assert a *new* cumulative error argument, combining (1) the alleged COI error; (2) the "outraged and incensed" rebuttal argument; and (3) the alleged Golden Rule violation. Br. 49-51. This Court, however, will not reverse the district court on a ground that was never presented to it, *Puffer*, 675 F.3d at 718, because to do so "would undermine the essential function of the district court." *Domka v. Portage County, Wis.*, 523 F.3d 776, 784 (7th Cir. 2008). *See also Fednav Intern. Ltd. v. Contl. Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010) ("a party has waived the ability to make a specific argument for the first time on appeal when the party failed to present that specific

argument to the district court, even though the issue may have been before the district court in more general terms").

Defendants' cumulative error argument has been waived.

**2. Only preserved or plain errors may be considered as cumulative errors.**

Even if the Court were inclined to overlook that waiver, there is another reason Defendants' current cumulative error is waived. In evaluating cumulative error, this Court will only consider "plain errors or errors which were preserved for appellate review." *Sanchez v. City of Chicago*, 880 F.3d 349, 361 (7th Cir. 2018); *see also United States v. Delgado*, 672 F.3d 320, 334 (5th Cir. 2012) (*en banc*) ("We consider each of [appellant's] allegations of error individually before examining the applicability of the cumulative error doctrine.").

As already established, Defendants have waived *individually* both their COI and "outraged and incensed" arguments. *See supra*. Therefore, of the three purported errors that make up Defendants' current cumulative error argument, only Defendants' Golden Rule argument was properly preserved in the district court, and this argument, standing alone, cannot constitute a "cumulative" error. *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001) ("If there are no errors or a single error, there can be no cumulative error."). Nor was the Golden Rule argument part of Defendants' cumulative error argument in the district court.

Defendants' cumulative error argument has not been preserved.[7]

[7] Defendants' position that it is okay to alter or amend the cumulative error argument on appeal is further supported by their silence on the proper

### B. The District Court Did Not Abuse Its Discretion In Rejecting Defendants' Cumulative Error Arguments.

Even if this Court were to hold that Defendants' cumulative error argument is preserved, it should still affirm the district court. To be successful on a "cumulative" error argument, a party must explain in detail how "the whole is greater than the sum of its parts." *Alvarez*, 225 F.3d at 824. In other words, Defendants must establish how errors which don't individually require reversal synergistically require reversal. *See supra*. Defendants have not done this here. While they repeat – over and over again – that admission of the COI was unfair, that Patrick's rebuttal argument was unfair, and that Patrick's Golden Rule argument was unfair, they do little, if anything, to establish the synergies required for this Court to reverse on cumulative error grounds. The closest that Defendants even get is to argue that "admission of the COI and the improper remarks by Patrick's counsel in closing argument, *considered in the context of a trial that hinged upon credibility*, cumulatively warrant a new trial." Br.51 (emphasis added).

First, that Patrick's trial "hinge[d] upon" credibility hardly makes a difference on cumulative error grounds since *every trial* hinges upon credibility (otherwise there would be no trial, Fed. R. Civ. P. 56).

---

standard of review of the district court's "cumulative error" holding. That silence violates Fed. R. Civ. P. 28(a)(8)(B), another basis on which this Court may reject the argument.

This Court appears to review a district court's cumulative-error holding for abuse of discretion in civil cases, and *de novo* in criminal cases, because of the due process component. *Compare Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 848 (7th Cir. 2017) *with United States v. Brown*, 822 F.3d 966, 971 (7th Cir. 2016).

Second, it was Defendants' decision to make this trial solely about Patrick's credibility instead of defending their own misconduct. Defendants' own unsuccessful trial strategy is not a basis for a new trial.

Third, arguing that the trial "hinged on credibility" hardly helps Defendants for another reason. The jury has overwhelmingly concluded that Patrick was credible on the core issues notwithstanding that he was not credible about two of his specific statements from 1999 and 2014.

