No. 18-2759

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

DEON PATRICK,

Plaintiff-Appellee,

v.

CITY OF CHICAGO, ANTHONY VILLARDITA,
THOMAS JOHNSON, RICK ABREU,
TERRY O'CONNOR, SEAN GLINSKI, and
MICHAEL BERTI,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 14 cv 3658
The Honorable Ronald A. Guzman, Judge Presiding

# SEPARATE SUPPLEMENTAL APPENDIX OF PLAINTIFF-APPELLEE

Stuart J. Chanen (Counsel of Record)
Nicole N. Auerbach
Ariel Olstein
VALOREM LAW GROUP
218 N. Jefferson St, Suite 300
Chicago, Illinois 60661
312-676-5460

## SUPPLEMENTAL APPENDIX TABLE OF CONTENTS


PTX35 Lewis Gardner Confession ............................................ PSA001-PSA026

PTX36 Daniel Taylor Confession ............................................ PSA027- PSA052

PTX44 Akia Phillips Confession ............................................ PSA053- PSA073

PTX47 Paul Phillips Confession............................................ PSA074- PSA092

PTX48 Deon Patrick Confession ............................................ PSA093- PSA096

PTX51 Rodney Mathews Confession............................................ PSA097- PSA100

PTX52 Joseph Brown Confession............................................ PSA101- PSA104

PTX41 Lewis Gardner Diagram............................................PSA105

PTX41A Lewis Gardner Diagram ............................................PSA106

PTX42 Akia Phillips Diagram............................................PSA107

PTX43 Daniel Taylor Diagram............................................PSA108

PTX46 Paul Phillips Diagram............................................PSA109

Slip Op. *Logan v. Burge*, 09 C 5471, Dkt. 423 (Court Order)
(N.D. Ill. Oct. 19, 2012)(Bucklo, J.) ................................ PSA110- PSA135

PLAINTIFF'S EXHIBIT 35

EXHIBIT 9
Deponent Villardita
Date 9.17.14 Rptr.
WWW.DEPOBOOK.COM

jkl

RE: INVESTIGATION (Death of Jeffrey Lassiter and Sharon Haugabook)

STATEMENT

of

LEWIS GARDNER,

taken in an interview room, 2nd Floor, Area 6 Headquarters, Belmont and Western, Chicago, Cook County, Illinois, on December 3, 1992, at 3:20 o'clock a.m.

PRESENT: MR. MARTIN FOGARTY
Assistant State's Attorney

Det. VILLARDITA, Star No. 20849
Area 6 Violent Crimes

Youth Officer Heryman, Star No: 14984
Area 6 Youth Division

Reported By: Janet K. Lupa
Illinois License No. 084-002103

Book No. 9212-3

---

MR. FOGARTY: Let the record reflect that we are in an interview room at Area 6 Violent Crimes. Today's date is December 3, 1992. The time is 3:20 a.m.

Present in the room with me, Assistant State's Attorney Martin Fogarty, are Detective Villardita, the court reporter, Youth Officer Heryman and Lewis Gardner.

We are here to take the statement of Lewis Gardner concerning the investigation of the homicides of Jeffrey Lassiter

and Sharon Haugabook, which occurred on 16 November 1992 at approximately 8:43 p.m. at 910 West Agatite in Chicago.

Q. Lewis, I talked to you earlier and explained that I am an Assistant State's Attorney, a lawyer and prosecutor, and not your lawyer, is that correct?

A. Yes, sir.

Q. And before we spoke, I advised you of your constitutional rights, is that correct?

A. Yes, sir.

Q. I am going to read you your rights again.

Do you understand that you have a right to remain silent?

A. Yes, sir.

Q. Do you understand that anything you say can be used against you in a court of law?

A. Yes, sir.

Q. Do you understand you have the right to talk to a lawyer and have him present with you while you are being questioned?

A. Yes, sir.

Q. Do you understand if you cannot afford to hire a lawyer, and you want one, a lawyer will be appointed by the Court to represent you before any questioning?

A. Yes, sir.

Q. Do you understand that you will be treated and charged as

L.G.



DT-031197

an adult in this case?

A. Yes, sir.

Q. Understanding these rights, do you wish to talk to us now?"

A. Yeah.

Q. Excuse me?

A Yes, sir.

Q Lewis, please state your full name and spell your last name?

A Lewis Gardner, G-A-R-D-N-E-R.

Q How old are you, Lewis?

A Fifteen.

Q What is your birthday?

A September 8, 1977.

Q What is your present address?

A 4408 North Hazel.

Q Who do you live with?

A My mother.

Q Anyone else?

A My two sisters, and my stepfather.

Q Where do you go to school?

A Senn.

Q What year are you at Senn?

L.G



DT-031198

A First.

Q Freshman?

A Yeah.

Q Lewis, are you a member of a gang?

A Yes, sir.

Q What gang is that?

A Vice Lords.

Q How long have you been a member of the Vice Lords?

A For about two years.

Q Do you have a rank in the Vice Lords?

A No, sir.

Q Lewis, I want to draw y our attention to the date of November 16, 1992, at about 7:00 o'clock p.m., do you remember that day?

A Yes, sir.

Q Did you have occasion that day to be at Clarendon Park in Chicago?

A Yes, sir.

Q Where is Clarendon Park at?

A It's Clarendon and Sunnyside.

Q Okay. What were you doing in Clarendon Park that night?

A We was having a gang meeting.

Q Can you tell me who was present at the gang meeting?

L.6

A It was C Deon, Paul Phillips, Deon Phillips, Rock, Ed, Slick, T Mack, Black T, Cuzzo, and that's all I can remember.

Q Do you recall --

A And me.

Q You were there?

A Yeah.

Q Do you recall if someone named Pookie was there?

A Yeah.

Q Was Pookie there?

A Yes, sir.

Q Do you recall if someone named Goldie was there?

A Yeah.

Q Was Goldie there?

A Yes, sir.

Q I have in my hand what's been marked Exhibit No. 1. Can you identify that exhibit, what that is?

A This is Maryville Children's Home right here. (indicating)

Q Is Exhibit No. 1 a map?

A Yes, sir.

Q Okay. And Maryville is the children's home you just pointed to. It would be located on that map somewhere, is that correct?

L.G



DT-031200

A Yes, sir.

Q And can you put a No. 1 where you had your meeting at Clarendon Park, where you had your gang meeting?

A Right behind the fieldhouse.

Q I also have in my hand several photographs and I'm going to mark them as exhibits and I'm going to show them to you and I'm going to ask you if you recognize the people in those photographs and if you do tell me and identify them if you would?

I have in my hand what's marked Exhibit No. 2.

A That's C Deon .

Q Do you know C Deon's full name?

A No, sir.

Q You only know him as C Deon?

A Yeah.

Q How do you know him?

A I see him walking up and down the street and keep on going.

Q Is he in your gang?

A He's in a different gang but he's a Vice Lord also.

Q Does he have a rank in the Vice Lords?

A Yes, sir.

Q What's his rank?

A Chief.

L.G

Q How do you know that?

A Because he tells a lot of Vice Lords what to do.

Q Does he tell you what to do?

A Uh-uh. Yes L.G

Q Do you see the IR number in the photo, Exhibit No. 2?

A Yes, sir.

Q Do you see the number next to that, the IR number?

A Yes, sir.

Q What is that number?

A 908357.

Q Are you sure of that number?

A 908351.

Q That last number is a one not a seven?

A Yes, sir.

Q I have in my hand another photo. This is Exhibit No. 3.
Do you recognize who is in this photo?

A Yes, sir.

Q Who is this?

A That's Paul Phillips.

Q How do you recognize Paul Phillips? How do you know him?

A We grew up together.

Q Was he at that gang meeting?

A Yes, sir.

L.G



DT-031202

Q I have in my hand Exhibit No. 4. Do you recognize the person in this exhibit?

A Yes, sir.

Q Who is that?

A That's Deon Phillips.

Q Do you know Deon Phillips?

A Yes, sir.

Q How do you know Deon Phillips?

A We grew up together.

Q Is he related to Paul Phillips?

A They're brothers.

Q Does Deon Phillips have a nickname?

A Baby T.

Q I have in my hand Exhibit No. 5. Do you recognize who is in that photo?

A Yes, sir.

Q Who is that?

A Daniel Taylor.

Q How do you know Daniel Taylor?

A He used to live with Paul Phillips.

Q Does Daniel Taylor have a nickname?

A Yes, sir.

Q What's his nickname?



L. G

A Black T.

Q I have in my hand what's marked Exhibit No. 6. Do you recognize the person in this photograph?

A Yes, sir.

Q Who is that?

A Goldie.

Q Do you know what Goldie's full name is?

A No, sir.

Q Do you see the number next to that, the IR number in this photograph?

A Yes, sir.

Q Can you read that number?

A 678832.

Q Was Goldie at that meeting?

A Yes, sir.

Q I have in my hand what's marked Exhibit No. 7. Do you recognize the person in this photo?

A Yes, sir.

Q Who is that person?

A Rock.

Q Do you know Rock by any other name?

A No, sir.

Q How do you know Rock?



L, G

DT-031204

A He's a chief of the Travelers.

Q What does that mean?

A He's the chief of the Vice Lords, Traveler Vice Lords.

Q He's one of the leaders of the Vice Lords?

A Yes, sir.

Q Do you see an IR number on this, attached to this person Rock?

A Yes, sir.

Q What is Rock's IR number?

A 9102815.

Q Okay. Is that the IR number or the CB number?

A 824772.

Q The first number that you read, 9102815, what number was that?

A CB.

Q Was Rock at that meeting on November 16th?

A Yes, sir.

Q I have in my hand Exhibit No. 8. Do you recognize the person in this photograph?

A Yes, sir.

Q Who is this person?

A Cuzzo.

Q And how long have you known Cuzzo?



L.G

DT-031205

A Since we moved around here.

Q How long is that?

A That's since February.

Q And how is it that you know Cuzzo?

A We talk on the street.

Q Is Cuzzo also a Vice Lord?

A Yes, sir.

Q Was Cuzzo at that meeting?

A Yes, sir.

Q Can you read Cuzzo's ID number as it appears on Exhibit No. 8?

A 909224.

Q On Exhibit No. 1 you indicated where your gang meeting took place and that was by the fieldhouse at Clarendon Park, is that correct?

A Behind.

Q Behind the fieldhouse?

A Yes, sir.

Q How were you congregated at the fieldhouse?

A We was all standing in a circle right there. (indicating)

Q Indicating for the record Lewis just drew a circle to the east of the fieldhouse. And, Lewis, does that circle represent the



L.G

DT-031206

fact that you were standing in a circle?

A How we were standing.

Q And was anyone talking at the meeting?

A Yes, sir.

Q Who was talking?

A C Deon and Rock.

Q Where were C Deon and Rock?

A They was in the middle of the circle.

Q Were they both in the circle at the same time?

A C Deon was in there first.

Q What did he say when he was in the middle, if anything?

A He said some people owe me some money and he wanted -- he say they kept beating him up and he never did get the money.

Q You said they kept beating him up, who was beating who up?

A C Deon and Rock was beating the people that owed them some money.

Q Who were the people that owed C Deon and Rock money?

A I don't remember their names.

Q Okay. Do you know where these people lived?

A They lived on Agatite.

Q Do you know where on Agatite?

A Uh-uh. Yes L.G W. Agarite and Hazel



L.G

Q What else did C Deon say?

A He said he wanted something done to them.

Q Did C Deon say how much money this person owed him?

A He said about three or $400.

Q Did C Deon say what would happen if this person didn't pay him the money?

A He said he was going to shoot him.

Q What else did C Deon do?

A That's it.

Q Did C Deon show anything?

A Yeah, he showed a gun. After the meeting we went to the fieldhouse and he showed a gun. I didn't get a good look at it. I just saw the black. He had it beside his beltline. He flashed it out for a minute and then he put it back in.

Q He pulled the gun out?

A Yes, sir.

Q You knew it was a gun?

A Yes, sir.

Q How did you know it was a gun?

A Because I seen the barrel part.

Q Okay. What color was it?

A Black.

Q Okay. Did C Deon say anything else at the meeting or



G

DT-001208

right after the meeting?

A Uh-uh. no 4.9

Q Did Rock say anything?

A Uh-uh -- he said let's all walk over to Agatite.

Q Who said that?

A Rock.

Q Why were you going to walk to Agatite?

A So they could go shoot them people, see if they get the money or not.

Q And why did you have to go to Agatite?

A So I could look out.

Q What were your duties as lookout?

A Look out for the police.

Q What were you supposed to do if you saw the police?

A Yell Five-0 real loud.

Q How did you get from Clarendon Park to 910 West Agatite?

A We walked straight down Agatite from Clarendon.

Q How did you decide you were going to be a lookout?

A Deon told it to me, C Deon told us at the meeting.

Q When you say Deon told you, do you mean Deon Phillips or C Deon?

A C Deon.

Q Were there any other lookouts?

4.G



DT-031209

A Yes, sir.

Q How many other lookouts were there?

A Three.

Q Who were these other lookouts?

A Deon Phillips, Slick, and Paul Phillips and me.

Q So, there were a total of four lookouts?

A Yeah.

Q And were all the lookouts at the meeting?

A Yes, sir.

Q Okay. Where did you stand as lookout?

A I was standing --

Q Would you describe it in words?

A I was standing on the corner of Agatite.

Q Agatite and what?

A Hazel.

Q Okay. Drawing your attention to Exhibit No. 1, if you could put a No. 2 at the point where you were standing as lookout. Okay. And you were standing right on the corner, is that correct?

A Yes, sir.

Q And from your vantage point could you see up and down Agatite?

A Agatite and Hazel.

Q And Hazel?



4.G

DT-031210

A Yes, sir.

Q Could you see up and down both these streets?

A Yes, sir.

Q You stated that Deon Phillips was also a lookout?

A Yes, sir.

Q Where was Deon Phillips a lookout?

A He was two houses down .

Q Can you place a No. 3 approximately where Deon Phillips was a lookout.

You stated also that Paul Phillips was a lookout?

A Yes, sir.

Q Where was he a lookout at?

A In the alley of Agatite and Hazel.

Q Can you place a No. 4 where approximately Paul Phillips was.

From where you were standing could you see Paul Phillips?

A Yes, sir.

Q You stated that Slick was also a lookout?

A Yes, sir.

Q Where was Slick a lookout at?

A On Sunnyside and Hazel.

Q Can you place a No. 5 where Slick was a lookout at.

From where you were standing on Hazel and Agatite, could

G



DT-031211

you see Slick?

A Yes, sir.

Q You stated that your job was to yell Five-0 if you saw the police?

A Yes, sir.

Q Did you have to look out for anyone else?

A No, sir.

Q Okay. You stated that you walked over to the building down Agatite with other members of the Vice Lords?

A Yes, sir.

Q Who did you see, if anyone, go into the building at 910 West Agatite?

A I saw C Deon, Rock, T-Mack, Black T and Goldie.