Finally, this Court held in *Alvarez v. Boyd*,

> Courts must be careful not to magnify the significance of errors which had little importance in the trial setting. This requires an examination of the entire record, paying particular attention to the nature and number of alleged errors committed; their interrelationship, if any, and their combined effect; how the trial court dealt with the errors, including the efficacy of any remedial measures; and the strength of the [prevailing party's] case. To warrant relief, the reviewing court must determine that the effect of the errors, considered together, *could not have been harmless*. Put another way, a court must be firmly convinced that but for the errors, *the outcome of the trial probably would have been different*.

225 F.3d at 824-25 (citations omitted) (emphasis added).

Here, the trial was six weeks long and included 32 witnesses and 164 admitted exhibits. None of these three errors, individually or cumulatively, swallowed up the rest of the trial. The most profound of the alleged errors, the COI, had numerous "remedial measures," including, but not only, the court's jury instruction, discussed above. Defendants took advantage of ample opportunities to diminish the value and significance of the COI and to argue (and re-argue, and re-argue) Patrick's alleged guilt, an argument the jury clearly rejected.

In contrast, Plaintiff's case was particularly strong because the evidence that Taylor was in lockup at the time of the murders was overwhelming, as was the clear pattern the Detectives used to overcome the will of the seven young men. Defendants have not even attempted to meet, and they cannot meet, the *Alvarez* standard for cumulative error, and this Court should therefore affirm.

## IV. THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ON FABRICATION OF EVIDENCE, AND THE JURY HAD SUFFICIENT EVIDENCE TO FIND LIABILITY.

Defendants Villardita, Johnson, Berti, and Glinski next argue that the district court's wording of the fabrication instruction was erroneous and that there was insufficient evidence to find them liable for fabrication of evidence. Br.51-57. This argument fails on its merits, or was harmless.

### A. The District Court Properly Instructed The Jury on Fabrication of Evidence.

#### 1. Standard of Review

Defendants' statement of the standard of review, Br.52, is incomplete. While Defendants correctly assert that a jury instruction is generally reviewed *de novo, id.*, defendants omit several other key elements of this Court's review.

First, to obtain relief from an allegedly faulty jury instruction, a party must establish not only (1) that the instruction "failed to completely and correctly state the law," but also (2) that the correct legal principles were not otherwise communicated to the jury through evidence and arguments, and (3) that the instruction prejudiced Defendants. *Susan Wakeen Doll Co. v. Ashton Drake Galleries*, 272 F.3d 441, 452 (7th Cir. 2001); *Saathoff v. Davis*, 826 F.3d 925, 932

(7th Cir. 2016). Defendants must meet all three elements in order to obtain relief in this Court. *Id.*

With respect to the first element, this Court has held that "jury instructions need not be perfect," *Hernandez v. HCH Miller Park Joint Venture,* 418 F.3d 732, 738 (7th Cir. 2005), and that district courts have "substantial discretion with respect to the precise wording of jury instructions so long as the final result, read as a whole, completely and correctly states the law." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). This Court will affirm a jury instruction that conveys "the correct message . . . to the jury reasonably well . . . in a common sense manner," *Saathoff v. Davis*, 826 F.3d 925, 932 (7th Cir. 2016) (citation omitted), and in reviewing such an instruction, this Court will "avoid[] nitpicking." *Id.*

Second, even if the jury instruction is erroneous, "if the applicable principles of law were communicated to the jury—through the arguments or evidence, for example—then [Plaintiff] does not deserve a new trial." *Susan Wakeen Doll,* 272 F.3d at 452.

Third, as Defendants concede, Br.52, they must establish prejudice in order to obtain a new trial on the basis of an erroneous instruction. *Saathoff*, 826 F.3d at 932; *Viramontes v. City of Chicago*, 840 F.3d 423, 428 (7th Cir. 2016).

**2. The Instruction Was Complete and Correct.**

The district court instructed the jury that in order to find for Patrick and against an individual defendant, Patrick was required to prove:

(1) that defendant fabricated evidence;

(2) that fabricated evidence was used to "deprive Patrick of his liberty in some way;" and

(3) that fabricated evidence proximately caused Patrick to be damaged.

SA50.