Q What door did you see them go in?

A The door way at the end of the building in the back of the building.

Q Does that door appear on Exhibit No. 1 on the map?

A Yes, sir.

Q Could you please circle that door and draw a No. 6 next to it.

Did you see them go in that door?

A Yes, sir.

Q After you saw them go in that door what happened?

- G

A They went up to the house, went inside.

Q Did you see that?

A Yes, sir. They went inside, kicked the door in, and they started arguing with the people about the money.

Q Okay. I want you to tell us what you saw when you were standing on Agatite. After they went in the door that you marked No. 6, what happened next?

A We heard -- About five or ten minutes later after they went in we heard four or five gunshots.

Q You say five or ten minutes passed?

A Yes, sir. Then we heard gunshots.

Q What were you doing in the five or ten minutes?

A Still standing on the corner.

Q Were you still a lookout?

A Yes, sir.

Q Did you see any police?

A No, sir.

Q What happened after that five or ten minutes?

A We heard gunshots .

Q When you say we you are talking about yourself?

A Yes, sir.

Q Describe the gunshots you heard. How many gunshots did you hear?



L. G



M Ex. 40

A Four or five.

Q After you heard the gunshots what happened?

A C Deon, Rock, T Mack, and Black T came running out the building.

Q Where did they come running out of the building?

A They came running out on Agatite.

Q Did you see the door they came out of?

A Yes, sir.

Q What door was that?

A The door in the back.

Q The door that you marked No. 6?

A Yes, sir.

Q What did they do -- strike that.

Did you see Goldie walk out?

A No, sir.

Q What did C Deon and Rock do when they walked out the building?

A C Deon said Almighty and Rock said we took care of business, we outie (sic).

Q We took care of business what?

A We took care of business and we outie, we going to go.

Q We're out of here?

A Yeah.



DT-031214

Q You stated that C Deon said Almighty?
A Yes, sir.
Q What does that mean?
A Means we got the job done. It's like -- It's gang talk, what they say in gangs.
Q That's a gang term that means the job was completed?
A Yes, sir.
Q Where were C Deon and Rock when they said this?
A It was outside the building.
Q Did they say this to you or did they yell it?
A They just said it.
Q To who?
A Just said it to everybody.
Q Did you hear it?
A Yes, sir.
Q How far were you from them when you heard it?
A About -- this was right here and I was right there. (indicating)
Q How many feet were you from them approximately?
A About five feet.
Q What happened after that?
A They left.
Q Did you see how C Deon and Rock left?

G

A No, sir.

Q Did you see how Black T and T Mack left?

A They left with C Deon and Rock.

Q What did you do afterwards?

A I went across the street to see what happened.

Q You went across the street?

A Across the street on Agatite.

Q And how long did you stay there?

A I stayed there until the police arrived and brought the bodies out the building.

Q Can you draw a No. 7 on the map where you were standing while you were waiting all this time.

What did you do when the police brought the bodies out of the building?

A I looked at it, saw it was two bodies, then I left and went in the house.

Q How far is your house from that place?

A Just right down the street.

Q Could you draw a box where your house would be on this?

A Yes.

Q Could you draw a No. 8 near that box that indicates approximately where your house is?

Drawing your attention to the next day, November 17th,

l G

did you have an opportunity to see any of the people involved in that shooting?

A Yes, sir.

Q Who did you see?

A I saw Rock, C Deon.

Q Did you see Deon Phillips or Paul Phillips?

A I seen Deon Phillips and Paul Phillips.

Q Did you see all these people together?

A Yes, sir.

Q Approximately what time did you see them?

A It was like in the afternoon.

Q Where did you meet them?

A We was on the corner again.

Q What corner?

A Of Agatite.

Q And what?

A Hazel.

Q Which corner was it? Was it on the northwest, the northeast, the southeast or the southwest?

A The southeast.

Q Can you place a No. 9 at the point where you met on November 17th with Rock, Deon, Paul and C Deon.

Why did you meet?

G



DT-031217

A We just stood there and talked.

Q What were you talking about?

A They was talking about what happened when they went upstairs and killed the people .

Q Okay. Who was talking?

A C Deon and Rock.

Q C Deon was talking?

A Yes, sir.

Q What did he say?

A He said we went in, they started arguing about the money, they didn't have it, so he shot them.

Q Did C Deon say he shot them?

A Yes, sir.

Q Did Rock say anything?

A No, sir, he was just laughing.

Q Was anyone else laughing?

A No, sir.

Q Was C Deon laughing?

A Yeah.

Q Was Deon Phillips laughing?

A No, sir.

Q Was Paul Phillips laughing?

A No, sir.

Q Lewis, I want to ask you a few questions regarding how you came to the police station today?

A Yes, sir.

Q On the morning of December 2nd, you were in custody on another case, is that correct?

A Yes, sir.

Q What kind of case was that?

A Drugs.

Q On that case did you have a conversation with a police officer regarding this case?

A Yes, sir.

Q Who started that conversation?

A I did.

Q What did you say to that officer?

A I told him I know who did the murder that happened on Agatite.

Q Did he mention anything about the murder before you said that?

A No, sir.

Q Did anyone force you to speak about that murder?

A No, sir.

Q Did anyone promise you anything in exchange for the information about that murder?

1 G



DT-031219

A No, sir.

Q Did you offer that information to the officer of y our own free will?

A Yes, sir.

Q Since you have been here at the police station at Area 6 at Belmont and Western, how have you been treated by the detectives?

A Good.

Q Have they offered you anything to eat or drink?

A Yes, sir.

Q Did you have anything to eat or drink?

A Yes, sir.

Q What did you have?

A I had a pop -- I had two pops and a bag of chips.

Q Has anyone here at Area 6 promised you anything in exchange for this statement?

A No, sir.

Q Has anyone threatened you in any way into giving this statement?

A No, sir.

Q You're giving this statement freely and voluntarily, is that correct?

A Yes, sir.



G

Q Why is it that you told the officers that you had information regarding this case?

A Because I feel guilty about it.

Q Lewis, the court reporter will now type up your statement. We will then read over the entire statement together and you will be able to make any additions and corrections that you wish. Do you understand that?

A Yes, sir.

MR. FOGARTY: This will conclude the statement of Lewis Gardner. The time is now 3:53 a.m.

Lewis Gardner

WITNESSES TO SIGNATURE:

A.S.A. Martin J Fogarty

Y.O. Brian J. Heyerman

Det. A. Villardita #20849

PLAINTIFF'S EXHIBIT 36

Δ(π) EXHIBIT 12
Deponent Villardita
Date 9-17-14 Rptr. 77
WWW.DEPOBOOK.COM

afm

RE: INVESTIGATION (DEATH OF JEFFREY LASSITER & SHARON HAUGABOOK)

STATEMENT

of

DANIEL TAYLOR,

taken in an interview room, 2nd floor, Area 6 Headquarters, Belmont and Western, Chicago, Cook County, Illinois, on December 3, 1992, at .

PRESENT: JOSEPH MAGATS,
Assistant State's Attorney,
Felony Review Unit;

Det. BRIAN KILLACKY, Star No. 20748,
Area 6 Violent Crimes;

Reported By: Ms. Annette E. Faklis, C.S.R.
Illinois State License No. 84-2318

Book No. 9212-1

---

MR. MAGATS: Let the record reflect that we are in an interview room at Area 6 Violent Crimes. Today's date is December 3, 1992. The time is 5:23 a.m.

Present in the room with me, Assistant State's Attorney Joseph Magats, are Detective Killacky, the court reporter, and Daniel Taylor.

We are here to take the statement of Daniel Taylor concerning the investigation of the homicides of Jeffrey Lassister and Sharon Haughabook, which occurred on November 16, 1992 at



JM DT BK

approximately 8:43 p.m. at 910 West Agatite.

EXAMINATION

BY MR. MR. MAGATS:

Q. Daniel, I talked to you earlier and explained that I am an Assistant State's Attorney, a lawyer and prosecutor, and not your lawyer; is that correct?

A. Yes.

Q. And before we spoke, I advised you of your constitutional rights, is that correct?

A. Yes.

Q. I am going to read you your rights again.

Do you understand that you have a right to remain silent?

A. Yes.

Q. Do you understand that anything you say can be used against you in a court of law?

A. Yes.

Q. Do you understand you have the right to talk to a lawyer and have him present with you while you are being questioned?

A. Yes.

Q. Do you understand if you cannot afford to hire a lawyer, and you want one, a lawyer will be appointed by the Court to represent you before any questioning?

A. Yes.

Q. Understanding these rights, do you wish to talk to us now?

A. Yes.

Q. Daniel, could you please state your full name and spell your last name for the court reporter?

A. Daniel Lee Taylor, T-a-y-l-o-r.

Q. How old are you, Daniel?

A. 17.

Q. And what is your address?

A. 4075 North Oak Park.

Q. Is that in Chicago?

A. Yes.

Q. Are you a member of any street gang?

A. Yes.

Q. Which street gang are you a member of?

A. Travelers Vice Lords.

Q. How long have you been a member of the Traveling Vice Lords?

A. Three months.

Q. Do you have a nickname in that gang?

A. Black T.

Q. I am directing your attention to November 16, 1992, at approximately 7:00 p.m., do you recall where you were at that time

and on that date?

A. Yes.

Q. Where were you?

A. I was at a park.

Q. What park were you at?

A. Clarendon Park.

Q. Who were you there with?

A. Deon, Rock, Goldy, Baby T., and Paul Phillips.

Q. Do you know Deon's full name?

A. Akia Phillips.

Q. And do you know Rock's real name?

A. Timothy Cobb.

Q. Do you know Black T's real name?

A. Daniel Taylor.

Q. And who else besides those people that you just mentioned, was anyone else present?

A. Slick.

Q. Do you know Slick's real name?

A. No.

Q. Was someone named C Deon there?

A. Yes.

Q. And who is C Deon?

A. The leader of the Conservatives.

BA JMDT

Q. What are the Conservatives?

A. Vice Lords.

Q. What is the difference between Conservative Vice Lords and Traveling Vice Lords?

A. Independent.

Q. What do you mean?

A. A different organization.

Q. When you mentioned Rock, who is Rock?

A. The chief of Travelers.

Q. That is your group?

A. Yes.

Q. Why were you guys all at Clarendon Park?

A. Discussing the money that the guy that was killed owed Rock.

Q. How much money did he owe Rock?

A. 2 or $300.

Q. And why did he owe Rock this money?

A. Over drugs.

Q. How did you know there was a meeting that night?

A. Rock told us that there was an emergency meeting.

Q. And did you go to the meeting alone?

A. No.

Q. Who did you go with?

A. I walked up there with Paul Phillips and Akia Phillips .

Q. At that meeting was there also a guy named Goldy there?

A. Yes.

Q. Do you know Goldy's real name?

A. No.

Q. What happened at the meeting?

A. He told us that there was a guy that owed him some money.

Q. Who told you that?

A. Rock.

Q. Okay.

A. And we was going to go over to his house and see if he had the money, and he told us if he didn't have the money that we were going to kill him.

Q. What happened then?

A. Then before we left to go to the house, he pointed out the areas that people were to stand in.

Q. Who pointed it out?

A. Rock.

Q. And what tasks did he assign?

A. Look-out and for people to go up in the house with.

Q. Who were the look-outs going to be?

A. Baby T, Paul Phillips, Slick, and Tony. AKA Louis Gardner JML

Q. What did he tell the look-outs, what were they supposed



JM BK DT

to do?

A. To stand on a corner and watch for the police.

Q. And did he tell them what to do if the police came?

A. Yes.

Q. What did he tell them to do?

A. Run to the back door, the man that was standing at the alley, he was to run up and knock on the door, and they would know to run.

Q. Did anyone have a gun at this meeting?

A. Yes.

Q. How do you know that?

A. They told me there was a gun there, and the person that had it was C Deon.

Q. How do you know C Deon had the gun?

A. He told me he had it.

Q. When did he tell you this?

A. In the middle of the meeting.

Q. What was your assignment to be?

A. To go inside the house.

Q. And who was supposed to go inside the house with you?

A. Goldy, Deon, and Rock.

Q. Who told you that you were supposed to go inside the house?

A. Rock.

Q. When you say Deon, do you mean Deon or C Deon?

A. C Deon.

Q. After you all got your instructions, what happened then?

A. We headed over to the house.

Q. The house at 910 West Agatite?

A. Yes.

Q. What happened when you got to the house?

A. The people that he gave directions to look-out, they went to their spots.

Q. What did you do?

A. We went inside the gate.

Q. When you say we went inside the gate, who do you mean?

A. Me, Daniel Taylor, Goldy, Rock, and C Deon.

Q. When you went inside the gate, where did you go?

A. We went all the way to the back.

Q. What is in the back?

A. The doors leading to the house.

Q. Can you describe the building at 910 West Agatite?

A. Black fence right there in front of it.

Q. What is the building shaped like?

A. Like a U.

Q. What happened when you went to that door?



MDT

A. We banged against it.

Q. How did you bang against it?

A. With our shoulders.

Q. What happened when you banged against it?

A. Door flew open, and we went in.

Q. Who went in?

A. Me, Daniel Taylor, Goldy, C Deon, and Rock.

Q. Besides the four of you, who else was in the apartment?

A. The guy and the lady.

Q. Where was the guy?

A. He was sitting on the mattress.

Q. Where was the mattress located in relation to the door?

A. On the right side of the door.

Q. Where was the lady?

A. Running towards the washroom.

Q. What happened after you got in there?

A. We got in, they asked the guy that got killed, where is the money.

Q. Who asked the guy that?

A. Rock.

Q. Where was C Deon when Rock asked him?

A. Beside him.

Q. Beside who?

A. Rock.

Q. Where was Goldy when Rock asked the guy if he had the money?

A. Behind the three of us.

Q. Where were you standing?

A. On the side of C Deon.

Q. What happened after Rock asked the guy if he had the money?

A. The guy said no, I don't have it right now, and then that is when he pointed out to us to go and get the girl.

Q. Who pointed out to you?

A. Rock.

Q. Who did he point it out to?

A. Me and Goldy.

Q. Where had the girl gone?

A. To the washroom and locked herself in there.

Q. After Rock told you to get the girl, what did you and Goldy do?

A. Went to the washroom door, talked to her, asked her to come out; and after a while, she came out of the washroom, and we grabbed her hands, Daniel Taylor and Goldy, and we started going through some drawers looking for money, but there was none.

Q. When you say you grabbed the girl, how did you grab the

girl?