Defendants assert that "contrary to precedent," the instruction was erroneous because it permitted the jury to find liability if the fabricated evidence "deprived Patrick of his liberty in some way" instead of "was used at his criminal trial." Br.53-54, *citing Whitlock v. Brueggemann*, 682 F.3d 567, 581-82 (7th Cir. 2012) and *Avery v. City of Milwaukee*, 847 F.3d 433, 442 (7th Cir. 2017). *See also* Br.36 ("[o]nly fabricated evidence introduced at a criminal trial can cause a due process violation"); *see also* Br.52, 54-55, 55 (same).

Defendants' own cited cases, however, prove this is wrong. In *Whitlock*, the court's very first sentence on due process causation arising from fabricated evidence is: "We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence *is later used to deprive the defendant of her liberty in some way*." 682 F.3d at 580 (emphasis added). In *Avery*, the very first sentence on the topic of due process causation from fabricated evidence is the same. 847 F.3d at 439–42 (internal citation omitted).

Not only do the very two cases upon which Defendants rely indicate that "deprived defendant of liberty in some way" is the correct legal standard, but many cases since *Whitlock* and *Avery* establish that this legal standard is now universally controlling in this Circuit. In other words, the language "deprived defendant of liberty in some way" is not only *not* contrary to precedent, it is *the precedent* in *this*

*Circuit*. *See*, *e.g.*, *Saunders-El v. Rohde*, 778 F.3d 556, 560 (7th Cir. 2015) ("if the fabricated evidence is later used 'to deprive an individual of his liberty of some way,' the police officer has violated the individual's due process rights"); *Khorrami v. Rolince*, 713 Fed. Appx. 494, 500 (7th Cir. 2017) ("The mere act of creating false evidence does not implicate due process rights, unless that evidence is later used to deprive the individual of liberty in some way"); *Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018) (if "the fabricated police reports furthered the prosecution, [Plaintiffs] have done enough"), *overruled in part on other grounds, Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019); *White v. Fitzpatrick*, No. 18-1741, 2018 WL 6168633, at *5 (7th Cir. Nov. 26, 2018) ("If the fabricated evidence is later used to deprive an individual of his liberty in some way, the police officer has violated the individual's due process rights").

Defendants falsely posit that because in *some cases* fabricated evidence was used against the criminal defendant at trial, therefore, there is a *requirement* that the evidence must be used at the trial to establish a due process violation. But that argument misrepresents this Court's holdings and misconstrues this Court's repeated emphasis on the many ways that fabricated evidence can deprive a defendant of the right to a fair trial, even if the actual piece of evidence is not "used" at trial. *See Avery*, 847 F.3d at 442 (correct inquiry is whether the intentionally fabricated evidence "taint[ed]" the trial in some way); *Armstrong v. Daily*, 786 F.3d 529, 540 (7th Cir. 2015) (correct inquiry is whether the intentionally fabricated evidence "undermine[d] the reliability of the trial").

Judge Guzman correctly stated at the jury instruction conference that the issue is one of "causation." S.A.21. Did the fabrication *cause* a deprivation of liberty, which can turn on myriad factors beyond just the use of the fabricated evidence at trial? Indeed, causation is why this Court – in discussing "deprived of liberty in some way" – repeatedly contrasts the "false evidence" cases from the "coerced confession" cases. In the coerced confession cases, this Court has repeatedly emphasized that coercively interrogating witnesses, even though deplorable, may nevertheless still lead to coerced testimony which "may in fact be true," whereas:

> The same cannot be said for fabricated evidence. Falsified evidence will *never* help a jury perform its essential truth-seeking function. That is why convictions premised on deliberately falsified evidence will always violate the defendant's right to due process.

*Avery*, 847 F.3d at 439. And, just as this Court has contrasted the false evidence cases from the coercion cases, it has also analogized "false evidence" cases to "destruction or withholding of exculpatory evidence" cases. Just as destruction or withholding of exculpatory evidence under *Youngblood* or *Brady* interferes with a defendant's trial rights (even though the destroyed or withheld evidence was not "used" at trial), so too fabricated evidence can be used to interfere with a defendant's trial rights even if not admitted as evidence at the trial. *See*, *e.g.*, *Avery*, 847 F.3d at 439; *Armstrong*, 786 F.3d at 540; *Fields v. Wharrie*, 740 F.3d 1107, 1111-12 (7th Cir. 2014).