A. By her arms.

Q. Which arm did you grab?

A. Right one.

Q. Which arm did Goldy grab?

A. Left one.

Q. After you grabbed the girl and went through the drawers, what did you do then?

A. Made our way towards the hallway where they took the dude to Rock where he was killed at.

Q. Who took the guy there?

A. C Deon and Rock.

Q. Where is the room in relation to where you came into the apartment?

A. The next room down.

Q. What happened when you saw C Deon and Rock had taken the guy into that next room?

A. That is when Deon asked him did he have any money, and he said no, I don't have it right now.

Q. When you say Deon, are you referring to Deon or C Deon ?

A. C Deon.

Q. What happened after the guy told C Deon he didn't have the money?

A. He pulled out the gun.

Q. Who did?

A. C Deon.

Q. What did the gun look like?

A. I am not good at naming guns.

Q. Do you recall what it looked like?

A. It was silver, like the kind that you clip back.

Q. Where were you when C Deon pulled out the gun?

A. I was standing right next to the door.

Q. Where was Goldy?

A. Standing next to me holding the girl with me.

Q. Were you holding the girl at that point?

A. Yes.

Q. Where were you holding the girl at that time?

A. On her right arm .

Q. Where was Goldy holding the girl?

A. By her left arm.

Q. What was Rock doing at that time?

A. Standing beside C Deon asking the guy if he had the money.

Q. What did he say?

A. No, I don't have it right now.

Q. What happened then?

A. He then shot the guy on the left side of his head, around his temple area.

Q. Who fired the gun?

A. C Deon.

Q. How many times did C Deon fire the gun?

A. Two or three times.

Q. And the guy who got shot, what kind of position was he in?

A. Standing up.

Q. Did C Deon say anything to him before he shot him?

A. Yes.

Q. What did he say to him?

A. Where is my money.

Q. What did the guy say?

A. I don't have it.

Q. What happened then?

A. That is when he then shot him.

Q. What was Rock doing at that point ?

A. Standing beside C Deon.

Q. Did Rock say anything when the guy said he didn't have any money?

A. Rock said shoot him.

Q. Who did he say that to?

A. C Deon.

Q. Is that when C Deon shot him?

A. Yes.

Q. When C Deon shot the guy, where were you?

A. I was then in the room.

Q. Where was Goldy?

A. On the other side of me holding the girl.

Q. Where was Goldy holding the girl?

A. On her left arm.

Q. Where were you holding the girl?

A. On her right arm.

Q. Did the girl do anything after the guy got shot?

A. She screamed, and they put some cloth in her mouth.

Q. Who did?

A. Rock.

Q. What did Rock say to the girl?

A. He said we got to kill you because you know who did it.

Q. What happened then?

A. I then pushed her, she fell, and she started to say, please don't kill me.

Q. Was she doing anything else?

A. She was on the ground saying, please don't.

Q. Was she laying face up on the ground or face down?

A. Face up.

Q. How did you push her onto the floor.

A. By her shoulders. (Indicating)

MR. MAGATS: Indicating for the record from the front.

BY THE WITNESS:

A. Yes.

BY MR. MAGATS:

Q. After you pushed her down, what happened then?

A. Then C Deon walked over there, shot her in the head, around up in here. (Indicating)

Q. Where is up in here?

A. On the left side around the jaw.

Q. How many times did C Deon fire the gun?

A. Twice.

Q. And about how close to the girl was C Deon when he shot her?

A. About four feet.

Q. Did C Deon say anything to the girl before he shot her?

A. Yes.

Q. What did he say?

A. We got to kill you because you know who killed the other guy.

Q. What did the girl say?

A. Please don't, please don't.

Q. Was she doing anything else at that time?

A. No.

Q. When the girl was lying on the ground and C Deon shot her, what were you doing?

A. I still had her arm.

Q. What arm were you holding?

A. Right.

Q. How were you holding it?

A. By the wrist.

Q. What was Goldy doing at that time?

A. He had her other arm, and then he let it go and stood off to the side.

Q. What was Rock doing at this point?

A. Standing on the side, and he told C Deon to shoot her.

Q. What did C Deon say?

A. Okay, and then shot her.

Q. How many times did he shoot her?

A. Twice.

Q. What happened after he shot her?

A. Rock told us to lay her on the couch.

Q. Told who to lay her on the couch?

A. Goldy and Daniel Taylor.

Q. Did you lay her on the couch?

A. Yes.

Q. How did you do that?

A. Grabbed her by her arms and Goldy grabbed her by her feet, and we squeezed her up to the couch and sat her down.

Q. What happened then?

A. Then that's when Rock went over to the other guy, searched his pockets; and when he pulled out the money, I seen some 20's and 10's, and it looked like $150.

Q. Where did he pull the money from?

A. Left side of his pocket.

Q. From the guy who got shot pockets?

A. Yes.

Q. What was C Deon doing when Rock took the money from the guy?

A. He was standing there.

Q. Standing where?

A. In the middle of the room.

Q. Middle of which room?

A. In the room where the two people got killed.

Q. Where were you at that time?

A. At that time I was over there with Goldy standing beside the girl that got killed.

Q. What happened to the money that Rock took?

A. I don't know.

Q. Where did Rock put it after he took it out of the dead guy?

A. Put it in his pocket.

Q. What happened after that?

A. Then they searched the girl pocket, C Deon and Rock, they searched her back and front pockets and nothing was there.

Q. What did Goldy do at that time?

A. At that time Goldy had walked towards the door.

Q. Did Goldy search the girl at all?

A. He was fiddling around.

Q. Where was he fiddling around?

A. Around her waist.

Q. Where around her waist?

A. Around where, this part, the buckle part at. (Indicating)

Q. The buckle on her pants?

A. Uh-huh.

Q. Did he do anything with the buckle of her pants?

A. I don't recall.

Q. What happened then?

A. We then exited the room that we killed the people at.

Q. Who exited the room?

A. Daniel Taylor, C Deon, Rock, and Goldy.

Q. Daniel Taylor is you, is that correct.

A. Yes.

Q. What happened when you exited the room?

A. We stood aside from the front door, the entrance door.

Q. Are you talking about the front door of the apartment or the front door of the building?

A. Front door to the apartment.

Q. What happened then?

A. That is where I was told to hide the gun.

Q. Who told you to hide the gun?

A. C Deon.

Q. What happened then?

A. I then took the gun from C Deon, put it in the back of my pants.

Q. Did you put it in anything or was it loose in your pants?

A. It was loose in my pants.

Q. What happened then?

A. They then said we're going to leave, and I walked out the unit first and went to the alley.

Q. Okay.

A. I walked down, and I was going to hide it in this spot,

BK JM DT

and I then remember my clothes came up stolen. I then walked back out from the dark spot that I was going to hide.

Q. Why don't we backtrack that first spot you went to hide the gun. Had you ever used that spot before?

A. Yes .

Q. What did you use that spot before for?

A. Clothes.

Q. To do what with clothes?

A. Hide my clothes there.

Q. Approximately where is this spot?

A. It's on the side of 834 West Agatite.

Q. Which side?

A. The left side.

Q. The left side as you are facing it?

A. Yes.

Q. Where on the left side is it?

A. Repeat that?

Q. Where on the left side is this spot?

A. It's like in a cartway like.

Q. Did you hide the gun there?

A. No.

Q. Why not?

A. Because some clothes of mine came up stolen.

Q. What did you do then?

A. I then walked further down the alley, jumped this fence, and hid the gun in the corner of this building.

Q. Do you recall where that building is?

A. It is next to this parking lot.

Q. Which side of the parking lot is it on?

A. Like the middle, on the part facing towards the alley.

Q. Where did you hide the gun?

A. In a corner on the side of this building in a plastic bag that I had in my pocket under some wood.

Q. How did you know to hide the gun there?

A. Because when I used to run away from Merryville, I had my radio there.

Q. After you hid the gun at that spot, what did you do then?

A. I then climbed back over the fence, walked back down the alley, and went up to 834 West Agatite as to where Paul Phillips, Andrea Phillips, and Akia Phillips stayed.

Q. Who is Akia Phillips?

A. Baby T.

Q. And Andrea Phillips is?

A. The mother.

Q. What was Baby T's assignment that night?

A. Look-out.

Q. And what was Andrea Phillips' assignment that night?

A. Nothing.

Q. He wasn't involved?

A. She wasn't.

Q. Why did you go there?

A. Because when I ran away from ~~ESE~~ ESC, they was my friends, and that is where I used to stay at.

Q. What did you guys do while you were there?

A. Smoked cigarettes, watched TV.

Q. Did later that night, did you go back to Oak Park, North Oak Park?

A. No, then the apartment got raided, and the apartment had got raided once before so they found drugs in the house. And they took Andrea Phillips to jail and left Paul Phillips upstairs. At that time Baby T was going over to his friend's house, and they brought me downstairs and asked me to show me where Baby T was. I then assisted them to Baby T.

Q. What happened then?

A. We went over to where Baby T was, and he was there, and then put him in a car, and they dropped me off at Merryville.

Q. Merryville is a shelter?

A. Yes.

Q. The spot that you hid the gun, had the Vice Lords used

that as a hiding spot before?

A. Yes.

Q. I am going to show you what has been marked as Exhibit No. 1 and ask you to take a look at Exhibit No. 1. Do you recognize that?

A. Yes.

Q. What is that?

A. The drawing of the area.

Q. The area of what?

A. Of where we planned to kill these guys, the guy and the lady.

Q. Now I am giving you a red pencil. On that map I would like you to place a number one where the meeting was, where you planned out what happened.

And also on the map, if you could place a number two where Louis Gardner's lookout spot was.

Could you also place a number three on there to show Deon Phillips' lookout post?

Now could you place a number four on there where Paul Phillips' lookout post was?

Could you place a number five on there where Slick's lookout post was?

Now could you put a number six on the

and C. Deon JM DT

door where you, Rock, and Goldy and C. Deon went into the apartment?

Now, Daniel, I have what has been marked as Exhibit No. 2 and ask you to take a look at that. Do you recognize Exhibit No. 2?

A. Yes.

Q. What is that?

A. A picture of C Deon.

Q. I have what is Exhibit 3 and ask you to take a look at that. Can you tell me what Exhibit No. 3 is?

A. Picture of Paul Phillips.

Q. I have what is Exhibit No. 4. Can you take a look at No. 4?

A. A picture of Akia Phillips known as Baby T.

Q. I have what has been marked Exhibit No. 5. Can you take a look at that?

A. It is a picture of Daniel Taylor, which is me.

Q. I have Exhibit No. 6 and ask you to take a look at that?

A. Picture of Goldy.

Q. I have what has been marked Exhibit No. 7 and ask you to take a look at that?

A. Picture of Timothy Cobb, known as Rock.

Q. I have what has been marked No. 8 and ask you to take a look at that?

JM DT

A. Picture of Cuzzo.

Q. What was his role in this?

A. He had no role.

Q. Now, Daniel, how did you come down to the police station tonight?

A. They came and picked me up from MYS.

Q. What is MYS?

A. Methodist Youth Service.

Q. Is that a group home?

A. Yes.

Q. That is the address you gave us on North Oak Park Avenue?

A. Yes.

Q. Did you agree to come with the police down here tonight?

A. Yes.

Q. Now since you have been here, how have the police treated you here?

A. Fine.

Q. How have I treated you?

A. Fine.

Q. Have you been offered food to eat?

A. No, I was not hungry.

Q. Have you been offered anything to drink?

A. No.

Q. Have you been given any cigarettes?

A. Yes.

Q. Have you been allowed to use the bathroom?

A. Yes.

Q. Has anybody threatened you?

A. No.

Q. Has anybody promised you anything in return for your statement?

A. No.

MR. MAGATS: The court reporter will now type up your statement. We will then read over the entire statement to go over it, and you will be allowed to make any additions or corrections that you want. Do you understand that?

THE WITNESS: Yes.

MR. MAGATS: This will conclude the statement of Daniel Taylor. The time is now 5:52 a.m.

x Daniel Taylor

WITNESSES TO SIGNATURE:

Det Brian Killacky

Joe Magats ASA

π EXHIBIT 12A
Deponent Killacky
Date 10.2.14 Rptr. TJ
WWW.DEPOBOOK.COM



C128

PLAINTIFF'S EXHIBIT 44

jkl

RE: INVESTIGATION (Death of Jeffrey Lassiter and Sharon Haugabook)

STATEMENT

of

AKIA DEON PHILLIPS, ADP

taken in an interview room, 2nd Floor, Area 6 Headquarters, Belmont and Western, Chicago, Cook County, Illinois, on [redacted]

PRESENT: MR. MARTIN FOGARTY
Assistant State's Attorney

Det. Terry O'Connor, Star No. 20831
Area 6 Violent Crimes

Reported By: Janet K. Lupa
Illinois License No. 084-002103

Book No. 9212-4

---

MR. FOGARTY: Let the record reflect that we are in an interview room at Area 6 Violent Crimes. Today's date is December 3, 1992. The time is 6:09 a.m.

Present in the room with me, Assistant State's Attorney Martin Fogarty, are Detective Terry O'Connor, the court reporter, and Akia Deon Phillips. ADP

We are here to take the statement of Akia Deon Phillips ADP concerning the investigation of the homicides of Jeffrey Lassiter and Sharon Haugabook, which occurred on November 1[illegible], 1992, at



EXHIBIT 111

Phillips EXHIBIT 1
FOR I.D. 12-4-14

approximately 8:43 p.m at 910 West Agatite.

Q. Akia, I talked to you earlier and explained that I am an Assistant State's Attorney, a lawyer and prosecutor, and not your lawyer, is that correct?

A. Yes, sir.

Q. And before we spoke, I advised you of your constitutional rights, is that correct?

A. Yes, sir.

Q. I am going to read you your rights again.

A. You have a right to remain silent --

Q. No. 1, do you understand that you have a right to remain silent?

A. Yes, sir.

Q. Do you understand that anything you say can be used against you in a court of law?

A. Yes, sir.

Q. Do you understand you have the right to talk to a lawyer and have him present with you while you are being questioned?

A. Yes, sir.

Q. Do you understand if you cannot afford to hire a lawyer, and you want one, a lawyer will be appointed by the Court to represent you before any questioning?

A. Yes, sir.



AD.

Q. Understanding these rights, do you wish to talk to us now?

A. Yes, sir.

Q. How old are you?

A Nineteen.

Q And will you please state your full name and spell your last name?

A Akia Deon Phillips, P-H-I-L-L-I-P-S. ADP

Q And how do you spell Akia?

A A-K-I-A.

Q And do you go by Akia or Deon? A.D.P

A I go by Akia and Deon. A.D.P

Q What is your address right now?

A 854 West Agatite.

Q Who do you live there with?

A My mom.

Q Do you go to school?

A Yes, sir.

Q Where at?

A David Orr.

Q What year are you there?

A Twelfth.

Q Are you a member of a gang?



A.D.P

A Yes, sir.

Q How long have you been a member of a gang?

A Three months.

Q What gang?

A Traveler.

Q Is that an affiliation of Vice Lords?

A Yes, it is.

Q Drawing your attention to the date of November 16, 1992, at about 7:00 o'clock, were you at Clarendon Park?

A Yes, sir.

Q Why were you at Clarendon Park?

A For the meeting.

Q What meeting?

A That they have at the park every Friday.

Q Who was having the meeting?