This Court gives district court judges substantial discretion in wording jury instructions, as long as the final instruction, read as a whole, completely and

correctly states the law. Judge Guzman's fabrication instruction did just that. Defendants' argument that he applied the wrong legal standard is frivolous, and this Court should resoundingly reject it.

### 3. Neither *Manuel* nor *Lewis* are applicable here.

Defendants passingly make a separate Fourth Amendment argument based on *Manuel v. City of Joliet*, — U.S.—, 137 S.Ct. 911 (2017) and *Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019). Br.31, 54-55. Defendants relied heavily on this argument before Judge Guzman, R403–3-7, but he properly rejected it, A20-21.

In *Manuel*, the Supreme Court held that a claim for wrongful pre-trial detention based on fabricated evidence must be brought under the Fourth Amendment, while a claim for post-trial detention must be brought under the Fourteenth Amendment. 137 S.Ct. at 919. Defendants therefore argue that even if they fabricated evidence, if it wasn't used at Patrick's trial, it does not implicate the Fourteenth Amendment and Patrick was entitled to only a Fourth Amendment claim for violation of his liberty during the two+ years he spent in pretrial detention. See Br.53-54. This argument must be rejected on numerous grounds.

First, Patrick's fabricated confession and the false Faye McCoy lineup report were used against him at his criminal trial, R380–1631:23-1633:2; DTX298—P111:3-15; Dkt.357-7, and that alone, is sufficient to reject Defendants' Fourth Amendment argument.

Second, *Manuel* only involves fabrication of evidence that causes deprivation of liberty between (A) the time of a defendant's arrest and (B) the time that the

prosecution drops the case or the defendant is acquitted. *Manuel*, 137 S.Ct. at 919-920; *Lewis*, 914 F.3d at 474. Neither *Manuel* nor *Lewis* apply at all where, as here, Patrick was convicted at a criminal trial and spent 18-1/2 years of post-trial incarceration on top of his 2-1/2 years of pretrial detention.

Third, *Lewis* actually supports Patrick's position. First, it repeats *Manuel's* straightforward holding that if *only* pretrial detention is at issue, the Fourth and not the Fourteenth Amendment governs. But it also makes clear that if Defendant is wrongfully convicted and suffers post-conviction detention, the Fourteenth Amendment governs. *Lewis*, 914 F.3d at 477. This Court's opinion in *Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018), further supports this point. In *Hurt*, this Court held that as long as plaintiffs prove that fabricated police reports "furthered the prosecution," plaintiffs had "done enough" to establish a due process violation. 880 F.3d at 844, *discussed and quoted* in A.20-21.

As Patrick was deprived of his liberty for 21 years because of the fabricated evidence, the Fourth Amendment cases are simply inapplicable.

**4. The Evidence and Argument Guided the Jury to a Proper Consideration of Patrick's Fabrication Claim.**

Defendants must do more than establish that an instruction was incorrect. Defendants must also establish that the jury was not properly guided by the evidence and arguments through some alternative method. *Susan Wakeen Doll*, 272 F.3d at 452; *White v. Hefel*, 875 F.3d 350, 359 (7th Cir. 2017) (instruction error harmless because plaintiffs "were allowed to, and did, argue in closing [the proper standard of liability in relation to excessive force]"). Here, the jury was properly

guided by admission of the fabricated evidence itself, testimony about it, and the arguments with respect to it. *See* R375–510:19-511:5 ("lookouts" couldn't see through buildings); R392–4051:3-4060:13 (summary of all fabricated evidence in closing argument).

Defendants have not even attempted to establish that the jury was deprived of such guidance from these alternative sources, another basis to reject Defendants' instruction argument.