A Rock and ~~Deon~~. C-DEON ADP

Q Who are Rock and ~~Deon~~? C-DEON A.D.P

A Chiefs.

Q Was this a gang meeting?

A Yes, sir.

Q Was that a Vice Lords meeting?

A Yes, sir.

Q And when you say Rock, is he a member of the Vice Lords?

~~A Yes, sir.~~

Q What is his rank?

A Chief .

Q Chief of what?

A Traveler Vice Lords.

Q And who is C Deon?

A Chief of the CVL, Conservative Vice Lords.

Q Who was at this meeting?

A C Deon, Popeye, ~~Karek~~, Muhammed. Kerrick ADP

Q When you say Popeye is that Lewis Gardner?

A Yes, sir.

Q How do you know Lewis Gardner?

A I grew up with him. He like a cousin to me.

Q Was Ed at this gang meeting?

A No, sir, he was at court.

Q Was Slick at the gang meeting?

A No, sir.

Q Was T Mack at the gang meeting?

A Yes, sir.

Q Was Pookie at the gang meeting?

A No, sir.

Q Was Cuzzo --

A No, sir.

ADP

Q Was Goldie at the gang meeting?

A Yes.

Q Was Black T at the gang meeting?

A Yes, sir.

Q I'm going to show you some photos. I have in my hand what's marked Exhibit No. 1. Exhibit No. 1 is a map, is that correct?

A Yes, sir.

Q And does that map show Clarendon Park?

A Yes, sir.

Q Where is Clarendon Park located?

A Clarendon and Sunnyside.

Q I'm going to ask you to take this red pencil and mark on Exhibit 1 where you had your gang meeting on November 16th.

Let the record reflect that Akia marked just east of the fieldhouse in Clarendon Park with a circle. When you had your gang meeting, Akia, how were you standing?

A Towards the lake.

Q How was the group standing?

A Towards the lake.

Q Were they in a circle?

A After we stand towards the lake and they said a prayer then they got in a circle.

Q I have in my hand what's marked Exhibit No. 2 --

A Deon. ADP

Q Do you recognize the person in this picture?

A. Yes, sir.

Q Who is that?

A C Deon.

Q Do you know what his real name is?

A I just know Deon.

Q How do you know C Deon?

A He be around the neighborhood with Rock.

Q Is he a Vice Lord?

A Yeah, he the chief over CVL.

Q He was one of the people heading this meeting, is that correct?

A Yes, sir.

Q For the record can you read the IR number you see on him?

A 908351.

Q Thank you. I have in my hand --

A My brother.

Q -- exhibit No. 3. Do you know this person?

A That's my brother.

Q What's his name?

A Paul Phillips.

ADP

Q Was he at the gang meeting?

A No, sir.

Q I have in my hand --

A A picture of me.

Q It's a picture of you. That's Exhibit No. 4, is that correct?

A Yes, sir.

Q I have in my hand a picture, Exhibit No. 5. Do you recognize who that is?

A Black T.

Q What is Black T's real name?

A Daniel Taylor.

Q How do you know Black T?

A He used to stay with us.

Q Is he a Vice Lord?

A Yes, sir, a Traveler.

Q He was at that meeting?

A Yes, sir.

Goldie.

Q Do you recognize the person in Exhibit No. 6?

A Yes, sir, Goldie.

Q How do you know Goldie?

A He be around the neighborhood too.

APP

Q Is Goldie a member of the Vice Lords?

A Yes, sir.

Q Can you please read Goldie's IR number?

A 678832.

Q I have Exhibit No. 7 in my hand. Do you recognize the person in that picture?

A That's Rock.

Q Do you know Rock's real name?

A Timothy Cobb.

Q You know him as Timothy Cobb?

A Yeah.

Q How do you know Rock?

A He be around the neighborhood. He our chief.

Q He's chief of the Travelers?

A Traveler Vice Lords.

Q What is his IR number?

A 824772.

Q And you're reading that off of Exhibit No. 7?

A Yes, sir.

Q And on Exhibit No. 8 in my hand --

A Cuzzo.

Q Was he at the gang meeting?

A No, sir. Nowhere around us.



ADP

Q Can you read Cuzzo's IR number?

A 909224.

Q I want to draw your attention to the meeting, okay?

A Uh-huh.

Q At the meeting you stated that you said a prayer and then everyone stood in a circle?

A Yes, sir.

Q What happened after that?

A C Deon stood in the middle of the circle.

APP

Q What happened when C Deon stood in the middle of the circle?

A He told us that somebody owed him some money and he was going to get his money.

Q Did he say who this person was?

A No.

Q Did he say how much money?

A No, sir.

Q What else did he say?

A He said he was going to scare him with a gun to get his money if he had to.

Q Did C Deon ever mention that he had contact with this person before?

A No, sir.



APP

Q Did he ever mention that he beat this person up before?

A Yes, sir.

Q How did he mention that?

A He say every time he see him he was going to beat him up until he got his money.

Q And what was C Deon going to do that night?

A Try to get his money.

Q How was he going to get the money?

A Scare him with the gun.

Q What kind of gun?

A I don't know. I didn't see it.

Q Did you know he had a gun?

A From the print in his pocket.

Q What pocket?

A Right pocket.

Q Of his coat or --

A Starter's coat.

Q Of his coat?

A Yes, sir.

Q Did you see the gun in his pocket?

A The print in his starter's coat.

Q You could see the bulge of the gun?

A Yeah.

Q What happened after C Deon said he was going to scare this guy with the gun and get his money?

A Then they left and got in the car and drove towards Agatite and Hazel.

Q Who did you see him leave with?

A Rock and Black T.

Q What did you do?

A I walked.

Q With who?

A ~~Terry~~ Tonan and Popeye.

Q Who is Popeye?

A Lewis Gardner.

Q Who is ~~Terry?~~ Tonan

A He live out south. He's a Traveler.

Q Where did you walk to?

A Agatite and Hazel.

Q What did you do when you got there?

A I stood on the corner.

Q Why did you do that?

A Cause we were appointed to those spots.

Q. Who appointed you to those spots?

A Rock.

Q What was your job?

A To holler Diana if the police came.

Q When did Rock give you that spot?

A At the meeting.

Q So, what was your job at Agatite and Hazel then?

A To be a lookout.

Q When you were looking out did you see C Deon and Rock at all?

A After I heard the shots.

Q Before that, when you first got to Agatite and Hazel did you see Rock and C Deon?

A No, I did not see them. I just seen them come out.

Q Who did you see — strike that.

After the meeting —

A Uh-huh.

Q — when is the first time you saw C Deon and Rock?

A When they came out the building.

Q Did you ever see them when they went into the building? Did you see them when they went into the courtyard?

A Yes, sir.

Q Who did you see go into the courtyard?

A C Deon, Black T and Rock.

Q They went into the courtyard off of Agatite?

A Yes, sir.



ADP

Q What happened after you saw them in the courtyard?

A Ten minutes later, five minutes later, I heard gunshots.

Q Where were you when you heard the gunshots?

A Right here on Agatite and Hazel.

Q For the record Akia has placed a mark at the intersection, the northwest corner of Agatite and Hazel. The mark is in the shape of a large asterisk.

After you heard the shots what happened?

A Then C Deon came out and ran into my building right here.

Q For the record Akia is indicating that C Deon came out from the front courtyard of the building.

This is the building at 910 West Agatite, is that correct?

A Yes, sir.

Q And C Deon came out of the building?

A Yes, sir.

Q He came out of the front courtyard of the building?

A Yes, sir.

Q Please place a No. 1 where you saw C Deon come out and please circle that.

Who did C Deon come out with?

A Black T and Rock.

Q Did any of them say anything to you?

~~A Yeah, Vice Lords Almighty and solid.~~

Q Who said Almighty?

A C-Deon, he said Vice Lords Almighty.

ADP

Q What does that mean?

A Everything over with, everything done. Then they say get off the strip.

Q Is that a gang term?

A Yes, sir.

Q Who said get off the strip?

A Rock.

Q What does that mean?

A Go home.

Q Who said -- did anyone say solid?

A Rock.

Q What does solid mean?

A Solid T.

Q What does that mean?

A Traveler, TVL.

Q That stands for solid Traveler?

A Uh-huh.

Q What does that mean? If I can rephrase that. To someone not in a gang what would that mean?

A Everything is straight.



ADP

Q What did you do after Rock said to get off the strip?

A I went home, called a cab, went over my girlfriend's house.

Q Drawing your attention to the next day, did you have an opportunity to see anyone who was involved in the gang meeting?

A Rock, C Deon, Popeye.

Q Did you see --When you say Deon, you mean C Deon?

A Yes, sir .

Q Where did you see them?

A Agatite and Hazel.

Q Would you put a No. 4 where you saw them, please.

What happened when you were in that group?

A Rock and Deon was laughing.

Q What were Rock and Deon laughing about?

A They shot somebody. And me and Popeye was standing there like it's not funny.

Q You and Popeye were not laughing, is that correct?

A Yes, sir.

Q What person was Rock and C Deon talking about?

A I don't know. they never tell us the name.

Q They were — Were they talking about the event from the day before?

A Yes, sir.

Q What did C Deon say when he was laughing?

A He didn't say nothing. He was just laughing. We kept saying what's so funny.

Q What did he say?

A That he shot somebody.

Q Did he tell you anything about it?

A No, sir.

Q Did Rock say anything about it?

A No, sir. They wouldn't tell me shit because they think I'm a traitor.

Q I want to draw your attention to the time after the gang meeting when you went to 910 Agatite, okay?

A Uh-huh.

Q You say that you were a lookout. Was anyone else a lookout?

A Popeye, me, and Slick.

Q Could you please draw a No. 3 on the map where Popeye was.

Indicating that Akia has drawn a No. 3 on top of the asterisk that he drew earlier on the map.

Where was Slick at? What intersection is that?

A Sunnyside, walking back and forth.

Q You drew a No. 4 and that indicates where Slick was and



ADP

an arrow?

A Yeah.

Q And you say that Slick was walking back and forth between what?

A Sunnyside and the alley.

Q Did you see any other lookouts? You're drawing a No. 5 where the other lookout is.

For the record Akia has drawn No. 5 on Exhibit 1 and has written the words T Mack above that?

A Yes, sir. ADD

Q Is that where T Mack was a lookout?

A Yes, sir. ADD

Q Did you ever see -- While you were a lookout, did you ever see any police cars?

A No, sir.

Q Did you ever have to yell Diana?

A No, sir.

Q Akia, I want to ask you a couple questions.

Have you been treated fairly by me?

A Yes, sir.

Q You have been treated fairly by Detective O'Conner, is that correct?

A Of course. I like him.

Q You have been offered something to eat and to drink?

A Yes, sir.

Q In fact, you have had some pop?

A Fries and pops.

Q Akia, has anyone promised you anything in exchange for this statement?

A Yeah.

Q What has been promised you?

A The police officer promised me if I told him w hat happened, they would get my drug case throwed out. ON my drug case ADP

Q Akia, in fact I asked you this question before and you told me that no one promised you anything, is that correct?

A I didn't think you was talking about that.

Q Let me ask you this.

Are you making this statement to me now because of a promise that someone made to you before?

A No, sir.

Q Why are you making this statement to me now?

A Because you're asking.

Q And I didn't threaten you, did I?

A No, sir.

Q You're giving this statement freely and voluntarily, is that correct?



ADP

A Yes, sir.

Q You're not giving this statement because -- strike that.

Are you giving this statement because someone has promised you anything?

A No, sir. They didn't find any drugs on me.

Q We're not here for the drug case?

A That's right.

Q In fact, you were arrested on another case?

A That's right.

Q And that's how you came in contact with the police on this case, is that right?

A Yes, sir.

Q You are in custody on another case?

A Yes, sir, I'm going back there.

Q And the police came and got you to this case?

A Yes, sir.

Q The court reporter will now type up your statement. We will then read over the entire statement together and you will be allowed to make any additions or corrections that you wish, do you understand that?

A Yes, sir.

ADP

MR. FOGARTY: This will conclude the ~~statement of Akia Beon~~ A.C MJF Phillips. The time is now 6:31 a.m. A.P

Akia Phillips

WITNESSES TO SIGNATURE:

Sgt. Martin J. Fogarty

Det. T. O'Connor 20831

PLAINTIFF'S EXHIBIT 47

afm

RE: INVESTIGATION (DEATH OF JEFFREY LASSITER & SHARON HAUGABOOK)

STATEMENT

of

PAUL PHILLIPS,

taken in an interview room, 2nd floor, Area 6 Headquarters, Belmont and Western, Chicago, Cook County, Illinois, on December 4, 1992, at 1:33 a.m.

PRESENT: MARTIN FOGARTY,
Assistant State's Attorney

Det. JOHNSON, Star No. 20820
Area 6 Violent Crimes

Reported By: Ms. Annette E. Faklis, C.S.R.
Illinois State License No. 84-2318

Book No. 9212-4

---

MR. FOGARTY: Let the record reflect that we are in an interview room at Area 6 Violent Crimes. Today's date is December 4, 1992. The time is 1:33 a.m.

Present in the room with me, Assistant State's Attorney Martin Fogarty, are Detective Johnson, the court reporter, and Paul Phillips.

We are here to take the statement of Paul Phillips concerning the investigation of the homicide of Jeffrey Lassiter and Sharon Haugabook, which occurred on November 16, 1992 at



PP MF [signature]

EXHIBIT 109

approximately 8:43 p.m. at 910 West Agatite.

EXAMINATION

BY MR. FOGARTY

Q. Paul, I talked to you earlier and explained that I am an Assistant State's Attorney, a lawyer and prosecutor, and not your lawyer; is that correct?

A. Yes.

Q. And before we spoke, I advised you of your constitutional rights, is that correct?

A. Yes.

Q. I am going to read you your rights again.

Do you understand that you have a right to remain silent?

A. Yes.

Q. Do you understand that anything you say can be used against you in a court of law?

A. Yes.

Q. Do you understand you have the right to talk to a lawyer and have him present with you while you are being questioned?

A. Yes.

Q. Do you understand if you cannot afford to hire a lawyer, and you want one, a lawyer will be appointed by the Court to represent you before any questioning?

A. Yes.

Q. Understanding these rights, do you wish to talk to us now?

A. Yes.

Q. Paul, how old are you?

A. 17.

Q. And what is your birth date?

A. October 15, 1975.

Q. What is your address?

A. 854 West Agatite.

Q. Who do you live with?

A. With my mom, Andrea Phillips.

Q. Where do you go to school?

A. I was going to Job for Youth, downtown.

Q. Paul, are you a member of a gang?

A. Yes.

Q. What gang?

A. Travelers.

Q. What gang is that affiliated with?

A. Vice Lords.

Q. How long have you been a member?

A. About a month.

Q. Drawing your attention to the date of November 16, 1992, at about 7:00 o'clock p.m., did you have occasion to be in



PP mg4 [signature]

Clarendon Park?