**5. Defendants Were Not Prejudiced by the Fabrication Instruction.**

Defendants' final burden is to establish that they were prejudiced by the purportedly faulty instruction. Defendants have not met this burden; indeed, even though Judge Guzman specifically pointed out that they failed to address prejudice in the court below, A.23-24, they have similarly failed in this Court to establish the way in which they have been prejudiced by the jury instruction given. Indeed, because the fabricated Patrick confession and fabricated lineup report were used at Patrick's criminal trial, Defendants cannot establish prejudice, even if the jury instruction was incorrect.

**6. The Court's Instruction Sufficiently Covered "Materiality."**

Defendants' final argument about the wording of the fabrication instruction is that Judge Guzman erred when he rejected (1) Defendants' proposed phrase, "the fabricated evidence must be material" and (2) their proposed definition of materiality. Br.56. *Cf. also* SA49 *with* SA50. Judge Guzman properly rejected this

argument, both at the instruction conference and then again in his post-trial opinion, S.A.25 and A.21-23, and this Court should as well.

First, Judge Guzman stated in the instruction conference, "By definition, if [the evidence Defendants falsified] caused [Patrick] to be deprived of his liberty for purposes of his constitutional rights, it's material." SA25. As long as that statement is correct, and it is, then Defendants' "nitpicky" argument that the district court did not use the precise word that Defendants requested is of no moment. *See Saathoff*, 826 F.3d at 932.

Second, Defendants relied heavily in their post-trial brief on a proposed Seventh Circuit Pattern Civil Rights Instruction that had been recently released for public comment. R403–7-10. Defendants re-assert this argument in this Court, arguing that the court erred because the word "material" and the instruction's definition of "materiality" were *required*. Br.56. In considering Defendants' "Pattern" argument post-trial, Judge Guzman carefully explained in detail why he was not required to follow the pattern instruction's proposed language and went further to explain why that proposed language was not required in this particular instance. *See* A.22-23. Defendants have not established how the failure to add "material" was erroneous given the explanation provided by the district court.

### B. Even If Fabrication Instruction Given Was Error, It Was Harmless Error.

Even if this Court concluded that Judge Guzman erred by choosing the words "deprived of liberty in some way" and omitting the word "material," this Court should still find that doing so was harmless error. "An inaccurate jury instruction

constitutes harmless error where the evidence is one-sided or overwhelming." *United States v. Carson*, 870 F.3d 584, 603 (7th Cir. 2017), *citing United States v. Dobek*, 789 F.3d 698, 701 (7th Cir. 2015). *See also United States v. Cardena*, 842 F.3d 959, 998 (7th Cir. 2016) ("Even a jury-instruction error of constitutional dimension is subject to the familiar requirement that the error . . . harmed the defendant[,]" and defendant must establish "a reasonable probability that but for the error the outcome of the trial would have been different.").

Here, Defendants have not established (and indeed, not argued) that there is a reasonable probability that but for the purported instruction error, the outcome of the trial would have been different. The evidence submitted and the jury's carefully-parsed verdict (especially its finding of liability on numerous other counts) strongly suggest otherwise, and Defendants have therefore not met this burden.

This Court should reject Defendants' faulty instruction argument.

### C. The Jury Had Sufficient Evidence For Fabrication Liability.

Defendants' final argument on fabrication is that Patrick presented insufficient evidence to establish that any fabricated evidence was used at Patrick's criminal trial. Br.36, 55. This Court should summarily reject this argument.

#### 1. Standard of Review

Defendants fail to identify the standard of review for an "insufficiency of the evidence" claim.

> To warrant judgment as a matter of law because of legal insufficiency of evidence, there must have been "no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." Attacking a jury verdict is a hard row to hoe. In assessing whether there was such a reasonable basis

> after a trial on the merits, this Court considers whether the totality of the evidence supports [the jury's] verdict . . . . Our inquiry "is limited to whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed[.]"

*Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1043–44 (7th Cir. 1999) (internal citations omitted).

First, this argument is really just a re-hash of the argument that the instruction was wrong. If this Court rejects Defendants' instruction argument, then the Court may and should reject Defendants' sufficiency-of-the-evidence argument on the same grounds.