A. Yes.

Q. And why were you at Clarendon Park?

A. Because Rock had called a meeting.

Q. What kind of meeting?

A. They called a gang meeting for all the Vice Lords to come up there.

Q. Where was the meeting held?

A. Back of Clarendon.

Q. And who was present at the meeting?

A. Rock, Deon.

Q. When you say Deon, who do you mean ?

A. My brother, Deon.

Q. Deon Phillips?

A. Yes, and C Deon.

Q. Who is C Deon?

A. Vice Lord, the one. I don't know his real name.

Q. You know him as C Deon?

A. Yes.

Q. Is C Deon the same person as Deon Phillips?

A. No.

Q. Who else was present at the meeting?

A. Slick, Ed, Lewis Gardner, Popeye, Evans, me, Goldy was



RP MJ4 [handwritten initials]

there, Pooky.

Q. Do you know someone named Black T?

A. He came there, too.

Q. What is Black T's real name?

A. Daniel Taylor.

Q. What happened at the meeting?

A. First Rock, he came into the circle, but he stepped out.

Q. You stated that you were in a circle. Who was in the circle?

A. All of us.

Q. You were standing in a circle?

A. Yes.

Q. What happened when you were standing in the circle?

A. When I was standing there?

Q. When everyone was standing in a circle.

A. C Deon came into the middle.

Q. What did C Deon do when he got to the middle?

A. He started talking about what he was going to do.

Q. What did he say?

A. He said that this guy owed him some money, and he said he is going to ask him to pay him; if he don't he is going to shoot him.

Q. Do you know why he owed him money?



P. P. MJF GHF

A. For drugs.

Q. Did C Deon have a gun?

A. I saw it, black handle in his pants.

Q. He did have a gun?

A. Yes.

Q. Describe what you saw?

A. I saw a black handle that he had in his pants.

Q. Was the handle a handgun?

A. Yes.

Q. Do you know what type of handgun?

A. No.

Q. Did C Deon say anything else at the meeting?

A. No.

Q. Do you know where this guy who owed C Deon money, do you know where this guy lived?

A. He stayed in the courtway. I know he was over there.

Q. When you say courtway, what do you mean?

A. Right there, 910.

Q. Do you mean the courtway building at 910 Agatite?

A. Yes.

Q. After the meeting, what did you do?

A. We walked like in front of Clarendon Park, in front of the field house.



RR mjt [handwritten initials]

Q. You walked from the field house to where?

A. In the front of the field house.

Q. What did you do when you were in the front of the field house?

A. I walked home with Kerrick and my brother, Deon Phillips.

Q. Is Kerrick a Vice Lord who was at the meeting with you?

A. Yes.

Q. And did you get home?

A. Yes.

Q. Where do you live?

A. 854 West Agatite.

Q. Is that at the corner of Hazel and Agatite?

A. Yes.

Q. What did you do when you got home?

A. I went upstairs and went to my house and sat in the dining room there.

Q. Did you see the members of the gang who were at the meeting again?

A. Yes. about 9 or 10 minutes later PP

Q. Where did you see them?

A. I saw them outside my window when they were at the corner of Agatite and Hazel.

Q. What did you do then?



PP

A. Went downstairs.

Q. After you were with the gang members at Agatite and Hazel, where did you go?

A. To the alley in the middle of Agatite and Sunnyside off Hazel.

Q. Why did you go to the alley?

A. 'Cause Rock told me to go stand by the alley.

Q. What was your job when you stood in the alley?

A. Lookout person, if the police come.

Q. Who else was a lookout?

A. Popeye.

Q. What is Popeye's real name?

A. Lewis Gardner.

Q. Who else was a lookout?

A. Mark C. lookout position was at sunnyside & hazel PP MJ? [illegible]

Q. Anyone else?

A. Deon Phillips.

Q. Anyone else?

A. No.

Q. Paul, I have in my hand what has been marked as Exhibit 1. Is this a map of the area that we are talking about?

A. Yes.

Q. Does this map show the intersection of Hazel and Agatite?



PP MJ? [illegible]

A. Yes.

Q. Can you place a number one at the position where your lookout point was. Place that in a red pencil.

Can you circle that number one? Can you please place a number two where Popeye or Lewis Gardner's lookout was? Do you know where Deon Phillips' lookout position was?

A. I know he was on Agatite.

Q. Do you know where on Agatite his position was.

A. No, it was up around here. (Indicating)

Q. Indicating --

A. By the courtyard.

Q. To the west of Hazel?

A. Yes.

Q. Was his lookout position between Clarendon and Hazel?

A. Yes.

Q. From where you stood at your lookout position, could you see Deon Phillips?

A. No.

Q. Okay. What is your relation to Deon Phillips?

A. Brother.

Q. Can you tell me what your duties were as a lookout?

A. Yes. If the police come, I was supposed to yell out Diana and then Popeye, he would have heard me, and he supposed to



PP MJA TK

yell out Diana, and my brother was supposed to run outside the courtyard and tell the person who is inside.

Q. Was there anything else you could have yelled, or was it only Diana?

A. Diana or 5-0.

Q. Did 5-0 mean the same thing?

A. Yes.

Q. While you were standing at your lookout position, did you see anyone walk ~~out~~ into the courtyard building at 910 Agatite?

A. Yes.

Q. Who did you see?

A. Daniel Taylor, C Deon, Rock, and Goldy.

Q. After you saw them walk towards the courtyard of that building, what happened?

A. I was leaning against the wall of the alley, and I heard gunshots.

Q. How much time passed before you heard the gunshots?

A. At least six or seven minutes.

Q. And did you see any police during that time?

A. No .

Q. Did you look?

A. Yes.

Q. What happened after you heard the gunshots?

A. I walked back towards Popeye.

Q. And where was Popeye?

A. Standing right here.

Q. Indicating at the corner of Hazel and Agatite?

A. Yes.

Q. And what did you do when you came upon Popeye?

A. I asked him what's up, and then C Deon came right out of the courtyard.

Q. What happened then?

A. They ran down Hazel towards Sunnyside and went inside my building.

Q. When you saw C Deon running out of the building, do you recall if he said anything to you?

A. He did not say nothing to me.

Q. When you went to your apartment, your building, who were you with?

A. I was by myself.

Q. Was anyone in your apartment with you?

A. My mom and my mom's friend and her son.

Q. And what happened when you were there?

A. I was sitting up there and Mark C had came up there.

Q. And after Mark C came up there, what happened?

A. Police had came up there.



P P MJ7 AS

Q. How much longer after Mark C was up there did the police come by?

A. About five minutes.

Q. While the police were there, did anyone else come?

A. Yes.

Q. Who came?

A. C Deon, Evans.

Q. Can you spell Evans?

A. E-v-a-n-s.

Q. After they came, what happened?

A. Police had arrested my mom, Mark C, and C Deon.

Q. And did they then leave?

A. Yes.

Q. And what happened after that?

A. Then Daniel Taylor, he came up the street of Agatite.

Q. What is Daniel Taylor's street name?

A. Black T.

Q. What happened then?

A. The police put him in a car and asked to show him where my brother, Deon Phillips, was at.

Q. What happened then?

A. Then he showed them, and ~~he~~ they dropped him off at the alley of Hazel where I was standing there. And he came up my back stairs

into my house.

Q. So you saw him again when he came to your back stairs?

A. Yes.

Q. What happened when he came to your back stairs?

A. He came in the house, and he was smoking a cigarette, watching TV, and I was inside my mom's room waiting for her to come.

Q. Did you have anything to eat with Black T?

A. Pizza.

Q. Where did you get the pizza from?

A. I ordered it.

Q. I want to draw your attention to the next day, November 17, and ask you if you had an opportunity to see anyone from the Vice Lords?

A. Yes.

Q. And where was that at?

A. Agatite and Hazel.

Q. I am going to ask you to place a number three on Exhibit 1 and circle the number three where you saw the members of the Vice Lords the next day.

And what members of the Vice Lords were there?

A. C Deon, Slick, Rock, Ed, Pooky, Popeye, Deon Phillips, me, Paul Phillips, Mark.



PP MJ7 [signature]

Q. And who was talking?

A. C Deon.

Q. And what did C Deon say?

A. He was bragging about what he did.

Q. Did when?

A. When he went inside the courtway building.

Q. What did he say?

A. He said that they had ran to the building, and he said we kicked down the door, and he asked him for the money; and then he started busting.

Q. What do you mean by busting?

A. Shooting.

Q. Did he say anything else?

A. No.

Q. Was anyone laughing?

A. Yes.

Q. Who was laughing?

A. C Deon, Rock, and the whole crowd.

Q. Were you laughing?

A. No.

Q. Do you remember if Rock said anything?

A. No.

Q. Paul, I have some photographs in my hand marked as



PP MJA [signature]

exhibits. And I am going to ask you to tell me if you can identify the people in each photograph. I have in my hand Exhibit No. 2. Do you recognize the person in that photo?

A. Yes.

Q. Who is that person?

A. C Deon.

Q. How do you know that person?

A. Because he used to come by my house all the time.

Q. Is he a member of the gang?

A. Yes.

Q. Is this the person that you saw on November 16, in the park with the gun?

A. Yes.

Q. Where did you see the gun on him?

A. Inside his pants.

Q. Where in his pants?

A. Like right here. (Indicating)

Q. Indicating for the record the front waistband area of C Deon's pants?

A. Yes.

Q. That is where you saw the handle of the gun sticking out?

A. Yes.

Q. I have in my hand what has been marked People's Exhibit

No. 3. Do you recognize this person?

A. Yes.

Q. Who is that?

A. Me.

Q. And I have Exhibit No. 4 in my hand. Do you recognize this person?

A. Yes.

Q. Who is that?

A. Baby T, Deon Phillips.

Q. Is this a relation to you?

A. Yes.

Q. Who is this?

A. My brother.

Q. And I have Exhibit No. 5 in my hand. Do you recognize this person?

A. Yes.

Q. What is his name?

A. Daniel Taylor.

Q. What is his nickname?

A. Black T.

Q. How do you know him?

A. He used to stay with us.

Q. What gang is he in?



PP MJ [illegible]

A. Traveling Vice Lords.

Q. Is your brother, Deon Phillips, in a gang?

A. Yes.

Q. What gang?

A. Traveling Vice Lords.

Q. I have in my hand Exhibit No. 6. Do you recognize this person?

A. Yes.

Q. Who is this person?

A. Goldy.

Q. How do you know this person?

A. I seen him by my house.

Q. Do you know his real name?

A. No.

Q. And do you know if he is in a gang?

A. No.

Q. You don't know?

A. No.

Q. I have in my hand what has been marked as Exhibit 7. Do you know this person?

A. Yes.

Q. What is this person's name?

A. Rock.



PP MJ

Q. Do you know his real name?

A. Rodney.

Q. Do you know his real last name?

A. Matthews.

Q. Do you know if he is in a gang?

A. Yes.

Q. What gang?

A. Traveling Vice Lords.

Q. Do you know this person shown in Exhibit 8?

A. Yes.

Q. What is this person's name?

A. Cuzzo.

Q. And how do you know this person?

A. Because he lives around my house.

Q. Do you know if this person is in a gang?

A. Yes.

Q. Do you know what gang he is in?

A. Black Peace Stone.

Q. Paul, since you have been here at Area 6, Belmont and Western, how have you been treated by the detectives?

A. Good.

Q. Has anyone offered you anything to eat or drink?

A. Yes.



PP MJ [signature]

Q. And have you had anything to eat or drink?

A. Yes.

Q. What did you have to eat?

A. Chips.

Q. What did you have to drink?

A. Pop.

Q. Has anyone promised you anything in exchange for this statement?

A. No.

Q. Has anyone forced you to give this statement?

A. No.

Q. Has anyone threatened you into giving this statement?

A. No.

Q. Is this a free and voluntary statement on your part?

A. Yes.

Q. The court reporter will now type up your statement. We will then read over the entire statement together, and you will be allowed to make any additions or corrections that you wish. Do you understand that?

A. Yes.

MR. FOGARTY: This will conclude the statement of Paul Phillips. The time is now 1:54 a.m.

x Paul Phillips

ASA Martin J. Fogarty

DET. Thomas Johnson #20820

PLAINTIFF'S EXHIBIT 48

EXHIBIT NO. 103
Magats
3-23-15
Tracy Jones, CSR, RPR, CLR

144

STATEMENT OF

Dean Patrick

Taken December 4, 1992 at 3:35AM

At 2452 W. Belmont, Area 6 Violent Crimes

Present ASA Joe Magats

Detective O'Connor

This statement taken regarding the Homicides

of Jeffrey Cassidy, Shawn Haugabook which occurred on November 16, 1992

at 910 West Agatite at 8:43 PM.

I understand I have the right to remain silent and that anything I say can be used against me in a court of law. I understand that I have the right to talk to a lawyer and have him present with me during questioning, and if I cannot afford to hire a lawyer one will be appointed by the court to represent me before any questioning. Understanding these rights, I wish to give a statement.

Dean Patrick

After being advised that Joe Magats is an Assistant State's Attorney, a lawyer and prosecutor and not his lawyer and not the public defender and after being advised of ~~to~~ each of his constitutional rights and stating that he understood each of those rights Dean Patrick agreed to give the following statement in summary and not word for word. Dean states that he is 20 years old and can read and write English as he went to Lincoln Park High School and has his GED. Dean states that he is a member of the Conservative Vice Lords street gang and has been a member for 11 years. Dean states that his gang name is "C Dean" and that the C stands for conservative. Dean states that on November 16, 1992 he was on electronic m...