Second, by finding in favor the jury of Patrick on this claim, the jury is presumed to have found that Patrick met each of the fabrication elements, S.A.50, and to have done so with evidence sufficient to establish (1) fabrication that (2) caused (3) a deprivation of Patrick's liberty.

Third, Defendants' insufficiency-of-the-evidence argument may be rejected as a matter of fact. There was undisputed evidence that both Patrick's fabricated confession and the fabricated lineup report were used at Patrick's underlying criminal trial. Not only do Defendants fail to acknowledge that the State used the fabricated lineup report to impeach McCoy at Patrick's criminal trial, they incorrectly state the opposite, when they assert that other than Patrick's confession, "none of the other allegedly fabricated evidence was used at trial." Br. 53. The State's use of the lineup report is sufficient, standing alone, to support fabrication liability.

With respect to Patrick's fabricated confession, they concede it was used but assert it still cannot form the basis of liability against Villardita or Johnson because – according to Defendants – Patrick only accused O'Connor and ASA Magats of fabricating his confession. Br.53. Defendants are just wrong. Patrick pled and proved that Villardita and Johnson were intimately involved and frankly, the ringleaders, in the fabrication of the confessions, including his own. R1-7; R380–1549:21-23. It is axiomatic that all evidence must be viewed in the light most favorable to Patrick, *supra*, and in that light, Villardita's and Johnson's argument that the jury could not tie them to the fabricated Patrick confession is frivolous and should be rejected.

Berti and Glinski make two equally unavailing arguments. First, they argue that because they were not part of the interrogation of Patrick or the others, they cannot be liable for fabrication of a report that was prepared *after* Patrick confessed and was arrested. Br.59. This is also wrong. After Villardita and Johnson learned there was proof that Taylor was in lockup at the time of the murders, they fabricated and caused others to fabricate additional false evidence. One such piece of evidence was the Berti-Glinski Report, PTX60. Nearly one month after the murders, Villardita and Johnson asked Berti and Glinki to prepare a false report of seeing Taylor on the street at 9:30 p.m., a half hour before he was actually released from lockup. Berti and Glinski readily obliged, and they prepared their report for the sole purpose of discrediting Taylor's alibi. This conduct was part of a continuing conspiracy to violate Patrick's – and the others' – civil rights.

That Berti and Glinski were not part of the initial interrogations may absolve them of fabricating the confessions, but it cannot possibly absolve them of their own fabrication of material evidence. In this regard, the precise question the jury was asked to decide was: did *that Defendant* fabricate evidence, and was the evidence *that Defendant* fabricated then used in some way to deprive Patrick of his liberty? The jury answered yes not only to Villardita and Johnson, but also to Berti and Glinski, and it has long been established that appellate courts will not replace their view of the evidence for that of the jury. In *Lavender v. Kurn*, 327 U.S. 645 (1946), the Supreme Court held:

> [Once] [t]he jury ha[s] made [an] inference, the [losing party is] not free to relitigate the factual dispute in a reviewing court. Under these circumstances it would be an undue invasion of the jury's historic function for an appellate court to weigh the conflicting evidence, judge the credibility of witnesses and arrive at a conclusion opposite from the one reached by the jury. . . .
>
> . . . Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.

*Id*. at 652-53 (internal citations omitted). See also *Ray v. Clements*, 700 F.3d 993, 1038 n.21 (7th Cir. 2012), *quoting Grepke v. General Elec. Co.,* 280 F.2d 508, 511–12 (7th Cir.1960), *quoting Lavender*, 327 U.S. at 653.

Here, it was more than a fair inference for the jury to conclude that Villardita and Johnson participated in the many instances of fabricated evidence, and in fact, spearheaded all of it. Similarly, it was a more than fair inference for the jury to

conclude that Berti and Glinski willingly fabricated the Berti-Glinski Report at the behest of those ringleaders, and did so to discredit the Taylor alibi and attempt to protect the fabricated and coerced confessions from attack.

Finally, the jury concluded that all of this evidence was used to deprive Patrick of his liberty. Nothing more is needed to affirm the jury's verdict.