Joe Magats ASA

and had to wear an ankle bracelet. Dean states that he had a curfew of 10:30PM on November 16, 1992. Dean states that about 6:30-7:00 PM on November 16, 1992, someone he knows as Goldie called a meeting of the Travelling Vice Lords street gang. Dean states that Goldie told him that there was a guy who owed Goldie money for drugs and that the guy did not pay the money so they had to beat him up and break his ribs. Dean states that Goldie told him that the guy was now out of the hospital and they had to go collect the money. Dean states that Goldie said that if the guy did not have the money then they would have to take care of business. Dean states that this meeting took place at Clarendon Park. Dean states that besides himself and Goldie, Black T, Baby T, Popeye, whose real first name is Lewis, Slick, Rock, whose real name is Rodney Matthews and Carick were present at the meeting. Dean states that all of those people are Travelling Vice Lords. Dean states that during the meeting it was decided who would act as look outs and who would go into the apartment. Dean states that he remembers that Slick, Lewis and Baby T were to act as look outs and that he, Rock, Goldie and Black T were to enter the apartment. Dean states that he, Rock, Goldie and Black T entered the building. Dean states that Goldie pressed a door bell and someone buzzed them in. Dean states that as they went upstairs to the guy's apartment Goldie gave him a silver revolver. Dean states that when the four of them got to the

Lee. Mut RA

Goldie knocked on the door and the guy who owed the money for drugs answered the door and let them in to the apartment. Dean states that inside the apartment was the guy and a girl. Dean states that the girl ran out of the room. Dean states that they went into another room and Goldie and the guy started arguing about the money. Dean states that Goldie then asked Dean to shoot the guy. Dean states that he then pulled the gun Goldie had given him and shot the guy in the head. Dean states that the girl then started running and that Black T chased her and grabbed her and brought her back to the room. Dean states that Black T was holding on to the girl. Dean states that Goldie then started yelling "Shoot the bitch shoot the bitch" Dean states that Goldie then took the gun and shot the girl. Dean states that after the girl and the guy were shot Goldie went into the guy's pocket and took out some money. Dean states that they then ran out of the apartment. Dean states that from the apartment he went to Andrea Phillips' house. Dean states that when he got there the police were there because they raided Andrea's house. Dean states that the police took him to the 23rd District Station and released him. Dean states that he then went home to 1637 S. Springfield. Dean states that the State's Attorney showed him Exhibit #2 of 12/3/92 and that Exhibit #2 is a photo of himself. Dean states that the State's Attorney showed him Exhibit #3 of 12/3/92 and Exhibit #3 is a photo of Paul Phillips. Dean states that Paul Phillips was at the meeting on November 16, 1992 at Clarendon Park. Dean states

Joe Mast [illegible]    [illegible] inConnor

that the States Attorney showed him Exhibit #4 of 12/3/92 and Exhibit #4 is A photo of Baby T. Dean states that the States Attorney showed him Exhibit #5 of 12/3/92 and Exhibit #5 is a photo of Black T. Dean states that the States Attorney showed him Exhibit #6 of 12/3/92 and Exhibit #6 is a photo of Goldie. Dean states that the States Attorney showed him Exhibit #7 of 12/3/92 and that Exhibit #7 is a photo of Rock. Dean states that the State's Attorney showed him Exhibit #8 of 12/3/92 and that Exhibit #8 is a photo of someone known to him As Cuzzo and that Cuzzo was not involved in any of the incidents on November 16, 1992. Dean states that he was treated well by the States Attorney and by the police. Dean states that he was not made any promises for his Statement nor was he threatened in anyway. Dean states that he was allowed to eat, drink, smoke and use the bathroom. Dean states that he is free from the effects of drugs and alcohol and appears to be free from their effects. Dean states that he has read all 4 pages of this Statement and has initialed any changes.

Dean Patrick
Joe Moss [illegible]
T. O'Connor

PLAINTIFF'S EXHIBIT 51

1 [illegible] 4.

STATEMENT OF

Rodney Mathews

Taken: December 5, 1992 At 1:00 AM

At 2452 W Belmont Area 6 Violent Crimes

Present ASA Joe Magats

Det. Villardita

This statement taken regarding the Homicides of Jeffrey Cassidy & Stacey Haynes which occurred on November 16, 1992 at 910 W. Agatite at 8:43 PM.

I understand I have the right to remain silent and that anything I say can be used against me in a court of law. I understand that I have the right to talk to a lawyer and have him present with me during questioning, and if I cannot afford to hire a lawyer one will be appointed by the court to represent me before any questioning. Understanding these rights, I wish to give a statement.

Rodney Mathews

After being advised of his constitutional rights and stating he understood each of those rights and stating that he understood that Joe Magats is an Assistant State's Attorney a lawyer and prosecutor and not his lawyer and not the public defender, Rodney Matthews agreed to give the following statement in summary and not word for word. Rodney states that he is 20 years old and can read and write English as he attended Westinghouse High School. Rodney states that he is a member of the Travelling Vice Lords street gang. Rodney states that he has been a member for the last seven years. Rodney states that his gang name is "Rock". Rodney states that on November 16, 1992 at 7:00 PM there was a regularly scheduled gang meeting at [illegible]

to discuss A truce with a rival gang, the Disciples. Rodney states that present at the meeting were C. Dean, Paul Phillips, Popeye Dion Phillips who is known As "Baby T", Black T, Goldie And Slick himself. Rodney states that other people attended the meeting and that he did not recall the names of those people. Rodney states that all the people he named At the meeting were Travelling Vice Lords except C Dean who is a Conservative Vice Lord. Rodney states that Goldie holds the rank of "5 Star Universal" in the Travelling Vice Lords. Rodney states that that means he is A chief. Rodney states that At the meeting Goldie told them that there was a guy who owed Goldie money. Rodney states that Goldie told them that if the guy did not pay the money they would have to take care of business And shoot him. Rodney states that Goldie had A gun. Rodney states that he knew Goldie had a gun because Goldie had his right hand in his pocket all of the time and that Rodney could see the point of the gun barrell sticking through the pocket. Rodney states that Goldie kept looking around all the time like he was checking for the police. Rodney states that

2nd Goldie then gave everyone their assignments. Rodney states that Goldie

1st ~~[illegible]~~ asked Popeye Paul Phillips, Baby T and Slick to be lookouts. Rodney states that Goldie asked those four to stand in various positions around the guy's building on Agatite and yell "5-0" if they saw the police. Rodney states that "5-0" means police. Rodney states that Goldie asked him, C. Dion and Black T to go into the apartment with him. Rodney states that they entered the building after Goldie had rang alot of doorbells and someone buzzed them in.

[illegible] Rodney states that they all went to an apartment

on the second floor. Rodney states that Goldie knocked on the door and the guy inside asked who was there. Rodney states that Goldie responded "Goldie." Rodney states that no one opened the door. Rodney states that Goldie then put his shoulder against the door and forced it open. Rodney states that they all entered the apartment. Rodney states that a guy and a girl were in the apartment. Rodney states that inside the apartment Goldie asked the guy if he had any money. Rodney states that the guy told Goldie that he did not have any money. Rodney states that Goldie and the guy started arguing. Rodney states that Goldie then pulled out the gun. Rodney states that Goldie pulled the gun from the same pocket that Goldie had his hand in and the barrell was sticking through the pocket during the meeting. Rodney states that when Goldie pulled out the gun, the girl ran to the bathroom. Rodney states that Goldie then fired the gun three times hitting the guy. Rodney states that Goldie then asked Black T to go get the girl and that Black T came back holding the girl from behind with one hand on each arm. Rodney states that the girl was screaming "please don't shoot", "please don't shoot" Rodney states that Black T. pushed the girl down and that Goldie then shot the girl twice in the head. Rodney states that Goldie then went in the right front pocket of the guy and remove money. Rodney states that they all then left the building. Rodney states that they walked out and away instead of running. Rodney states that Goldie walked away down Hazel. Rodney states that he and C. Dean walked to some steps at 4502 N. Hazel and that

he then went to his house where he spent the night with his girlfriend. Rodney states that on December 3, 1992 at about 8:05 PM he was walking on Wilson with Eric and Richie Jordan and the police came. Rodney states that he agreed to go with the police. Rodney states that he was treated well by the police and by the Assistant State's Attorney. Rodney states that the Assistant State's Attorney showed him Exhibit #2 of 12/3/92 and that Rodney identified that as a picture of C Dean. Rodney states that the Assistant State's Attorney showed him Exhibit #3 of 12/3/92 and that #3 is a photo of Paul Phillips. Rodney states that the Assistant State's Attorney showed him Exhibit #4 of 12/3/92 and that #4 is a picture of Dean Phillips known as Baby T. Rodney states that the Assistant State's Attorney showed him Exhibit #5 of 12/3/92 and that #5 is A photo of Black T. Rodney states that the Assistant State's Attorney showed him Exhibit #6 of 12/3/92 and that #6 is a photo of Goldie. Rodney states that the Assistant State's Attorney showed him Exhibit #7 of 12/3/92 and that #7 is A photo of himself. Rodney states that the Assistant State's Attorney showed him Exhibit #8 of 12/3/92 and that #8 is a picture of someone named "Cuzzo" who was not At the meeting. Rodney states that he was not threatened or promised anything in return for his statement. Rodney states that he has had a baloney sandwich to eat and Pepsi to drink and has been allowed to use the bathroom. Rodney states that he is free from the effects of drugs and alcohol and appears to be free from their effects. Rodney states that he has read all 4 pages of his statement and has initialed any changes.

PLAINTIFF'S EXHIBIT 52



STATEMENT OF

Joseph Brown

Taken December 5, 1992 At 3:50 AM

At 2452 W. Belmont Area 6 Violent Crimes

Present ASA Joe Magats

Det. Johnson

This statement taken regarding the Homicides of Jeffery Lassiter & Shawn Haugabook which occurred on November 16, 1992 at 910 W. Agatite at 8:43 PM.

I understand I have the right to remain silent and that anything I say can be used against me in a court of law. I understand that I have the right to talk to a lawyer and have him present with me during questioning, and if I cannot afford to hire a lawyer one will be appointed by the court to represent me before any questioning. Understanding these rights, I wish to give a statement.

Joseph Brown

After being advised that Joe Magats is an Assistant State's Attorney, a lawyer and prosecutor and not his lawyer & not the public defender and after being advised of each of his Constitutional Rights and stating that he understands each of those rights, Joseph Brown agreed to give the following statement in summary and not word for word. Joseph states that he is 19 years old and can read and write English as he went to Orr High School. Joseph states that he has been a member of the Travelling Vice Lords street gang for the past 3 years. Joseph states that his gang nickname is "Slick". Joseph states that during the early evening hours of November 16, 1992 he attended a gang meeting at Clarendon Park. Joseph states that Rock, Paul Phillips, Deon Phillips known as "Baby T", Popeye, C. Deon, Black T and Goldie were also present at the meeting. Joseph states that all of those

Joseph Brown Joe Magats ASA DET. Thomas Johnson #08.

people except for C Dean are Travelling Vice Lords. Joseph states that C Dean is a Conservative Vice Lord which is a different faction of Vice Lords street gang. Joseph states that at this meeting Goldy stated that two "hypes", a man + a woman, owed him money. Joseph states that "hype" is slang for a drug user. Joseph states that Goldie told them that they were going to collect the money from them. Joseph states that Goldie told them that if the guy and girl did not pay the money that he would take care of business. Joseph states that he knows take care of business means to kill someone and make sure that person is dead. Joseph states that he knew Goldie had a gun because if Goldie said he was going to take care of business then he would have a gun on him or near by to use. Joseph states that he knew Goldie had a gun because he always kept one hand in his pocket. Joseph states that Goldie asked him to be a look out. Joseph states that Goldie asked him to stand at the corner of Hazel and Sunnyside and watch for the police. Joseph states that if the police did come he was to yell "Dianna" to warn the others. Joseph states that "Dianna" is slang for the police. Joseph states that Paul Phillips, Baby T, + Popeye also agreed to be look outs. Joseph states that he walked to his post at Sunnyside and Hazel and watched for the police. Joseph states that he waited at his post for five minutes but no police came. Joseph states that his friend Mike came to where Joseph was and they went to a game room. Joseph states he was at the game room with Mike and Mike's girlfriend Kianna for about two hours. Joseph states that they then went to his house and played Sega Genesis video games. Joseph states that

Joseph Brown, Joe Mays ASA. DET. Thomas [illegible]

CCSAO 000101

his girlfriend Aisha Fisher was there. Joseph states that on December 3, 1992 at about 10:00PM he was on N. Hazel with his friends Cophus and Nolan. Joseph states that the police stopped him and he agreed to go with the police. Joseph states that the Assistant State's Attorney showed him Exhibit #1 of 12/5/92 and #1 is a diagram of the area of Clarendon Park on the East, Sunnyside on the North, Sheridan Rd. to the East and Montrose to the South. Joseph states that he has placed a "1" on the map to show where the 11/16/92 meeting was, a "2" on the map to show his look out post, a "3" on the map to show Paul's look out post and a "4" to show Baby T's look out post. Joseph states that he does not recall where Popeye's look out post was. Joseph states that the Assistant State's Attorney has shown him Exhibits #2 - #8 of 12/3/92 and that #2 is a photo of C. Dean, #3 is a photo of Paul Phillips #4 is a photo of Dean Phillips, known as Baby T, #5 is a photo of Black T, #6 is a photo of Goldie, #7 is a photo of Rock and #8 is a photo of someone named Cueco who was at Clarendon Park on 11/16/92 but was not at the meeting. Joseph states that he was treated well by the police and Assistant States Attorney. Joseph states that he was not made any ~~statement~~ promises in return for his statement, nor was he threatened in any way. Joseph states that he has had chips and pizza to eat, Coke to drink and was allowed to use the bathroom. Joseph states that he is free from the effect of drugs and alcohol and appears free of their effects. Joseph states that he has read all 4 pages of this statement and has initialed any changes.

Joseph Brown Joe Magats ASA
DET. Thomas [illegible]

CCSAO 000102



N
S
E
Montrose
Alley
Sunnyside
Hazel
Agatite
Clarendon
Field House
Clarendon Park
1
2
3
4
1494
Exhibit #1
D: Joseph Brown
10/5/92




PLAINTIFF'S EXHIBIT 41

EXHIBIT 107


DT-016214
ALLEY
HAZEL
AGATITE
SUNNYSIDE
CLARENDON
FIELD HOUSE
CLARENDON PARK
EXHIBIT
Gardner #1
12-3-93
PENGAD-Bayonne, N. J.
tabbies
PLAINTIFF'S EXHIBIT
41A

PLAINTIFF'S EXHIBIT 42

EXHIBIT 112

EXHIBIT




DT- 016213

PLAINTIFF'S EXHIBIT 43

EXHIBIT 113

EXHIBIT 21




DT-016211

PLAINTIFF'S EXHIBIT 46

EXHIBIT 1
D: PAUL PHILLIPS 12-4-12

EXHIBIT 110

PENGAD 800-631-6989




DT-016212

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ALTON LOGAN,** | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 C 5471 |
| **CITY OF CHICAGO, et al.,** | ) | |
| Defendants. | ) | |

**ORDER**

Now before me are the parties' motions in limine, which are resolved as follows:

Defendants' Motions in limine

1) *To bifurcate trial*. This motion is denied. I am not persuaded that bifurcation of this case would be more efficient, or less prejudicial, than a consolidated trial.

2) *To bar any reference to plaintiff's certificate of innocence.* This motion is denied. Defendants' discussion of *res judicata* is irrelevant. On the issue of relevance, defendants' assertion of the wholly inapposite *Rodriguez v. Cook County, Ill.*, 664 F.3d 627, 629 (7th Cir. 2011), borders on the frivolous. The certificate is relevant at least to the "indicative of innocence" element of plaintiff's malicious prosecution claim, as well as to his damages.