## V. THIS COURT SHOULD UPHOLD THE JURY'S LIABILITY FINDINGS FOR FAILURE TO INTERVENE AND CONSPIRACY.

In Section V, Defendants assert that this Court should reverse their failure-to-intervene and conspiracy liability and order a new trial. Br.58. Defendants' sole argument in support of this proposition is that both counts "require an underlying constitutional violation," of which there was none. *Id*. Defendants Berti and Glinski separately argue that they cannot be found liable on these counts at all because, as they contended with respect to the fabrication claim, they did not join the conspiracy until after Patrick had already confessed and been charged.

### A. Defendants Were Properly Found Liable For Underlying Constitutional Violations.

As an initial matter, as to Villardita, O'Connor and Abreu, there *is* an underlying constitutional violation that they have not challenged on this appeal – coerced confession liability. This Court should therefore affirm their conspiracy and failure-to-intervene liability on this basis alone.

As to Johnson, Berti and Glinski, if this Court upholds their fabrication-of-evidence liability, it must also uphold Defendants' failure-to-intervene and conspiracy liability. In that regard, these Defendants' Section V arguments simply

repeats their Section IV fabrication arguments, and this Court should reject them for the same reasons stated above.

### B. Defendants' Failure-To-Intervene and Conspiracy Arguments Should Be Rejected As Moot.

There is another reason Defendants' failure-to-intervene and conspiracy argument should be rejected. Defendants themselves proposed a verdict form by which the jury awarded a single compensatory damages figure jointly and severally against all Defendants found liable, regardless of the count or counts on which any individual defendant was found liable. Indeed, the Court used the *Defendants'* proposed verdict form, not Patrick's. *Cf.* R217-19 with R368.

Under this approach, a defendant would be liable for the same compensatory damage amount whether he was found liable on only one count or all six. Because of this, even if the Court were to find error with respect to one or more counts against one or more individual defendants, such individual error would be harmless as long as any single count against that defendant was upheld. Put another way, the sole basis on which this Court could alter an individual Defendants' liability would be to conclude that that individual Defendant was not liable under any count.

Where, as here, there are numerous counts of liability that Defendants have not challenged *at all,* the Court may and should uphold the entire judgment irrespective of any alleged problems in the counts about which Defendants complain.

As just one example, all four Detectives were found liable for malicious prosecution and state conspiracy (and three were found liable for coercion), none of

which they challenge on this appeal. Those jury findings, standing alone, make each Detective jointly and severally liable for the $13.3M in compensatory damages, and each is responsible for their own punitive damages arising out of that liability. Therefore, even if this Court agreed with some or even all aspects of the Detectives' fabrication, failure-to-intervene, and conspiracy arguments, any error applicable to those specific counts would be harmless because each Detective would still remain liable to Patrick on the other unchallenged counts, and each would remain liable in the same compensatory and punitive damage amounts.

In response, Defendants incorrectly assert that "[a] verdict for any defendant on any claim would reduce that defendant's liability." Br.59-60. That is just flatly wrong. The Court could reverse the failure-to-intervene liability against every defendant found liable, and it would not affect at all that each of the Defendants was still jointly and severally liable for the full $13.3M compensatory verdict.

The same is true for punitive damages. Defendants incorrectly assert that the Court should order a new trial on punitive damages because "the jury's assessment of punitive damages may be different for a defendant who is liable on fewer claims." Br.59-60 (citations omitted). Defendants do not produce a single fact to support their supposition that a jury awards punitive damages based on the number of counts on which they find an individual defendant liable, and Defendants

have offered nothing to contradict the presumption that the jury properly followed the Court's punitive damages instruction.[8]

Finally, there was more than sufficient evidence from which the jury could have concluded that Defendants conspired and failed to intervene. In fact, Defendants, who rely primarily on the argument that there was no underlying constitutional violation, do not seriously argue otherwise. The Court should affirm Defendants' failure-to-intervene and conspiracy liability.

### C. This Court Should Reject Berti's and Glinski's Assertion that They Cannot Be Liable for Conspiracy or Failure To Intervene.