On the issue of admissibility, I may take judicial notice of the certificate's issuance (a fact not subject to reasonable dispute), as indeed defendants' own authority recognizes. *U.S. v. Jones*, 29 F.3d 1546, 1553 (11th Cir. 1994) (while it is inappropriate to take judicial notice of another court's factual findings, a court may take judicial notice of another court's order "for the limited purpose of recognizing the 'judicial act' that the order represents"). Defendants argue that the certificate does not fall within the scope of the public records exception to the hearsay rule, but I am not persuaded that their cited authorities, *Jones, supra; Nipper v. Snipes,* 7 F.3d 415 (4th Cir. 1993); *Hillard v. City of Chicago*, No. 09 C 2017, 2010 WL 1664941 (N.D. Ill. Apr. 23, 2010) (Conlon, J.); and *Taylor v. City of Chicago*, No. 09 C 5092, 2012 WL 669063 (N.D. Ill. Feb. 29, 2012) (Shadur, J.), none of which deals specifically with certificates of innocence, compels that conclusion. The thrust of *Jones* and *Nipper* is that judicial findings of fact (which were included in the orders at issue in those cases, and portions of which were read aloud to the jury in both cases) are not covered by Rule 803(8). But plaintiff's certificate of innocence does not, on its face, include any judicial findings.[1] *Taylor,* which deals with a judicial finding

[1]The text of the order reads, in its entirety: "This matter coming to be heard on Alton Logan's Petition pursuant to 735 ISCS 5/2-702 *et seq.* for a Certificate of Innocence, due notice having

of no probable cause, relies on *Jones* (and a later 11th Circuit case citing *Jones*, *U.S. v. $125,938.62*, 537 F.3d 1287 (11th Cir. 2009)) without further analysis, while *Hillard,* which also addresses a judicial finding of no probable cause, holds only that that finding is not admissible under Rule 803(22), (judgments of previous convictions), which plaintiff does not rely upon here. Finally, on the issue of prejudice, defendants' argument that evidence of the certificate of innocence would unfairly prejudice defendants because "the jury may equate the court's finding with a determination as to the propriety of the defendant officers' actions" is without merit. *See Newsome v. McCabe*, No. 96 C 7680, 2002 WL 548725, at *5 (N.D. Ill. Apr. 4, 2002) (Plunkett, J.).

3) *To bar certain hearsay statements attributed to Andrew Wilson.* This motion is denied. I agree that Wilson's confession to his attorneys is an admissible statement against penal interest within the scope of Fed. R. Evid. 804(b)(3), as the Seventh Circuit has interpreted that Rule. *See U.S. v. Garcia*, 897 F.2d 1413, 1420 (7th Cir. 1990) (statement is against penal interest if it "would be probative in trial against the [declarant]"). Neither of the cases defendants cite--*U.S. v. Jones*, 600 F.3d 847 (7th Cir. 2010), and *U.S. v. Alvarez*, 266 F.3d 587 (6th Cir. 2001)--supports their

---

been provided to the People of the State of Illinois, it is hereby Ordered that: Petitioner's request for a Certificate of Innocence is granted."

argument that privileged statements generally are treated differently under this rule. *Jones* is entirely inapposite, and *Alvarez* stands, at best, for the narrow proposition that an incriminating statement made by a witness after receiving affirmative promises that his statement would *not* subject him to criminal charges cannot later be admitted as a statement against penal interest. In this case, by contrast, there is no evidence that Wilson believed his statements to be anything other than incriminating--to the contrary, evidence that he directed his lawyers to keep his confession secret until his death indicates an awareness that his statements could subject him to further criminal charges. Moreover, as both the *Alvarez* and *Garcia* courts recognized, the rationale behind Rule 804(b)(3) is that "reasonable people...tend not to make self-inculpatory statements unless they believe them to be true." *Alvarez*, 266 F.3d at 593. *See also Garcia,* 897 F.2d at 1420 (statement against interest is one that "a reasonable person in the declarant's position would not have made...unless the declarant believed it to be true."). As for Wilson's statements to his fellow inmates McDowell and Bivens, defendants contend that they are too unreliable to qualify under Rule 804(b)(3). But all of defendants' arguments in this connection target the trustworthiness not of Wilson's statements, but of the individuals to whom the statements were allegedly made. Defendants are certainly entitled to challenge the credibility of

these individuals and may do so through cross-examination; exclusion of their testimony about Wilson's statements is not the appropriate response to the issues defendants raise. Finally, I disagree that Wilson's statements to Rhonda Howse, the mother of his children, are either too vague or too unreliable to qualify under Rule 804(b)(3).

4) *To bar hearsay statements during the testimony of Thomas Bennett.* This motion is granted. Bennett signed an affidavit stating that before his death, detective Grunhard told Bennett (his former partner) that Burge had told him (Grunhard) that "one of the guys convicted in the McDonald's shootings was the wrong guy," and that "the right guy was Andrew Wilson." Plaintiff seeks admission of Burge's statement under Rule 801(d)(2)(E), as the statement of a co-conspirator made to another co-conspirator in the course of the conspiracy. But plaintiff does not identify Grunhard as a participant in the alleged conspiracy. Plaintiff acknowledges that neither Grunhard nor Bennett is a defendant in this case. While the fact of Grunhard's death in 1990 explains his omission as a defendant, it does not explain why acts attributed to him are absent from the record, if indeed plaintiff believes that those acts form part of the basis for his allegations of a conspiracy. Plaintiff's argument that Grunhard's non-alleged (and unsupported) involvement in the McDonald's investigation qualifies Grunhard as

a co-conspirator is without legal support. Among other things, plaintiff points to nothing in the record to suggest that Grunhard affirmatively agreed with any defendant to conceal evidence of Logan's innocence. Because the record does not allow me to conclude that Grunhard was a co-conspirator, Burge's alleged statements to him do not qualify for admission under Rule 801(d)(2)(E).

5) *To admit certain former testimony*. This motion is denied as to Grunhard, Murray, Downs, Karl, Wilson, and Bennett. It is further denied as to Gorman, who may be deposed in Florida. As to Trent, Parker, Owen, and Hope, the motion is denied without prejudice, and I will consider a narrowly tailored motion that indicates specifically which testimony defendants seek to admit.

6) *To bar any reference to allegations of physical abuse*. This motion is granted in part. It is denied as to Donald White, who testified that he told defendants that he knew Andrew Wilson and Edgar Hope were involved in the McDonald's killing and told them that he didn't know plaintiff, "but they didn't want to hear that." White testified that he was then abused by defendants and thereafter identified plaintiff as the McDonald's shooter because he was afraid of further police brutality. White's testimony is plainly relevant to plaintiff's *Brady* claim. Moreover, defendants

intend to challenge White's credibility at trial, and plaintiff is entitled to offer his testimony about police brutality as an explanation for his previous inconsistent testimony. The motion is granted, however, as to Derrick Martin, the Wilson brothers, and Anthony Williams. Plaintiff has not identified any evidence that these witnesses provided defendants with any information to exculpate plaintiff with respect to the McDonald's murder.[2] Accordingly, their testimony is not relevant to plaintiff's *Brady* claim. Indeed, plaintiff essentially acknowledges that the purpose of these other witnesses' testimony is to support White's testimony and bolster his credibility. But its relevance for that purpose is simply too far removed from the central issues in this case. Meanwhile, the likelihood of unfair prejudice against defendants is high.

7) *To bar any reference to defendant Burge's 2010 conviction*. This motion is denied. Even assuming that there is merit, in theory, to defendants' argument that a conviction should not be permitted for

[2]Plaintiff argues, "other witnesses knew that Andrew Wilson was the true perpetrator, but were abused by police officers and did not come forward with what they knew," but offers no evidence for this argument. In a footnote, plaintiff states, "Williams did tell some but not all the police officers he interacted with about Andrew Wilson's guilt," citing to "Exhibit B at 83-85 (Deposition of Anthony Williams)." But Exhibit B is an excerpt of Derrick Martin's deposition testimony, not Anthony Williams's. And while Exhibit C contains an excerpt of Williams's deposition testimony, pages 83-85 do not support plaintiff's assertion.

impeachment where there is no testimony to impeach, the argument ignores that in this case, hearsay statements by Burge are apparently among the evidence the jury will weigh, and that these statements subject Burge's credibility to attack under Fed. R. Evid. 806, regardless of whether he takes the stand. And there remains the further issue of defendants' proffered expert, Anne Bremner, who explicitly discusses the charges leading up to Burge's 2010 conviction, then opines that it would be unfair to Burge to infer--as if it were an open question--that Burge was guilty of those charges on the basis of his invocation of the Fifth Amendment in that case. Her legal argument may be correct as far as it goes; but defendants are not entitled to use a factually incomplete picture of Burge's perjury case to defuse the possibility that the jury will draw an adverse inference (as all agree it is entitled to do) from his invocation of the Fifth Amendment in *this* case.

8) *To bar witnesses who intend to invoke the Fifth Amendment from being called to testify*. This motion is denied. As Judge Kennelly recently held, "plaintiff is not required to accept a stipulation in lieu of proving a point at trial." *Jimenez v. City of Chicago*, ---F. Supp. 2d---, 2012 WL 2863259, at *21 (July 11, 2012), distinguishing *Old Chief v. United States*, 519 U.S. 172 (1997), which defendants also cite here. Plaintiff's examination of each Fifth Amendment witness, however, will be limited to twenty

questions, and plaintiff must of course have a good faith basis for each.

9) *To bar reference to other lawsuits, other claimed incidents or defendants' disciplinary histories.* This motion is granted. Plaintiff does not claim to have been subjected to abusive police interrogations. He insists that evidence of defendants' other bad acts is relevant to *modus operandi*, intent, opportunity, preparation and plan–but with respect to what element of his claims? As discussed above with respect to defendants' sixth motion in limine, the claims asserted in this case are based on the non-disclosure and concealment of exclupatory evidence. The type of evidence at issue in this motion simply does not evince an intent (or plan, opportunity, or preparation etc.) to do anything relevant to these claims. The primary relevance of this evidence is, again, to support Donald White's explanation for his previous testimony incriminating plantiff.[3]

10) *To bar reference to evidence of prior bad acts, arrests, and*

[3]Plaintiff argues, for example, "[t]o the extent that the Defendants claim that they had no intent to coerce a statement from White, then Plaintiff is entitled to present evidence demonstrating otherwise," and continues: "In dispute is whether Defendants used physical violence, amongst other methods, to coerce a false statement from White, and if Defendants had an intention to use violence, then it makes it more likely that they did use violence." But the "dispute" referenced here is tangential to plaintiff's claims.

*general character attacks on witnesses Anthonette Dawson and Alvin Thompson.* This motion is granted as agreed by the parties.

11) *To bar testimony from Terrance Babers, Wilbur Cooley and Joseph Prendergast.* This motion is denied. The difficulties defendants describe in obtaining the depositions of these third-party witnesses are nothing like those that led the court to bar trial testimony in the cases defendants cite, *Johnson v. J.B. Hunt Transport, Inc.*, 280 F.3d 1125 (7th Cir. 2002) (testimony of witness barred as sanction for "unprofessional" and "abusive" conduct during discovery, including repeated failure to produce witness for deposition), and *Bronk v. Ineichen*, 54 F.3d 425 (7th Cir. 1995) (witnesses not disclosed in final pre-trial order). Here, by contrast, there is no indication (indeed, defendants do not even contend) that plaintiff or his counsel is responsible for defendants' alleged inability to depose these witnesses. Moreover, Prendergast has explicitly stated his willingness and availability to be deposed. As to the other two witnesses, defendants could have, but did not, raise, during discovery, the difficulties they apparently had in serving them with deposition subpoenas, which might have avoided the prejudice they now claim will result if these witnesses testify.

12) *To bar certain witnesses disclosed relative to the since*

*dismissed "widespread practice" claim.* This motion is granted for substantially the reasons discussed in my rulings above as to defendants' sixth and ninth motions in limine.

13) *To preclude evidence or argument regarding plaintiff's "street files" claim already dismissed on summary judgment.* This motion is granted as follows: I agree that plaintiff may not introduce evidence of a "street files" practice for the purpose of establishing, as plaintiff apparently intends to do, defendants' "regular practice of trying to hide things." As all agree, the "street file" at issue in this case was not, in fact, "hidden" from plaintiff's attorney. This ruling does not, however, necessarily preclude any reference to the "street file" in this case or the contents thereof, and, if referenced, plaintiff is entitled to introduce evidence necessary to enable the jury to understand what is meant by a "street file."

14) *To preclude speculative arguments concerning Wickliffe's .38 caliber revolver and an alleged lineup at Cook County Jail.* This motion is denied. There is sufficient evidence in the record to justify good-faith questions on these topics. Defendants are free to present the evidence they believe rebuts plaintiff's version of these issues.

15) *To bar evidence or argument inconsistent with the law of probable cause.* This motion is denied. If what defendants are really getting at is the admissibility of the so-called Celovsky memo, neither the formulation of their argument-which, I note, invokes no evidentiary rule or principle-nor their cited authorities establish any basis for its exclusion. I agree with plaintiff that defendants' argument is better suited to a dispute about jury instructions, not a dispute about the admissibility of evidence.

16) *To bar the proffered testimony of Dr. Jennifer Dysart on the issue of eyewitness identification.* This motion is granted. The thrust of Dr. Dysart's testimony is to cast doubt on the reliability of the testimony of the witnesses who identified plaintiff as Wickliffe's killer in his underlying criminal proceedings. But this case is not a retrial of plaintiff, and while I acknowledge that evidence pointing toward, or against, his guilt has some tangential relevance to the issues in this case, the examination of Dr. Dysart would take the case in a direction too far afield from the central issues to be decided. Moreover, to the extent Dr. Dysart's report opines on the central issue here-whether defendants deliberately orchestrated lineups in such a way as to incriminate plaintiff-plaintiff does not dispute that Dr. Dysart answered "no" to the question: "In your entire review of the

materials, were you able to find any record support for any allegation that either Jon Burge, George Basile, Joseph DiGiacomo, James Pienta, Thomas McKenna, Fred Hill, or Anthony Katalinic conducted an improper lineup?"[4]

17) *To bar the proffered police practices testimony of Russell Fischer.* This motion is denied. Unlike the proposed testimony of Dr. Dysart, discussed above, the proposed testimony of Mr. Fischer relates directly to the issue of whether defendants deliberately handled the McDonald's investigation in such a way as to inculpate plaintiff, regardless of his guilt. Defendants' lead argument that Mr. Fischer is not qualified to offer an expert opinion on whether defendants' investigation of the McDonald's murders was consistent with normal police practices is without merit. I am not persuaded that an understanding of how police investigations are carried out is within the ken of the average juror, and, in any event, "[i]f an expert's testimony is helpful to the jury, it is admissible even if it "'cover[s] matters that are within the average juror's comprehension.'" *Wells v. City of Chicago*, No. 09 C 1198, 2012 WL 116040, at *10 (N.D. Ill. Jan. 16, 2012) (Kennelly, J.) (expert

[4]Unhelpfully, defendants have omitted from the cited exhibit the page on which they say this testimony appears. Nevertheless, I presume that if the testimony were misquoted or otherwise mischaracterized, plaintiff would have brought this to my attention. Since he has not, I assume that the quotation in defendants' brief accurately reflects the record.

qualified on the basis of his "extensive background in law enforcement" to opine that "under the facts of the case, proper police procedure would require" certain actions) (citation omitted). Nor do I conclude that Fischer's opinions inappropriately make credibility determinations. While expert opinions must have some basis in the record, they need not rely only on undisputed facts. *Id.* at *11. Defendants' remaining objections to Fischer's opinions are without merit for reasons discussed elsewhere in this order.