For the same reasons, this Court should reject Berti's and Glinski's separate argument that they cannot be found liable for conspiracy or failure to intervene because they were not involved in Patrick's confession. Br.58-59. First, a defendant may join a conspiracy at any time, and as the jury was properly instructed, that defendant is liable for all of the overt acts of the conspiracy, regardless whether those acts occurred before, during, or after that conspirator joined the conspiracy. *Kitchen v. Burge*, 781 F. Supp. 2d 721, 734 (N.D. Ill. 2011) ("each conspirator is liable for overt acts of every other conspirator done in furtherance of the conspiracy, whether the acts occurred before or after he joined the conspiracy"). As long as

---

[8] Nor does *Glickenhaus & Co. v. Household International Inc.*, 787 F.3d 408, 428 (7th Cir. 2015), support Defendants' suggestion that a remand is required to re-apportion punitive damages. Defendants argue that "[w]here apportionment of responsibility may change if a jury were properly instructed, a new trial is warranted." Br.57, *citing Glickenhaus*. But the re-apportionment of damages that was required in *Glickenhaus* was caused solely by an incorrect instruction on the three officers' *liability*. 787 F.3d at 426. *Glickenhaus* is wholly inapposite to this case.

Berti and Glinski took an overt act (which the jury found they did, R369–34, 38), they are liable for conspiracy. *Id*.

Second, Berti and Glinski were not necessarily found liable for failure to intervene in Patrick's coerced confession. It is far more likely that the jury found them liable for failure to intervene when Villardita and Johnson asked them to fabricate a police report (one month after the fact), a report that made it appear that Daniel Taylor was *not* in lockup when he actually *was* in lockup. Defendants concede in their Brief that this conduct falls squarely within the failure-to-intervene jury instruction, stating:

> Here, the failure to intervene instruction required a defendant to know that another defendant "was about to unconstitutionally coerce the Plaintiff into providing a self-incriminating statement <u>or</u> *fabricate evidence against the Plaintiff*."

Br.58, *quoting* R369-33 (emphasis added). When Villardita and Johnson asked Berti and Glinski to fabricate evidence against Patrick, they both had the opportunity to intervene, but chose not to. Indeed, to the contrary, they chose to participate in the conspiracy and to fabricate evidence against the Plaintiff. As the jury found, doing so constituted fabrication of evidence, conspiracy, and failure to intervene, and this Court should affirm.

## CONCLUSION

Deon Patrick requests this Court affirm the district court's judgment.

Dated: May 6, 2019

Respectfully submitted,

*<u>/s/ Stuart J. Chanen</u>*
Stuart J. Chanen
Nicole N. Auerbach

Ariel Olstein
VALOREM LAW GROUP
218 N. Jefferson Street
Chicago, IL 60661
312-676-5460
Stuart.chanen@valoremlaw.com
Nicole.auerbach@valoremlaw.com
Ariel.olstein@valoremlaw.com

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B)(i) and CIRCUIT RULE 32(c)

In accordance with Fed. R. App. P. 32(g)(1), I certify that the Brief and Appendix of Plaintiff-Appellee complies with the type-volume limitation set forth in Fed. R. Civ. P. 32(a)(7)(B)(i) as modified by Seventh Circuit Rule 32(c), and this court's April 24, 2019 order granting leave to file a brief not to exceed 18,000 words, Dkt. 31, because it contains 17,999 words, beginning with the words "JURISDICTIONAL STATEMENT" on page 1 and ending with the words "Respectfully submitted" on page 69. In preparing this certificate, I relied on the word count of the word-processing system used to prepare the brief, which was Word 2016.

/s/ Stuart J. Chanen

## CERTIFICATE OF SERVICE

I certify that I filed the attached Brief and Supplemental Appendix of Plaintiff-Appellee, electronically via the CM/ECF system on May 6, 2019. All counsel of record in this appeal are registered CM/ECF users and thus will be served electronically via the CM/ECF system on May 6, 2019.

/s/ Stuart J. Chanen
Stuart J. Chanen, Attorney