18) *To bar any reference to the City as a party and to omit the City as a defendant on the verdict form.* This motion is granted. Plaintiffs object to the motion on the ground that, although all claims against the City have been dismissed, the City may yet be responsible, under the theory of *respondeat superior*, for unspecified tortious acts of unspecified agents other than Burge and Basile (who are named in the state law counts, and as to whose alleged acts the City agrees were within the scope of their employment). Any such claims were either dismissed at summary judgment, or have not been properly disclosed and pursued in the course of litigation. *Prate v. Village of Downers Grove*, 2011 WL 5374100, at *6 (N.D. Ill. Nov. 11, 2011) (St. Eve, J.), is not to the contrary. In that decision, the court merely declined to dismiss, at the pleading stage, *respondeat superior* claims against

the defendant city, even though the individual officers whose conduct was at issue could not be named as defendants because the limitations period as to claims against them had run. The problem here is not merely that plaintiff declined to name additional City agents in his pleading, it is that he failed to develop evidence as to the conduct of such agents over the course of this litigation. I agree that it would be unfair to defendants for plaintiff to claim, for the first time at trial, that such other City agents committed torts for which the City should be held liable.

Plaintiff's motions in limine

1) *To bar argument or suggestion that Andrew Wilson's criminal defense lawyers are responsible for plaintiff's injuries.* This motion is granted. Wilson's former attorneys are not on trial. Even assuming that the lawyers' decision not to share exculpatory evidence with plaintiff's defense counsel was in some way culpable, that decision has no bearing on defendants' potential liability under *Brady* for their own failure to disclose exculpatory evidence allegedly in their possession. This is true regardless of how a jury may view the lawyers' credibility. In any event, the lawyers' silence cannot, as defendants argue, reasonably be deemed the "sole proximate cause" of the constitutional violations plaintiff asserts. Finally, because it is irrelevant whether ethical rules did, in fact, prevent Wilson's lawyers from coming forward with

exculpatory evidence, the testimony and report of Thomas Fitzpatrick, who opines on this issue, is not admissible.

2) *To bind defendants to their privilege assertions.* This motion is granted to the extent it seeks to prevent defendants from answering questions they previously declined to answer in reliance on their Fifth Amendment rights. Defendants are not, however, precluded from testifying that their decision to assert their Fifth Amendment rights was on the advice of their counsel.

3) *To admit statements of Andrew Wilson, Edgar Hope, and Jon Burge.* This motion is granted as to Wilson's statements for reasons discussed in relation to defendants' motion in limine no. 3. It is also granted as to Hope's statements to his attorney for similar reasons. Hope's statement to Ronald Kliner, "you know [plaintiff], he's innocent. He's on my case," is also admissible. While the statement does not amount to a confession, it nevertheless qualifies as a statement against Hope's penal interest because it reflects knowledge about the crime that Hope would have had because of his own involvement. *See U.S. v. York*, No. 86 CR 315, 1989 WL 65167, at *4 (N.D. Ill. Jun. 9, 1989) (Williams, J.). The motion is denied as to Burge's statement to Grunhard for reasons discussed in conjunction with defendants' motion in limine no. 4.

4) *To bar reference to street gangs*. This motion is granted. The parties dispute whether plaintiff was a member of the Gangster Disciples street gang thirty years ago. Defendants argue that evidence that plaintiff was a gang member is relevant to impeach plaintiff's testimony that he did not know Andrew Wilson (who the parties agree was "undoubtedly" a gang member) prior to the McDonald's murder, and that it further suggests a bias in Wilson's hearsay testimony. But any probative value this evidence may have is clearly outweighed by the risk of prejudice to plaintiff.

5) *To bar all references to Mr. Logan's arrests or criminal convictions.* This motion is granted in part. The parties do not appear to dispute that plaintiff's arrests that did not lead to convictions are inadmissible.[5] Defendants argue, however, that plaintiff's criminal record is relevant to establish 1) that plaintiff knew Wilson and Hope, 2) that defendants had probable cause to prosecute plaintiff, 3) that plaintiff had a motive to murder Lloyd Wickliffe, and 4) plaintiff's damages. I am persuaded only as to the damages issue. The opinion of plaintiff's expert Terry Kupers makes reference to plaintiff's experiences in prison

[5]Plaintiff seeks to carve out an exception for one incident, prior to the McDonald's murder, in which defendant Burge arrested plaintiff. Plaintiff asserts that this evidence is relevant to establish that Burge bore plaintiff animus, and that it should be admitted for that purpose and that purpose only. Defendants do not appear to object to the use of the evidence for that limited purpose.

prior to the sentence he served for the Wickliffe murder. Plaintiff cannot have it both ways, advancing a damages theory that relies on reference to his past prison experience, on the one hand, while barring any reference to his criminal record on the other. That said, while defendants are entitled to refer to plaintiff's previous incarceration, they will not be permitted to explore the details of his previous felony convictions, all of which are presumptively inadmissible under Fed. R. Evid. 609(b).

6) *To bar reference to various bad acts committed by Mr. Logan.* This motion seeks to bar reference to 1) various events plaintiff characterizes as "childhood infractions," 2) plaintiff's discharge from the Army, 3) plaintiff's possession of homemade knives while incarcerated, and 4) plaintiff's employment status before 1983. The motion is granted as to items 1 and 2 and denied as to items 3 and 4. Plaintiff's unemployment at the time of his conviction is relevant to his damages calculation. And, because plaintiff's own expert discusses, in the course of his analysis of the psychological damage plaintiff suffered as a result of his incarceration, plaintiff's possession of homemade knives or "shanks," it would be inappropriate to preclude defendants from referencing the same.

7) *To bar Thomas Durkin as a testifying expert for defendants.* This motion is granted. Defendants do not claim that Mr. Durkin's proposed testimony is offered for any purpose other than to rebut the testimony of plaintiff's expert Dr. Dysart, which I have excluded for the reasons set forth in my discussion of defendants' motion in limine no. 16.

8) *To bar undisclosed and irrelevant witnesses from testifying at trial.* This skeletal, three-page motion seeks a blanket ruling that thirty-four individuals on defendants' witness list are barred from testifying because they were not disclosed, have no relevant testimony to offer, or both. With the exception of Charles Harris, whose testimony the parties agree is unnecessary, I decline to grant this motion on its present terms. The record reveals that witnesses Hogan, Frum, Kapture, Leifheit, Wilson, and Meeks were, contrary to plaintiff's assertion, disclosed in a supplementary discovery response dated May 3, 2011, and that witness Madden was disclosed during the deposition of Derrick Martin. Defendants agree that witness Hill, who was previously withdrawn from the witness list, will not be called unless for impeachment testimony. Although plaintiff states that the remaining witnesses identified in the motion are irrelevant, he makes no reasoned argument in this connection.

9) *To bar reference to defendants' allegations that Mr. Logan or his brother threatened defense counsel.* This motion is granted. No such reference would have any probative value as to any issue at this trial.

10) *To bar reference to a fight between Mr. Logan and his girlfriend and allegations that Mr. Logan was unfaithful.* This motion is granted for the same reason as the previous motion.

11) *To bar references to plaintiff's prison disciplinary history.* This motion is denied. Plaintiff intends to testify to the conditions of his incarceration in support of his claim for damages. Defendants are entitled to probe this topic, including with evidence of plaintiff's own conduct while incarcerated. Plaintiff claims that this evidence is unfairly prejudicial, but that is not necessarily true. Indeed, plaintiff himself observes, "details of Mr. Logan's prison disciplinary history will give the jury a better picture of how terrifying Mr. Logan's 26 years of wrongful incarceration were for him."

12) *To bar reference to collateral source payments.* This motion is granted. Defendants are free to press their construction of the certificate of innocence through legal argument based upon the text of the statute. Evidence that plaintiff was paid pursuant to the

statute is of no meaningful probative value to the issues in this case and is outweighed by the likelihood of prejudice.

13) *To refer at trial to certain former state's attorneys as "counselor" rather than "judge."* This motion is granted as unopposed.

14) *To bar reference to criminal convictions of third-party witnesses.* This motion is granted in part. I agree that the details of the crimes for which McDowell, Bivens, and Kliner were convicted are not relevant to any issue in this case. Defendants are, however, entitled to cross-examine these witnesses and test their credibility, including by asking questions relating, for example, to affidavits they signed in other cases. As for Jackie Wilson, it is impossible to determine on anything other than an issue- or question-specific basis whether reference to his convictions are, or are not, relevant to the issues in this case.

15) *To bar references to illegal drugs and alcohol.* This motion is granted.

16) *To bar Edgar Hope and Jerome Johnson from testifying and to bar reference to their invocation of the Fifth Amendment.* This motion is granted. It may, indeed, be permissible to draw an adverse

inference "*against a witness* who pleads the Fifth Amendment even if that witness is not a party." *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 983 F.2d 800, 802 (7th Cir. 1993) (emphasis added). But no adverse inference that might be drawn against the witnesses who invoked the Fifth Amendment in response to the questions posed is relevant to the issues in this case. For example, Hope was asked, "Isn't it true that the person who entered the McDonald's with the shotgun was Alton Logan?" Hope's invocation of the Fifth Amendment could, in a civil case, be construed as evidence that a truthful answer would have revealed Hope's own involvement in the crime (even if the truthful answer were "no."). But the permissible adverse inference that *Hope* was involved in the crime does not make it any more or less likely that *Logan* was. Accordingly, Hope's invocation of the Fifth Amendment is irrelevant to any issue here. Defendants similarly fail to explain how any adverse inference that might be drawn against Smith from his invocation of the Fifth Amendment in response to the question: "Isn't it true, sir, that you witnessed Alton Logan at the McDonald's on January 11, 1982 shoot Lloyd Wickliffe with a shotgun?" is relevant to this case.

17) *To bar defendants from showing any videotaped portion of Gail Hillard's deposition.* This motion is granted as unopposed.

18) *To bar reference to jurors as taxpayers.* This motion is granted as unopposed.

19) *To bar reference to various bad acts committed by Donald White.* This motion is granted in part. Mr. White's testimony is a key element of plaintiff's case, and defendants are entitled, pursuant to Fed. R. Evid. 608 and 609, to impeach his credibility with evidence of his conviction for crimes involving dishonesty and evidence showing his character for untruthfulness. In this case, I conclude that all of Mr. White's convictions for crimes involving dishonesty are admissible. While it is true that Rule 609(b) presumptively bars convictions that are over ten years old, the jury in this case will be asked to assess Mr. White's credibility not only with respect to statements he makes on the stand, but also in considering statements he made in 1982, 1989, 2000, and 2010. Rule 403 considerations also do not require excluding this evidence. Mr. White is not a party in this case, so the relevance of the evidence to his credibility (and, indeed, the importance of his credibility to plaintiff's claims) is not substantially outweighed by the risk of unfair prejudice. The jury is not likely to conclude, improperly, that *plaintiff* is not entitled to relief simply because it may conclude, based on Mr. White's past convictions, that *Mr. White* is a bad person. Nor are these convictions needlessly cumulative to other evidence, since Mr.

White's "character for truthfulness" is at issue, and evidence of one conviction does not have the same weight, in this regard, as evidence of multiple convictions.

I also see no basis for excluding Mr. White's own testimony about his commission of uncharged crimes of dishonesty. The case plaintiff cites in this connection, *U.S. v. Davis*, No. 99 C 928, 2001 WL 1195729 (N.D. Ill. Oct 9, 2001) (Kennelly, J.), does not militate in favor of exclusion, since, among other distinctions, the uncharged crime in that case was defendant's own (so the risk of prejudice was significant), and the evidence of the crime was not the defendant's own admission, but instead the testimony of one of the state's witnesses.

Nevertheless, defendants overreach with the suggestion that Mr. White's "entire criminal history" is admissible.[6] I am not persuaded, for example, that evidence of Mr. White's arrests not leading to convictions, or convictions more than 10 years old for crimes not involving dishonesty, are sufficiently probative of his credibility to be admissible.

Finally, the parties appear to agree that incidents they vaguely refer to as occurring in Aurora are not relevant to any

---

[6]They caption their first argument, "Mr. White's Entire Criminal History is Relevant to the Jury's Assessment of his Credibility and not Defeated by Fed. R. Evid. 404(b) or 403," but their brief does not specifically address every item plaintiff seeks to bar in his motion. Accordingly, I assume they agree not to offer evidence of bad acts other than those addressed, and that I conclude here are admissible.

issue in this trial, so I presume that neither side intends to offer evidence relating to these incidents.

20) *To bar speculation from Donna Parker.* This motion is granted. Defendants argue that Parker's proffered testimony about the meaning of the phrase, "[plaintiff] states that he was under the influence of alcohol at the time of this offense," which she wrote in plaintiff's presentence investigation report, is akin to evidence held admissible in *Newton v. Ryder Transp. Services*, 206 F.3d 772 (8th Cir. 2000). In that case, the appellate court concluded that the lower court should have admitted the deposition testimony of a police officer in which he read the contents of an accident report he had written about the plaintiff's traffic accident. The Eighth Circuit held that it was error to exclude the contents of the report (which "indicated that [the plaintiff] stated that he fell asleep behind the wheel and that he was wearing a seat belt at the time of the accident"), rejecting the plaintiff's argument that the officer "had no knowledge" of the "origin of the statement," that is, whether the statement reflected in the report was based on information obtained from the plaintiff or from someone else. *Id.* at 774-75. The court concluded, based on the officer's credible testimony about his record-writing practices and his belief that the information could have come from only one source--the plaintiff--that the evidence met the

requirements of Fed. R. Evid 803(5). That rule, which defendants assert here, permits the admission of a "record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly." *Newton*, 206 F.3d at 774.

In this case, however, there is no dispute about the origin of the statement in Ms. Parker's report. Plaintiff does not deny making the statement it attributes to him. Indeed, I do not construe plaintiff's motion as seeking to exclude the statement itself. What plaintiff seeks to bar is Ms. Parker's testimony in which she interprets the statement's meaning. I agree that exclusion of this evidence is proper. Nothing Ms. Parker could properly testify to, i.e., about which she has personal knowledge, is relevant to what plaintiff meant by the statement.

21) *To bar the testimony of Erich Speckin.* Oral argument on this motion is set for October 31 at 10:30.

Dated: 10/19/2012

Elaine E Bucklo

## CERTIFICATE OF SERVICE

I certify that I filed the attached Separate Supplemental Appendix of Plaintiff-Appellee, electronically via the CM/ECF system on May 6, 2019. All counsel of record in this appeal are registered CM/ECF users and thus will be served electronically via the CM/ECF system on May 6, 2019.

/s/ Stuart J. Chanen
Stuart J. Chanen, Attorney